IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
IN ADMIRALTY

IBERIABANK, A LOUISIANA STATE
BANK

    *Plaintiff,*

v.

BG CAPITAL MANAGEMENT SOUTH
FLORIDA, LLC, A FLORIDA LIMITED
LIABILITY COMPANY; BG 1
LAZZARA, LLC, A FLORIDA LIMITED
LIABILITY COMPANY; BG BOAT,
LTD., A FLORIDA LIMITED
COMPANY; ROBERT GENOVESE, *IN
PERSONAM;* AND THE M/Y BG, *IN
REM,*

    *Defendants.*

CIVIL ACTION NO. _____

IN ADMIRALTY // FRCP 9(h)

## VERIFIED COMPLAINT

  Plaintiff, IBERIABANK, a Louisiana state bank ("IBERIABANK" or "Plaintiff") brings

this Verified Complaint against the above-named Defendants, BG Capital Management South

Florida, LLC, a Florida limited liability company, BG 1 Lazzara, LLC, a Florida limited liability

company, BG Boat Ltd., a Florida limited company, Robert Genovese, an individual ("Robert

Genovese"), and the vessel M/Y BG (Official No. 70683), Her Engines, Boilers, Tackle,

Furniture, Apparel, Bunkers, Appurtenances, etc., *in rem*, alleges as follows:

## THE PARTIES

  1.  IBERIABANK is a Louisiana state-chartered bank organized and existing under

the laws of the State of Louisiana that is authorized to transact and currently transacts business in

the State of Florida.

2.      The *in rem* Defendant M/Y BG is, upon information and belief, a motor yacht, approximately 75 feet in length, with a gross tonnage of 91 GT.

3.      Defendant BG Capital Management South Florida, LLC, is Florida limited liability company with its principal place of business in Florida.

4.      Defendant BG 1 Lazzara, LLC, is a Florida limited liability company with its principal place of business in Florida.

5.      Defendant BG Big Boat, LTD. is a company organized under the laws of the Cayman Islands.

6.      Defendant Robert Genovese is an individual who, upon information and belief, is a citizen of Canada.

<u>**JURISDICTION AND VENUE**</u>

7.      This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiff invokes the maritime procedures and special relief provided in Rules B and C of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure for the arrest and attachment of the M/Y BG, Her Engines, Boilers, Tackle, Furniture, Apparel, Bunkers, Appurtenances, etc.

8.      Subject matter jurisdiction of this Honorable Court is based upon 28 U.S.C. § 1333 and the Commercial Instruments and Maritime Lien Act, 46 U.S.C. §§ 31301-31343. *In rem* jurisdiction over the M/Y BG is appropriately exercised, as the vessel is now or will be, during the pendency of this action, within the Southern District of Florida, and may be attached and arrested in accordance with the provisions of Rules B and C, as pled below.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## FACTS AND CLAIM

10.     On or about January 14, 2015, defendants BG Capital Management South Florida, LLC, and BG 1 Lazzara, LLC ("Borrowers") executed and delivered that certain Term Note in the amount of One-Million Seven Hundred Fifteen Thousand and 00/100 Dollars ($1,715,000.00) (the "Term Note"), and as evidenced by that certain Loan Agreement dated January 14, 2015, along with that Addendum to Loan Agreement dated March 17, 2015 (collectively, the "Loan Agreement") and secured by that certain First Preferred Ship Mortgage on the vessel M/Y BG (the "Mortgage").  A true and correct copy of the Term Note, Loan Agreement, and Mortgage are attached hereto at Composite Exhibit A and are incorporated as if fully set out herein.

11.     The Loan was secured by the guarantee of Corporate Guarantor BG Big Boat, LTD., and the guarantee of Robert Genovese, an individual.  A true and correct copy of each Guaranty is attached hereto at Composite Exhibit B and incorporated as if fully set out herein.

12.     Subsequently, Borrowers defaulted and on or about July 20, 2017, Borrowers and IBERIABANK entered into a series of modifications including that certain First Addendum to Term Note dated July 20, 2017 (the "First Addendum to Term Note"), along with that certain "First Addendum to Loan Agreement (the "First Addendum") and that certain Security Agreement dated July 20, 2017 (the "Security Agreement").  A true and correct copy of the First Addendum to Term Note, First Addendum and Security Agreement are also attached hereto at Composite Exhibit C and incorporated as if fully set out herein.  All documents associated with the Loan are referred to herein as the "Loan Documents."

13.     Borrowers have again defaulted in their obligations under the Loan Documents in that they have failed to make payments when due.

31141447 v1

14.     Upon information and belief, other events of default have occurred under the Loan Documents which may result in the deterioration of the underlying collateral.

## FIRST CAUSE OF ACTION // FORECLOSURE OF FIRST PREFERRED SHIP MORTGAGE

15.     IBERIABANK repeats and re-alleges the preceding paragraphs set forth above as if alleged herein.

16.     IBERIABANK holds a First Preferred Ship Mortgage on the M/Y BG.

17.     Pursuant to the Commercial Instruments and Maritime Lien Act, 46 U.S.C. §§ 31301-31343, and in light of Borrowers' default, IBERIABANK is entitled to foreclose its Mortgage on the subject Vessel.

## SECOND CAUSE OF ACTION // SUPPLEMENTAL RULE C RELIEF

18.     IBERIABANK repeats and re-alleges the preceding paragraphs set forth above as if alleged herein.

19.     Pursuant to the Federal Maritime Law, Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions, IBERIABANK is entitled to arrest the M/Y BG to enforce its maritime lien.

## THIRD CAUSE OF ACTION // SUPPLEMENTAL RULE B RELIEF

20.     IBERIABANK repeats and re-alleges the preceding paragraphs set forth above as if alleged herein.

21.     Upon information and belief, Defendant Robert Genovese is not located within this District and/or not otherwise subject to service of process which may be issued from this Honorable Court.  However, property belonging to said Defendant in the form of the M/Y BG, Her Engines, Boilers, Tackle, Furniture, Apparel, Bunkers, Appurtenances, etc., is or during the pendency of litigation will be within the jurisdiction of this Honorable Court.

4

31141447 v1

22.     Therefore, a Writ of Attachment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, Fed. R. Civ. P. may issue to attach the M/Y BG, Her Engines, Boilers, Tackle, Furniture, Apparel, Bunkers, Appurtenances, etc., as the property of the Defendants.

## RELIEF REQUESTED

WHEREFORE, IBERIABANK demands and prays for the following relief:

A.   That process *in rem* pursuant to Rule C of the Supplemental Rules for Certain Admiralty and Maritime Claims be issued against Defendant M/Y BG, Her Engines, Boilers, Tackle, Furniture, Apparel, Bunkers, Appurtenances, etc., placing the vessel under the arrest, custody and control of the United States Marshals Service of this District;

B.   That process in due form issue against Defendant Robert Genovese pursuant to Rule B Supplemental Rules for Certain Admiralty and Maritime Claims, and levy a Writ of Attachment against the M/Y BG, Her Engines, Boilers, Tackle, Furniture, Apparel, Bunkers, Appurtenances, etc., as the property of the Defendant;

C.   That all persons claiming an interest in the M/Y BG and the aforesaid chattels found aboard the vessel be cited to appear and answer all and singular the matters aforesaid;

D.   That IBERIABANK have judgment hereon in the amount of $1,129,660.42 together with pre-judgment and post-judgment interest, attorneys' fees and costs, including but not limited to *custodia legis* expenses incurred in connection with the requested arrest and/or attachment of the M/Y BG;

E.   That the Defendant M/Y BG, Her Engines, Boilers, Tackle, Furniture, Apparel, Bunkers, Appurtenances, etc., and all other appurtenances and additions, improvements, and

31141447 v1

replacements belonging thereto, be condemned and sold to pay the demands and claims aforesaid; and,

F. That Plaintiff may have such other, further and different relief as the Court deems just and proper.

**BURR & FORMAN LLP**

*/s/ Michael S. Waskiewicz*
Michael S. Waskiewicz
Florida Bar No. 693642
Courtney Oakes
Florida Bar No. 106553
50 N. Laura Street, Suite 3000
Jacksonville, Florida 32202
(904) 232-7204 (telephone)
(904) 232-7201 (facsimile)
Email: MWaskiewicz@burr.com

Attorneys for Plaintiff, IBERIABANK

**INSTRUCTIONS FOR CLERK OF COURT AND U.S. MARSHAL:**

Please issue Warrant of Arrest and Writ of Attachment, which can be served on the M/Y BG (vessel), which is now lying afloat at or near the Miami Beach Marina, 300 Alton Road, Miami Beach, FL 33139, Slip # D-22.

## VERIFICATION

State of Florida

County of _L E E_

 

       I, Paul Cotoni, Jr. being duly sworn, deposes and says:

       23.    I am a Vice President of Special Assets.

       24.    I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge.

       25.    The reason I make this verification is that Plaintiff IBERIABANK is a Louisiana state-chartered bank and I am a Vice President of Special Assets with IBERIABANK.

       26.    The source of my information and the grounds of my belief are documents and information supplied to me by employees of IBERIABANK, review of records kept in the ordinary course of Plaintiff's business, and by reviewing IBERIABANK's file relating to these Defendants.

       27.    I am authorized to make these representations on behalf of Plaintiff IBERIABANK.

 

Paul Cotoni, Jr.

 

NOTARY PUBLIC

SWORN to and subscribed before me, this the 8ᵗʰ day of February, 2018.

NOTARY PUBLIC

My commission expires on _1-19-19_

JOYCE TORR
Notary Public - State of Florida
My Comm. Expires Jan 19, 2019
Commission # FF 162859

31141447 v1

01/28/15 09:49:54 BGT

5300402540

## TERM NOTE

$1,715,000.00                                                    January 14, 2015

FOR VALUE RECEIVED, **BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC**, a Florida limited liability company, and **BG 1 LAZZARA, LLC**, a Florida limited liability company (collectively, jointly, and severally, the "Borrower"), promise to pay to the order of **IBERIABANK**, a Louisiana state-chartered bank, and its successors and assigns as their interests may appear ("Lender"), at its office at 200 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, FL 33301 (or at such other place as the Lender may designate), the sum of **ONE MILLION SEVEN HUNDRED FIFTEEN THOUSAND AND 00/00 US DOLLARS ($1,715,000.00)** ("Loan"), together with accrued and unpaid interest thereon to be paid as required by the terms of this Promissory Note ("Note"). This Note is executed by Borrower in conjunction with that certain Loan Agreement, dated as of even date herewith, between Lender and Borrower ("Loan Agreement"). Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Loan Agreement.

**Interest Rate.** Interest on this Note shall accrue from and after January 14, 2015 at an annual rate equal to the 30-Day LIBOR Rate plus Three percent (3.00%) ("Interest Rate"). If the LIBOR Rate becomes unavailable during the term of this Note, the Lender may designate a replacement rate after notice to Borrower. The LIBOR Rate will be adjusted approximately every 30 days, beginning on the first Banking Day of the month following closing and on the first Banking Day of each month thereafter. For purposes of this Note, "LIBOR Rate" shall mean the rate per annum quoted by Lender based upon quotes from the London Interbank Offered Rate from the British Bankers Association Interest Settlement Rates, as quoted for U.S. Dollars by Bloomberg or other comparable services selected by the Lender for determining LIBOR Rate. The LIBOR Rate is to be strictly interpreted and is not intended to serve any other purpose other than providing an index to determine the interest rate used herein. The LIBOR Rate may not necessarily be the same as the quoted offered side in the Eurodollar time deposit market by any particular institution or service applicable to any interest period and is not the lowest rate at which the Lender may make loans to any of its customers, either now or in the future. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum interest rate allowed by applicable law. Interest shall be paid in arrears and shall accrue daily and be calculated on the basis of a 360-day year and the actual number of days elapsed in any partial calendar month.

Notwithstanding the foregoing, if at any time during the term of the Loan (or any extensions thereof) the average daily deposit held in deposit or investment management account(s) with the Bank held in the name of the Borrower should fall below Five Hundred Thousand and 00/100 US dollars ($500,000.00) or if Borrower should otherwise fail to maintain such account, then the Interest Rate will be automatically adjusted (effective the next Payment Date) to an annual rate equal to 30 Day LIBOR Rate plus five and 00/100 percent (5.00%) for the remainder of the term of the Loan (and any extensions thereof) unless Borrower or the Account Holders restore the required minimum average daily deposit to Five Hundred Thousand Dollars ($500,000.00) in which case the Interest Rate will automatically be adjusted (effective the next Payment Date) to an annual rate equal to 30 Day Libor plus three percent (3.00%).

**Payment and Maturity Date.** Commencing on February 15, 2015, and on the 15th day of each succeeding month during the five (5) year term of this Note (each such date is called a "Payment Date"), Borrower shall pay to the Lender monthly installments of principal and interest as follows:

(a)     From February 15, 2015 to December 15, 2019 (59 payments), the Borrower shall pay consecutive installments of principal in the amount of

## COMPOSITE EXHIBIT A

C
L-23

Nine Thousand Five Hundred Twenty-Seven and 77/100 U.S. Dollars ($9,527.77) plus accrued interest.

(b) On January 14, 2020 ("Maturity Date"), Borrower shall pay the entire unpaid principal amount and any interest and fees accrued, unless sooner accelerated pursuant to this Note or other Loan Documents.

Bank shall debit (or ACH) any deposit accounts maintained by Borrower for principal and interest payments or any other amounts Borrower owes Bank under the Loan Documents when due. These debits (or ACH activity) shall not constitute a set-off.

All payments on account of the Indebtedness evidenced by this Note shall be applied first to outstanding costs and fees of Lender, then to accrued and unpaid interest and the remainder to principal.

This Note is subject to the terms and conditions of the Loan Agreement and Preferred Ships Mortgage and is secured by the security interests and liens granted thereunder and pursuant to other documents, agreements, and instruments executed in connection with the Loan Agreement by the Borrower and/or Guarantor of the Borrower (as amended, the "Loan Documents"). This Note is made and delivered pursuant to the Loan Agreement, and Preferred Ships Mortgage, and other Loan Documents, and is subject to the further terms and conditions thereof, including the right of the holder to accelerate payment of the principal of and accrued and unpaid interest on this Note and to exercise other remedies upon the occurrence of an Event of Default and the required prepayment of principal of this Note upon certain other events or conditions, all of which are hereby incorporated and made a part of this Note by reference.

Any waiver of any payment due hereunder or the acceptance by the Lender of partial payments hereunder shall not, at any other time, be taken to be a waiver of the terms of this Note or the Loan Agreement or any other agreement between the Borrower and the Lender.

Each Borrower and Guarantor of this Note, jointly and severally, hereby waives the following: (1) demand, presentment, protest, notice of dishonor, suit against any party, exhaustion of legal remedies, and all other requirements necessary to charge or hold any party liable on any Obligation under this Note or the Loan Agreement; (2) any further receipt for or acknowledgment of the Collateral now or hereafter deposited; (3) statement of Indebtedness; and (4) the right to interpose any set-off or counterclaim of any nature or description in any litigation in which the Lender, each Borrower or any Guarantor shall be adverse parties. Each Borrower and the Guarantor jointly and severally agree that any Obligations under this Note or Loan Agreement may, from time to time, in whole or in part, be renewed, extended, modified, accelerated, compromised, discharged or released by the Lender, and any Collateral, lien and/or right of set-off securing any Obligation may, from time to time, in whole or in part, be exchanged, sold, or released, all without notice to or further reservations of rights against each Borrower or Guarantor and all without in any way affecting or releasing the liability of any other Borrower or Guarantor.

Each Borrower and the Guarantor shall be jointly and severally liable for all Indebtedness represented by this Note and Loan Agreement. This Note and Loan Agreement shall be binding upon each Borrower, Guarantor and their respective heirs, executors, administrators, assigns and shall inure to the benefit of the Lender, its successors and assigns.

Each Borrower and Guarantor acknowledges and agrees that the Lender may sell, assign, pledge, encumber, or otherwise transfer all or any portion of its interest in this Note and Loan Agreement, the documents evidencing and securing those Obligations, and that in connection with any such

proposed transfer, Lender may disclose to the proposed purchaser any or all information in its files as to the Loan evidenced by this Note.

Surrender of this Note, upon payment or otherwise, shall not affect the right of the Lender to retain the Collateral as security for other Obligations.

All notices and other communications under this Note shall be in writing. All written notices and communications shall be sent by registered or certified mail, postage prepaid, return receipt requested, by reputable overnight courier, freight prepaid, or delivered by hand. All notices and other communications under this Note shall be given at the following addresses and the attention of the following persons:

    (i)      If to the Borrower:

            BG Capital Management South Florida, LLC and
            BG 1 Lazzara, LLC.
            Attn: Mr. Owen Duke
            1250 South Pine Island Road, #500
            Plantation, FL 33324

    (ii)     If to the Lender:

            IBERIABANK
            200 East Las Olas Boulevard
            Suite 2000
            Fort Lauderdale, FL 33301
            Attention: Maria Elena Ferrer

Notwithstanding the foregoing, all written notices and communications under this Note shall be sent to such other address or facsimile number or to the attention of such other person as the party to whom such information pertains may hereafter specify for the purpose in a notice to the other specifically captioned "Notice of Change of Address". All notices shall be deemed to be delivered upon receipt or refusal of receipt.

All payments on this Note received during normal banking hours after 12:00 p.m. shall be deemed received at the opening of the next banking day.

If any Prepayment is made within the first TWELVE (12) months from the date of the Note, Borrower shall pay a prepayment fee equal to one percent (1.00%) of the principal so prepaid. If any Prepayment is made between TWELVE (12) and TWENTY-FOUR (24) months from the date of the Note, Borrower shall pay a prepayment fee equal to three-quarters of one percent (0.75%) of the principal so prepaid. If any Prepayment is made between TWENTY-FOUR (24) and THIRTY SIX (36) months from the date of the Note, Borrower shall pay a prepayment fee equal to one-half of one percent (0.50%) of the principal so prepaid. Any payment made after THIRTY SIX (36) months from the date of the Note shall not be subject to a pre-payment fee. Borrower shall be deemed to make a "Prepayment" within the meaning of this Note if Borrower prepays an amount or amounts greater than fifty percent (50%) or more of the Loan Amount at any time prior to THIRTY SIX (36) months from the date of the Note. Notwithstanding the foregoing, if the Borrower repays the Loan Amount in its entirety to purchase another vessel, of equal or greater value, provided that Lender provides the financing for the new vessel with a principal amount greater to or equal to the Loan Amount, any and all prepayment fees will be credited towards the new loan facility.

THIS NOTE AND THE LOAN AGREEMENT SHALL BE GOVERNED BY, ENFORCED, AND CONSTRUED EXCLUSIVELY IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, without regard to any laws, rules or regulations concerning conflict of laws that might result in the application of the laws of any other jurisdiction. Provided, that matters pertaining to the perfection of liens and the enforcement of remedies with respect to Collateral shall be governed by the laws of the jurisdiction where such Collateral may be located to the extent such local laws are mandatorily applicable to such issues.

Notwithstanding the foregoing, Lender reserves the right to exercise any of the remedies available to a secured lender under the laws of, including the maritime laws or Uniform Commercial Code or other laws of similar effect as adopted in, or as may apply in the State of Florida, the United States, or any place where Borrower is registered, maintains a place of business, or any place where the Vessel or any of the Collateral may be located, including, without limitation, the remedy of non-judicial repossession and sale.

Any legal action or proceeding with respect to this Note or the Loan Agreement or any related document may be brought in the courts of the Broward County in the State of Florida or the Federal Courts of the United States for the Southern District of Florida in Broward County, and by execution and delivery of this Note, each Borrower and the Lender consent to the non exclusive jurisdiction of those courts.  The Borrower and the Lender irrevocably waive any objection, including any objection to the laying of venue or based on the ground of forum non conveniens, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Note or any document related hereto.  Notwithstanding the foregoing, (i) the Lender shall have the right to bring any action or proceeding against either Borrower, any Guarantor, or their property in the courts of any other jurisdiction the Lender may deem necessary and appropriate in order to enforce its rights and remedies under the Loan Documents or any related documents, and (ii) each Borrower and the Lender each acknowledge that any appeals from the aforesaid courts may have to be heard by a court located outside the jurisdiction of the jurisdiction of such courts.

EACH BORROWER (AND GUARANTOR) AND THE LENDER, BY ACCEPTANCE OF THIS NOTE, KNOWINGLY, VOLUNTARILY AND WITH ADVICE OF COUNSEL, HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN OR WITH RESPECT TO ANY PROCEEDING ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE, THE LOAN AGREEMENT OR ANY LOAN DOCUMENT, OR GUARANTIES, OR WITH RESPECT TO DEALINGS BETWEEN THE LENDER AND THE BORROWER OR GUARANTORS CONCERNING ANY COURSE OF CONDUCT, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER TO PROVIDE CREDIT TO THE BORROWER.

IN WITNESS WHEREOF, Borrower has executed this Note on the date first written above.

**BORROWER:**

**BG 1 LAZZARA, LLC,** a Florida Limited liability company

By: _____

Owen Duke, Manager

**BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC,** a Florida limited liability company

By: _____

Owen Duke, Manager

**LOAN AGREEMENT**
**(BG 1 LAZZARA, LLC AND**
**BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC)**

This Loan Agreement ("Agreement") is made as of January ⊔⊔, 2015, by and among IBERIABANK, a Louisiana state-chartered bank ("Bank"), on one hand, and BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC, a Florida limited liability company, and BG 1 LAZZARA, LLC, a Florida limited liability company (collectively, jointly, and severally, the "Borrower"), on the other.

**WITNESSETH:**

WHEREAS, Borrower desires to borrow $1,715,000.00 from the Bank in form of a term loan as described in and subject to the terms of this Agreement;

WHEREAS, the loan made by the Bank to the Borrower is to be secured by a preferred ship mortgage on the 2009 75' Lazarra Motor Yacht "BG" (the "Vessel") owned by Borrower, its engines, equipment and appurtenances, and a security interest in and to other personal property on or about the Vessel and in a deposit account maintained by Borrower with the Bank;

WHEREAS, the loan made by the Bank to the Borrower is to be fully guaranteed by Borrower.

NOW, THEREFORE, for and in consideration of the foregoing premises, which are hereby incorporated herein as true, and the terms, conditions, representations, warranties, covenants, promises and agreements herein contained, the parties hereto agree as follows:

I.   Definitions:

1.1   Certain Definitions

"30 Day Libor Rate" shall have the same meaning assigned to that term in the Note.

"Account Debtor" shall have the same meaning assigned to that term in the version of the Uniform Commercial Code in effect in the State of Florida from time to time, including, without limitation, as amended by Revised Article 9 as enacted in the State of Florida.

"Affiliate" means any corporation or Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Borrower. For purposes of this definition "control" means the power to vote or direct the vote of more than 50% of the voting interests of such corporation or Person.

"Agreement" means, collectively, this Loan Agreement, together with any and all exhibits, attachments and amendments thereto and modifications, extensions, restatements and substitutions thereof and therefor.

"Bank" means IBERIABANK, a Louisiana state-chartered bank.

"Banking Day" means any day upon which the Federal Reserve Bank of New York and U.S. domestic commercial banks are open for the transaction of domestic business.

"Collateral" means the Vessel, its engines, equipment and appurtenances, the proceeds from the sale thereof, and all other property encumbered by any security documents from the Borrower or Guarantors to Bank which secure the Note, together with all property of each Borrower or Guarantor that for any purpose, whether in trust for any Borrower or Guarantor for custody, pledge, collection or otherwise, is now or hereafter in the actual or constructive possession of, or in transit to, the Bank in any capacity, its correspondents or agents, and the right of set-off against all deposits and credits of the Borrower and

02/04/15 10:56:22 CP

each Guarantor with, and all claims of the Borrower or each Guarantor against, the Bank at any time existing, including, without limitation, any deposit account maintained by Borrower at the Bank.

"Default Interest Rate" means the maximum lawful rate permissible under applicable law on the unpaid principal balance under this Agreement and the other Loan Documents at the time of an Event of Default, after deducting any paid and unaccrued or paid and unearned interest from the principal balance then due.

"Event of Default" means an event or occurrence described in Article VII of this Agreement.

"Financial Statements" means the combined or uncombined, as applicable, balance sheets, statements of income and retained earnings and statements of changes in cash flow of each Borrower for each calendar year to be delivered to the Bank pursuant to Section 5.l.b of this Agreement.

"Fiscal Year" means a calendar year.

"Guarantor" includes Robert Genovese, individually.

"Loan" means the Term Loan made to Borrower as described in Section 2.1 hereof.

"Loan Documents" means those documents set forth in Section 3.1 hereof, and any other agreements, instruments, documents or certificates heretofore, now or from time to time hereafter executed by or on behalf of Borrower, or at the request of the Bank and delivered to Bank in connection therewith or pursuant thereto, including, without limitation, the Mortgage on the Vessel, the Note, the UCC financing statement, and guaranties, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time and all extensions, renewals or substitutions thereof or therefore.

"Note" means the note executed by the Borrower, as may be amended, modified, renewed, extended, replaced or consolidated from time to time.

"Obligations" means each and every promise, agreement, covenant, debt and all other obligations and indebtedness of the Borrower to the Bank, its successors or assigns, whether primary, secondary, contingent, direct, or indirect, howsoever incurred, created, arising or evidenced, whether presently or hereafter existing, evidenced, arising or becoming due, including, without limitation, such obligations and indebtedness of the Borrower to the Bank arising from or in connection with the Term Loan under this Agreement, the Note or any other Loan Documents with any refinancing, substitutions, extensions, renewals, replacements and modifications for or of the foregoing.

"Person" means any individual, sole, proprietorship, joint venture, partnership, limited partnership, association, unincorporated organization, joint-stock company or association, trust, corporation, entity, institution or government body.

"Mortgage" means the Preferred Ship mortgage covering the Vessel in form and substance satisfactory to the Bank to grant Bank a lien and ship mortgage on the Vessel, and any amendments and modifications thereof, which shall attain first priority and shall be established, maintained and perfected as a first preferred ship mortgage upon filing.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible and includes the Vessel.

"Vessel" means the *BG*, a 2009 75' Lazzara Motor Yacht, its engines, equipment and appurtenances, Official Number **70683**, currently documented with the Republic of the Marshall Islands, to be documented with the United States Coast Guard, under the name *BG* with a Hailing Port of Miami Beach, FL.

02/04/15 10:56:23 CP

1.2     Accounting and Other Terms

Any accounting terms used but not otherwise defined herein shall be construed following GAAP. All other terms used but not otherwise defined herein shall have the meanings set forth in the other Loan Documents, or as provided by the version of the Uniform Commercial Code as in effect in the State of Florida from time to time.

II.     The Credit

2.1     Term Loan

2.1.a     Funding of Term Loans. Subject to terms and conditions of this Agreement, the Bank agrees to lend to Borrower the sum of ONE MILLION SEVEN HUNDRED FIFTEEN THOUSAND DOLLARS AND 00/00 ($1,715,000.00) in lawful money of the United States, with interest at the Applicable Interest Rates defined below.

2.1.b     The Note. In order to evidence the Loan made by the Bank to the Borrower on the date hereof, the Borrower will execute and deliver a promissory note, in the form of Exhibit "A" hereto (together with any and all amendments, modifications, supplements, substitutions, renewals, extensions, and restatements, thereof and therefor, the "Note", repayable and maturing in accordance with and bearing interest as set forth therein).

2.2     Term of Loan, Interest Rates

2.2.a     Term Loan. Borrower's Loan shall be a term loan, and absent an Event of Default, the final payment of principal, interest and costs shall be paid on or before January _____, 2020, or as otherwise provided herein ("Maturity Date").

2.2.b     Interest on the Loans. As set forth more specifically in the Note, interest on this Note shall accrue from and after the date of disbursement at an annual rate equal to the 30 Day LIBOR Rate plus three and 00/100 percent (3.00%) ("Interest Rate"), provided however, that if at any time during the term of the Loan (or any extensions thereof) the Borrower's total minimum average daily deposit held in a deposit or investment management account with the Bank should fall below Five Hundred Thousand dollars ($500,000.00) or if Borrower should otherwise fail to maintain such account, then the Interest Rate will be automatically adjusted (effective the next Payment Date) to an annual rate equal to 30 Day LIBOR Rate plus five and 00/100 percent (5.00%) for the remainder of the term of the Loan (and any extensions thereof) unless Borrower restores the minimum average daily deposit to Five Hundred Thousand Dollars ($500,000.00) in which case the Interest Rate will automatically be adjusted (effective the next Payment Date) to an annual rate equal to 30 Day Libor plus three and 00/100 percent (3.00%). Borrower shall pay monthly consecutive installments of principal in the amount of $9,527.77 per month plus accrued interest. All unpaid principal, interest and costs hereunder shall be due and payable on the Maturity Date.

2.2.c     Default Interest Rate; Late Fee. All Obligations shall bear interest from and after the occurrence of an Event of Default and for so long as an Event of Default shall be continuing, and without constituting a waiver of any such Event of Default, on the unpaid principal balance hereof at the Default Interest Rate. The Borrower agrees to pay a late charge equal to five percent (5%) of each payment of principal and/or interest which is not paid within ten (10) days of the date on which it is due. If said ten (10) day period ends on a day other than a Banking Day, the aforedescribed late charge shall be payable if the payment is not received by the last Banking Day within said ten day period.

2.2.d     Maximum Interest Rate. In no event shall any rate of interest charged hereunder exceed the highest applicable rate permitted by law ("Maximum Rate"). If, in any month,

the applicable rate absent such limitation would have exceeded the Maximum Rate, then the rate for that month shall be the Maximum Rate, and if in future months, the rate would otherwise be less than the Maximum Rate, then to the extent permitted by applicable law, the rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate. The Bank may, at its option, charge any interest payable by Borrower to Borrower's Loan Account, which amounts shall thereupon constitute Obligations hereunder and shall thereafter accrue interest as provided for in this Agreement. Nothing contained in this Agreement or the other Loan Documents shall be construed or shall so operate either presently or prospectively to require Borrower to pay interest at a rate greater than the rate which is now or hereafter lawful for transactions of this kind. If the interest rate exceeds any applicable law relating to interest, then this Agreement and the Loan Documents shall be interpreted and construed to require payment of interest only to the extent of such maximum lawful rate, not to exceed the rate set forth in this Agreement or the other Loan Documents, where applicable.

## 2.3    Fees and Expenses

2.3.a    <u>Loan Fee.</u> The Borrower shall pay to the Bank a Loan Fee in the amount of $25,725.00.

2.3.b    <u>Expenses.</u> The Borrower shall reimburse the Bank for all of its reasonable expenses incurred in connection with the preparation (including due diligence), negotiation, documentation, amendment, modification, administration or enforcement of this Agreement, the Note or any other Loan Documents, including reasonable attorney, paralegal, marine surveys and other professional fees, and for all filing, approval, survey, title, inspection and insurance fees and charges incurred by Bank in connection with the preparation, negotiation, drafting, underwriting, collateralizing, administrating, issuing or enforcing the Loan Documents.

## 2.4    Prepayment

2.4.a    <u>Prepayment.</u> If any Prepayment is made within the first TWELVE (12) months from the date of the Note, Borrower shall pay a prepayment fee equal to one percent (1.00%) of the principal so prepaid. If any Prepayment is made between TWELVE (12) and TWENTY-FOUR (24) months from the date of the Note, Borrower shall pay a prepayment fee equal to three-quarters of one percent (0.75%) of the principal so prepaid. If any Prepayment is made between TWENTY-FOUR (24) and THIRTY-SIX (36) months from the date of the Note, Borrower shall pay a prepayment fee equal to one-half of one percent (0.50%) of the principal so prepaid. Any payment made after THIRTY-SIX (36) months from the date of the Note shall not be subject to a pre-payment fee. Borrower shall be deemed to make a "Prepayment" within the meaning of this Agreement if Borrower prepays an amount or amounts equal to greater than fifty percent (50%) or more of the original principal balance of the Loan ("Loan Amount") at any time prior to THIRTY-SIX (36) months from the date of the Note. Notwithstanding the foregoing, if the Borrower repays the Loan Amount in its entirety to purchase another vessel, of equal or greater value, provided that Bank provides the financing for the new vessel with a principal amount greater to or equal to the Loan Amount, any and all prepayment fees will be credited towards the new loan facility.

2.4.b    <u>Mandatory Prepayment.</u> If Borrower sells the Vessel, the proceeds of any sale shall be applied to the outstanding principal balance of the Loan. In addition, if the net amount realized from the sale of any Vessel is less than the outstanding principal balance of the Loan, Borrower agrees to remit to Bank any additional amounts required so that the outstanding principal balance of the Loan is paid in full.

2.5     Application of Payments and Prepayments. Any payments made by Borrower under this Agreement, the Note or any other Loan Documents shall be applied to Borrower's Obligations owing as of the date of payment in the following order: (i) to any amounts or fees owing to the Bank pursuant to this Agreement and the Loan Documents; (ii) to interest accrued pursuant to the terms of the Note; and (iii) to the principal balance of each respective Loan.

2.6     Default Interest. In the event any amount of principal or interest due hereunder or any other payment due under this Agreement or any of the other Loan Documents becomes overdue, such overdue amount shall accrue interest at the Default Interest Rate from the due date through the date of payment.

2.7     Payment to the Bank; Automatic Payment. Borrower hereby authorizes the Bank to effect payment of all sums payable to the Bank hereunder or under the Note by charging against or debiting Borrower's deposit account all amounts due hereunder or under the Note, in immediately available funds, without deduction, withholding or holdback.  The Bank's right from time to time after the occurrence or happening of an Event of Default hereunder (which has not been waived in a writing signed by the Bank) by the Borrower against the Borrower's monies, deposits, credits, accounts or other property now or at any time in the possession or control of the Bank, is hereby acknowledged and agreed to by the Borrower. For purposes of this Agreement and the other Loan Documents, payments to Bank with checks or other similar drafts which shall be returned to Bank due to insufficient funds shall be deemed not to have been paid to Bank in the first instance.

2.8.    Returned Payment Fee.  Borrower understands that Bank may charge and collect a processing fee of $30.00 for each and every check on which payment has been refused by the payor or bank because of insufficient funds.

III.    Conditions Precedent

3.1     Delivery of Documents as Conditions Precedent to Term Loan. The delivery to the Bank of each of the following documents (the "Loan Documents") executed by the Borrower and/or third parties as indicated thereon, in each case in form and substance satisfactory to the Bank shall constitute separate and distinct conditions precedent to the making of the Term Loan by the Bank to the Borrower:

3.1.a    A duly executed original of this Agreement;

3.1.b    The duly issued and executed Note, dated as of the date hereof;

3.1.c    Mortgage on the Vessel;

3.1.d    (i) Proof that the Mortgage on the Vessel is in a form so that it may be duly filed and recorded and accepted for filing and recording; (ii) abstracts or title searches showing the Mortgage constitutes the first lien on the Vessel upon release of the Comerica Mortgage; (iii) estoppel statements, releases of or satisfactions to release and file UCC termination statements of any liens or encumbrances on or affecting title to the Vessel, and other Collateral, including estoppel statements, releases or satisfactions of any existing mortgage and UCC filings, or equivalent in the applicable jurisdiction, on the Vessel and other Collateral; and (iv) such other documents, certificates, affidavits, indemnities and opinions as the Bank may require of the Borrower;

3.1.e    Uniform Commercial Code financing statement, or equivalent search results for Borrower and Guarantors; and from such other offices or governmental agencies or

bodies as the Bank, in its sole discretion, may request from the Borrower, indicating that there are no liens on, or creditors claiming any interest in, the Collateral of the Borrower;

3.1.f    All Information, Financial Statements or other notices for Borrower and Guarantors, including, but not limited to, lists of contingent liabilities, credit bureau reports from domestic and the International Credit Bureau, all real estate holdings, personal liquidity statements and income tax returns for the last three (3) years, to be delivered to the Bank as provided for herein;

3.1.g    Insurance Binders or policies covering the Vessel, in a form acceptable to Bank, with certificates or endorsements naming the Bank as an additional insured (to the extent such insurance company is willing to name the Bank as an additional insured) and loss payee, and, providing for Mortgagee's (Breach of Warranty) Insurance, either by endorsement or policy, in favor of Bank, all in form and as required by the Loan Agreement and the Mortgage;

3.1.h    Surveys from the Bank's designated marine surveyor;

3.1.i    Guaranty of Robert Genovese;

3.1.j    Assignment of Insurance;

3.1.k    A certificate of the Managers of the Borrower, certifying (i) that attached to the certificate is a true, correct and complete copy of the Borrower's articles of organization as in effect on the date of adoption of the board resolution referred to below, and that the certificate or articles of organization are still in full force and effect, (ii) that attached to the certificate is a true, correct and complete copy of the Operating Agreement of Borrower as in effect on the date of adoption of the board resolution referred to below, and that such documents are still in full force and effect, and have not been amended, altered or repealed, (iii) that attached hereto is a true, correct and complete copy of the resolutions adopted by the managers of Borrower, and that such resolutions have not been amended, altered or repealed and are in full force and effect, and (iv) as to the incumbency and specimen signature of each of the officers of Borrower executing the Loan Documents to which Borrower is to be a party;

3.1.l    A Closing Statement/Disbursement Authorization authorizing the Bank to disburse Loan proceeds first, to pay any prior lien holders holding an interest in the Collateral, second, to the Bank for its fees, costs and expenses in connection with the Loans and the Loan Documents, including loan title search and insurance charges, filing fees and mortgage and intangible taxes, and professional fees, and third, to Borrower's account at Bank in such amount as is directed by the Borrower;

3.1.m    In form and substance satisfactory to the Bank, each and every agreement, document, note, release, guaranty, certificate, notice, affidavit, exhibit, schedule, resolution, legal opinion, assignment, security agreement or financing statement, which the Bank may reasonably request from the Borrower to effect the intent of this Agreement;

3.1.n    Attestation regarding financial statements;

3.1.o    Opinion of Borrower's Counsel in a form satisfactory to Bank; and

3.1.p    Commitment Letter dated December 22, 2014.

3.2    <u>Representations and Warranties.</u> The representations and warranties set forth in Article IV hereof shall be true and correct in all material respects as of the date of closing and the time of funding the Loan.

IV.    <u>Representations and Warranties.</u>   As further inducement to the Bank to enter into this Agreement and make the Loan hereunder, the Borrower represents and warrants, as of the date hereof (except as such representation or warranty relates solely to another date), the following, which shall survive the execution and delivery of this Agreement, the Note and the Loan Documents and continue until all of the Obligations and Indebtedness of the Borrower have been paid, satisfied or discharged in full, regardless of any investigation by the Bank of the Borrower's financial condition or assets:

4.1    <u>Organization of Borrower.</u>  Each Borrower is duly organized, validly existing and in good standing under the laws of the State of Florida.  Each Borrower has appointed and will maintain a registered agent in Florida, in compliance with applicable regulations. The exact legal name of each Borrower is as set forth in the first paragraph of this Agreement. Each Borrower's state issued organizational identification number and taxpayer identification number has been provided to Bank.

4.2    <u>Authority and Consents.</u> Each Borrower has all corporate power and authority to own and operate its property and assets.  No consent, approval or authorization of, or filing, registration or qualification with, any Person, governmental, regulatory or otherwise, is required to be obtained or effected by each Borrower in connection with the execution, issuance, delivery and performance of this Agreement, the Note and the Loan Documents to which each Borrower is a party or signatory or the incurrence or performance of the Obligations of each Borrower or, if so required, it has been duly obtained or effected before the date hereof. The execution, issuance, delivery and performance of this Agreement, the Note and the Loan Documents to which each Borrower is a party or is a signatory and the incurrence or performance of the Obligations and indebtedness of each Borrower hereunder, (a) has been duly and properly authorized by all necessary corporate, manager, member and other action of each Borrower, and (b) has not resulted in and will not result in:

(ii)    the creation or imposition of any Lien, security interest, mortgage, charge or any encumbrance of any nature whatsoever (except in favor of the Bank) upon any property or assets of either Borrower; or

(ii)    The violation or contravention of, the occurrence of a default, Event of Default or event, which with the passage of time or giving of notice or both, would constitute a default or event of default under, any term or provision any order of any court, or any contract, agreement, mortgage, indenture, instrument, judgment or Laws to which either Borrower is a party or signatory or by which either Borrower is bound.

4.3    <u>Binding Effect and Enforceability.</u>   This Agreement, the Note and the other Loan Documents to which each Borrower is a party or signatory are the legal, valid and binding Obligations of each Borrower enforceable in accordance with their terms and provisions, except as the same may be limited by bankruptcy and moratorium laws and all other similar laws affecting the rights of creditors generally and the application of general principles of equity and to the extent that specific performance may be granted or denied and, on the date of delivery, each Borrower is not in violation or contravention of, and no Event of Default exists under, any of the foregoing.

4.4    <u>Default of Indebtedness or Contracts.</u>   Neither Borrower is in default and no Event of Default or event which after the expiration of any applicable grace or cure periods or the giving of notice or both, would constitute a default or Event of Default, has occurred and

is continuing with respect to any contract entered into by either Borrower or any indebtedness of any kind or nature including, without limitation, any mortgage, deed, loan agreement or other agreement relating to the borrowing of monies.

4.5     Financial Condition and Litigation. The Financial Statements of each Borrower and the Guarantor heretofore delivered, and to be delivered during the term of the Loan, to the Bank have been compiled by an independent certified public accountant and fairly present the financial condition of each Borrower as of the dates thereof. Since the most recent Fiscal Year-end for the Borrower's and Guarantors' Financial Statements have been delivered to the Bank and received thereby, no material adverse change in either Borrower's or Guarantor's financial condition or affairs has occurred. Except as previously disclosed in writing by Borrower to Bank, neither Borrower has any indebtedness. No proceedings, suits, orders, claims, investigations, or other actions are pending before any court or governmental authority or, to the best knowledge of Borrower or any of its Affiliates, after diligent inquiry, threatened against any Borrower, which could materially adversely affect the assets, properties, business or condition, financial or otherwise, of either Borrower, the Collateral of either Borrower or materially adversely affect the ability of either Borrower to perform any Obligations.

4.6     Title and Liens. Except the liens and encumbrances discharged at the time of execution of this Loan Agreement and the funding of the Loan and the Comerica Mortgage, each Borrower has good and marketable title to all of their respective Property, assets and the Collateral, and the Collateral is not subject to any liens, claims, security interests, mortgages, pledges, charges or other encumbrance of any Person, except, with respect to the Collateral, the Bank.

4.7     Information Warranties. All information provided by each Borrower, including, but not limited to, any information pertaining to the Guarantor, to Bank is true, correct and complete on the date hereof and, unless amended by Borrower with the consent of the Bank, at all times hereafter.

4.8     Taxes. Each Borrower has filed a federal, state county, municipal, and other tax returns, reports and declarations required to be filed by all Laws, has paid all taxes, including excise taxes, assessments, penalties, interest and any other governmental charges which are or were due and payable, unless such Borrower is contesting in good faith, by an appropriate proceeding, the validity, amount or imposition of the above while maintaining reserves, deemed adequate by the Bank in its sole and complete discretion, to cover the above, and such contest does not have or cause a material adverse change in either Borrower's financial condition or operations and does not impair either Borrower's ability to perform its Obligations, has made adequate provision for the payment of all taxes, assessments, penalties, interest and other governmental charges which are accruing but are not yet due and payable, and has no knowledge and is not aware of any deficiency or additional assessment which may have or has arisen in connection with the foregoing.

4.9     Compliance with Laws. No notice from any governmental body or other party has been served upon either Borrower, claiming any violation of any Laws or requiring, or calling attention to themed for any material work, repairs, construction, alterations or installation on or in connection with the Vessel. Neither Borrower has received notice of any special tax assessment affecting the Vessel, or any of the Collateral.

4.10    Assumed Names. Neither Borrower has any other names nor is it doing business under any name other than its corporate name.

4.11    Regulations. The Borrower confirms that: (a) the proceeds of the Loan are not being used to purchase or carry any "margin stock" within the meaning of Regulation "G", "U", or "I"

CRITICAL

of the Board of Governors of the Federal Reserve System, nor to extend credit to others for that purpose, and (b) each extension of credit secured by this Loan is exempt from the provisions of the United States Federal Consumers Credit Protection Act (Truth-In Lending Act) (the "Act") and Regulation "Z" of the Board of Governors of the Federal Reserve System (the "Regulation"), because each Borrower is fully excluded from the Act and the Regulation, and/or because said extension of credit is only for business or commercial purposes of each Borrower and the proceeds of the Loan are not being used for personal, family, household or agricultural purposes.

4.12    No Options. No Person has any option to acquire ownership of the Collateral or any portion thereof.

4.13.    Membership Interest.  The names of the holders of the membership interest in each Borrower are as provided to the Bank, and there have been no changes or amendments thereto. All of the outstanding securities of each Borrower were issued in compliance with all applicable federal and state securities laws.  None of the outstanding securities of either Borrower have been issued in violation of any preemptive rights, rights of first refusal or similar rights.   There are no outstanding options, warrants, convertible securities, calls, rights, commitments, preemptive rights or agreements or instruments or understandings of any character, to which either Borrower is a party or by which either Borrower is bound, obligating either Borrower to issue, deliver or sell, or cause to be issued, delivered or sold, contingently or otherwise, additional membership units of either Borrower or any securities or obligations convertible into or exchangeable for such units or to grant, extend or enter into any such preemptive right or agreement.  There are no outstanding obligations, contingent or otherwise, of either Borrower to purchase, redeem or otherwise acquire any membership units of either Borrower.  There are no voting trust agreements or other contracts, agreements, arrangements, commitments, plans or understandings restricting or otherwise relating to voting, dividend or other rights with respect to either Borrower's membership units or shares.

4.14    Ship Mortgage. The representations, warranties, covenants and conditions set forth in the Bank's Mortgage for the Vessel are incorporated herein by reference.

4.15    Claims.  As of the date hereof, there are no claims, filed or threatened against either Borrower, the value of which exceeds Ten Thousand Dollars ($10,000.00).

4.16    Title. BG 1 Lazzara, LLC is the sole owner of all shares in the Vessel and has and shall have possession of the whole (100%) Vessel free from all liens, security interests or encumbrances whatsoever except for Comerica Mortgage and the security interests under this Agreement and the Loan Documents. If Bank has to establish or contest title in the Vessel, or defend its security interest or mortgage lien, Borrower shall be responsible for all of the Bank's expenses and losses including, without limitation, legal fees and expenses, and Borrower shall indemnify Bank if anyone other than BG 1 Lazzara, LLC or Bank claims an interest in the Vessel or any part of it or if the Comerica Mortgage is not released and discharged upon payment to Comerica in an amount equal to the amount set forth in the Closing Documents. Upon discharge, satisfaction and release of the Comerica Mortgage as provided in the Bank's Mortgage, Borrower will keep the Vessel free of any mortgages, security interests, liens or encumbrances except in favor of Bank.

V.    Covenants. The Borrower hereby covenants and agrees that, until the Obligations and indebtedness of the Borrower to the Bank have been satisfied and discharged in full, the Borrower will comply with the following covenants, unless the Bank shall give its prior written consent to the contrary:

5.1    Affirmative Covenants.

5.1.a    Payments. The Borrower shall pay, or cause to be paid, when due all principal and interest under the Note and all other Obligations in respect with this Agreement, the Note and the other Loan Documents.

5.1.b    Financial Information and Reporting. The Borrower and each Guarantor shall cause to be furnished to the Bank:

(i)    Every thirteen months from the date of the last personal financial statement, the Guarantor's personal financial statements, all in reasonable detail compiled by an independent certified public accountant, in a form acceptable to Bank, inclusive of liquidity verification, bank/brokerage statements, and all assets and contingent liabilities;

(ii)    On an annual basis, as soon as practicable and, in any event, within thirty (30) days of filing, copies of each Borrower's corporate tax returns as filed with the IRS or other applicable taxing authority, inclusive of all K-1s and, if any, copies of all extensions filed with the IRS or other applicable taxing authority;

(iii)    On an annual basis within sixty (60) days of each Borrower's respective fiscal year end, copies of each Borrower's financial statements, all in reasonable detail compiled by an independent certified public accountant, in a form acceptable to Bank, inclusive of liquidity verification, bank/brokerage statements, and all assets and contingent liabilities;

(iv)    Promptly after notice of the commencement thereof, notice, in writing, of any actions, seizures, adverse claims, detentions, sequestrations, suits, arbitration or other proceedings instituted, commenced or to the Borrower's or each Guarantor's knowledge, threatened against or affecting the Borrower, the Collateral, or Guarantor;

(v)    Promptly after the occurrence thereof, notice, in writing, of any other matter which has resulted in, or might result in, a materially adverse change in the financial or other condition of Borrower or any Guarantor or their ability to fully perform their Obligations, under the terms and conditions of this Agreement and the Loan Documents or their ability to repay the Note;

(vi)    With reasonable promptness, such other information respecting the business, properties or the condition or operations, financial or otherwise, of the Borrower or Guarantor(s), as the Bank may from time to time reasonably request in writing; and

(vii)    Notice of any change in location of any place of business, the state of incorporation, the form of business entity, the legal name of the Borrower or the jurisdiction of flagging of the Vessel at least thirty (30) days prior to such change (and no such change may be made without the prior written consent of the Bank).

5.1.c    Notice of Defaults and Potential Defaults. Borrower agrees to promptly, and in no event more than three (3) days after it becomes aware of the occurrence thereof, inform the Bank in writing, of any Events of Default or events which with the giving of notice or lapse of time or both, would constitute an Event of Default

together with a description of the particulars thereof, how Borrower intends to cure or avoid the Event of Default and any writings or notices Borrower has received or generated in connection with the Event of Default or potential Event of Default.

5.1.d    Repair and Maintenance.  Borrower will maintain the Collateral, in good condition and repair and in proper working order, normal wear and tear excepted, and will pay and discharge, or cause to be paid and discharged, when due, the cost of repairs, replacement or maintenance to the foregoing and all rentals or mortgage payments on the foregoing (including, without limitation, the completion of customary annual inspection, periodic drydock work and other routine maintenance, in accordance with generally accepted industry practices and procedures in the ship ownership and management industry and as required by the classification and regulatory authorities). In the event Borrower fails in the foregoing, Borrower hereby authorizes, without requiring the Bank, to perform the same and to incur such reasonable costs, fees and expenses in connection therewith which shall be payable on demand by the Borrower pursuant to Section 5.1 hereof.  Borrower will cause the Vessel to be kept in such condition as will entitle her to the highest classification and rating of the applicable classification society for Vessels of the same age and type without outstanding recommendations or notations; and annually on the anniversary hereof Borrower will furnish to the Bank a certificate by the applicable classification society with respect to such Vessel that such classification is maintained.  Borrower will not make or permit to be made, any change in the classification of the Vessel by the applicable classification society or any substantial change in the structure, type or speed of the Vessel without first receiving the written approval thereof by the Bank.

5.1.e    Liquidity Verification/Annual Review.  Each Borrower and Guarantor shall participate in, and provide all documentation reasonably required for, the Bank's annual liquidity verifications and annual review of each Borrowers' and Guarantor's contingent liabilities, including, but not limited to, the Bank's review of each Borrowers' and Guarantor's unencumbered liquidity as provided in Section 5.2.i.

5.1.f    Corporate Existence.  Each Borrower shall maintain and preserve its corporate existence, good standing, and certificates of authority, including, without limitation, all licenses, permits and authorizations necessary to do business in the Florida and to own and operate the Vessel.

5.1.g    Bank Costs.  Borrower shall pay to the Bank upon demand, all reasonable out-of-pocket fees, costs and expenses incurred or paid by the Bank (i) in connection with the repair and maintenance of Borrower's Property under Section 5.1.d hereof; (ii) in connection with the enforcement of its rights and remedies hereunder including, without limitation, the reasonable costs of attorney and paralegal fees; (iii) in connection with the inspection, sale, disposition or collection of or execution upon the Collateral; (iv) in notifying Account Debtors of the Borrower or verifying the Accounts of the Borrower; (v) in perfecting or protecting the Collateral security or security interest or lien(s) granted hereunder; and (vi) in connection with any litigation, contest, suit or proceeding (whether instituted by the Bank, a Borrower or where payment of the Obligations or the Collateral might be materially adversely *affected*, by any other Person) in any way relating to the Collateral, this Agreement and the Loan Documents, except where it is determined that Bank's action or failure to act constituted gross negligence or willful misconduct.

5.1.h   <u>Indemnity and Release</u>. Borrower agrees that it shall bear the risks of loss with respect to the Collateral and will indemnify the Bank and hold the Bank harmless from any and all claims, demands, liabilities, losses, damages, diminutions of value, costs and expenses relating to or in any way arising out of or from any possession, use, operation, control, sale, disposition or collection of any of the Collateral, except to the extent the foregoing are caused directly by the Bank's gross negligence or willful misconduct. Borrower hereby releases the Bank from any and all claims or causes of action, which Borrower may have, now or hereafter, relating to the foregoing, except those arising from the Bank's gross negligence or willful misconduct.

5.1.i   <u>Defense of Collateral</u>.  Borrower shall pay, or cause to be paid, when due, all material indebtedness, lawful claims or demands with respect to the Collateral which, if unpaid, might result in, or permit the creation of, any lien or encumbrance on the Collateral, including, without limitation, all lawful claims for labor, materials and supplies, and, in general, do and cause to be done, everything reasonably necessary to fully preserve the rights and interests of Bank under this Agreement and the other Loan Documents. In addition, Borrower shall at all times defend Bank's rights and interests in and to the Collateral, and the first priority position of said rights and interests against any and all claims of any person adverse to Bank and take all necessary or appropriate actions to *give* effect to Bank's first priority of rights and interests contemplated by this Agreement and the other Loan Documents.

5.1.j   <u>Automatic Debit</u>. Bank shall debit (or ACH) any deposit accounts, maintained by either Borrower for principal and interest payments or any other amounts Borrower owes Bank under the Loan Documents when due. These debits (or ACH activity) shall not constitute a set-off.

5.1.k   <u>Assignment of Maintenance and Service Contracts</u>: Borrower hereby absolutely and irrevocably assigns and transfers to the Bank all of Borrower's right, title and interest in and to a maintenance, service or other third-party contracts affecting the Collateral. Borrower irrevocably appoints the Bank its true and lawful attorney-in-fact, at the option of the Bank at any time and from time to time, to demand, receive and enforce Borrower's rights thereunder.

5.1.l   <u>Insurance</u>. Borrower will maintain in full force and effect fire, theft, and "all risk" marine hull and machinery and protection and indemnity insurance on the Vessel, and such other insurance covering such risks and perils, upon such terms and in such amount and with such endorsements as the Bank may reasonably require, including without limit, environmental coverage. In addition to protecting Borrower, the insurance must protect the Bank as a loss payee and as an additional insured (without liability for payment of premium), but only to the extent that the insurance company agrees to list the Bank as an additional insured, and must be written for at least one year at a time. The amount of Borrower's marine hull and machinery insurance shall not be less than the market value of the Vessel or the unpaid amount of the Loan, whichever is greater (except as otherwise restricted by law). The underwriter and maximum deductible on Borrower's insurance must be reasonably satisfactory to the Bank. The Bank may sign any proof of loss and endorse any check, draft, or other form of payment issued by the insurance company or its agent as a loss payment, and Borrower hereby appoints the Bank as Borrower's attorney-in-fact for this purpose. This power of attorney shall not be affected by Borrower's disability. Proceeds of the insurance may be used either to repair the Vessel or to reduce the indebtedness, in the Bank's discretion. If Borrower's insurance lapses or is canceled at any time before this Mortgage is fully paid and performed, the Bank

02/04/15 10:56:28 CT

must be given prompt notice of said lapse or cancellation. In the event of lapse or cancellation, or in the event of Borrower's failure to pay any premiums when due or otherwise to provide or maintain insurance coverage, the Bank may, but is not obligated to, buy replacement coverage protecting Borrower and the Bank or the Bank alone. In such event, Borrower will repay the premiums at the Bank's request with interest at the rate in effect under the Note. Borrower shall procure breach of warranty endorsements or separate the Bank's single interest coverage in an amount at all times equal to or greater than the Borrower's indebtedness to the Bank as set forth in the Note, such that no act or omission of Borrower, or any charterer, or breach of any warranty, including breach of any warranty of seaworthiness, whether express or implied, shall operate to forfeit the Bank's coverage under the above policies or result in a cancellation of insurance as to the Bank.

5.1.m   Seizure. If the Vessel shall at any time, while subject to the lien hereof, be libeled, seized, detained, levied or attached under process or color of legal authority for any cause whatsoever (individually or collectively the "Seizure"), Borrower will within forty-eight (48) hours of the Seizure notify the Bank in writing and, without expense to the Bank, within fourteen (14) days from the Seizure, either cause the Vessel to be released by filing an undertaking or stipulation or otherwise as may be lawfully permitted or furnish the Bank additional security of a value acceptable to the Bank. If Borrower shall fail or neglect to furnish additional security to the Bank or otherwise to release the Vessel from the Seizure, the Bank may (but need not) furnish security to release the Vessel, and if, as a result of the Seizure, the Vessel shall be sold at a marshal's sale or otherwise under legal process, any insurance money, excess proceeds and other sums recoverable with respect to the Vessel shall be paid to the Bank and shall be applied against the Indebtedness. In the event of a Seizure, Borrower authorizes the Bank to disclose any information which the Bank deems necessary to protect the Bank's interest in the Vessel and Borrower further authorizes the Bank or the Bank's agents in Borrower's name and as Borrower's attorney in fact to: (i) receive or take possession of the Vessel; (ii) defend any action and/or discharge any lien; and (iii) refer the protection of the Bank's interest to an attorney who is not the Bank's salaried employee and receive from Borrower reasonable attorneys' fees. This power of attorney shall not be affected by Borrower's disability.

5.1.n   Operation of Vessel. The Vessel shall always be under the command of a Master licensed by or having a certificate of competence issued by a country acceptable to the **United States** maritime authorities, and who meets the requirements of the Vessel's insurance policy.

5.2     Negative Covenants.

5.2.a   Debt. Borrower shall not, directly or indirectly, create, assume, incur, become or be liable for or with respect to any manner of obligations, subordinate loans, liabilities or indebtedness whatsoever to any Person, or by way of any guaranty that may give rise to a lien, security interest, or other encumbrance against the Collateral.

5.2.b   False Statements. Borrower will not furnish the Bank any certificate or other document that contains any untrue statement of material fact or that will omit to state a material fact necessary to make it not misleading in light of the circumstances under which it was furnished.

5.2.c   Name Changes. Borrower shall not, without the Bank's prior written consent: (i) change its corporate name or adopt an assumed corporate name, change its

jurisdiction of incorporation or corporate or organization structure, or change its organizational identification number; (ii) sell or any substantial portion of its assets; or (iii) reregister the Vessel in a jurisdiction other than the United States.

5.2.d   Guaranties. Borrower shall not guarantee, assume, endorse or otherwise, in any way, become directly or contingently liable in any manner with respect to the obligations or liabilities of any Person, except by endorsement of instruments or items for payment or deposit or collection or as required pursuant hereto or the other Loan Documents.

5.2.e   Capital/Ownership Structure. Without the prior written consent of the Bank, neither Borrower shall make any material change in its capital structure or in the ownership structure of Borrower.

5.2.f   Use of Vessel. Borrower hereby agrees, represents and warrants that the Vessel is not and shall not be used as Borrower's principal dwelling place. The Vessel may be operated only for pleasure and may not be used for any commercial purposes, unless the Bank otherwise agrees in writing. The Vessel may be operated only within the geographical limits and other requirements of the marine insurance covering the Vessel. If the Vessel is chartered, Borrower agrees to and Borrowers hereby assigns to the Bank all charter hire and all other payments received in consideration for said charter as additional security for this Agreement. Borrower shall keep all dockage charges current. Borrower shall not use, nor allow the use of, the Vessel for any illegal purpose or contrary to any provision of the laws, treaties, regulations or orders of the United States or other jurisdiction in which the Vessel is operated. If Borrower takes the Vessel to another country, Borrower will comply with all pertinent treaties between the United States and such country, and all laws and applicable regulations of such country. The illegal commerce in, or possession, carriage, or use of any firearms or controlled substance whatsoever on or about the Vessel is absolutely prohibited.

5.2.g   Change of Address or Location of Vessel. Borrower will not, without the Bank's prior written consent, move the Vessel from the place(s) as stated in the Loan Documents where it is customarily moored in the summer or stored in the winter, as the case may be, or from the State of the Vessel's principal use, other than for voyages with the intent of returning. Borrower agrees to inform the Bank within thirty (30) days if Borrower changes Borrower's name, identity, ownership, membership or structure in any manner. Borrower will notify the Bank promptly if Borrower changes Borrower's principal residence or place of business. Borrower agrees that any and all notices sent by the Bank to the address listed herein for Borrower, or the last known address of record for Borrower, shall constitute adequate notice to Borrower for all purposes.

5.2.h.   Restrictions on Sale, Charter or Use of Vessel. Borrower will not, without the Bank's prior written consent, sell or mortgage the Vessel, pledge it as security for another loan, give it away, lease, charter, carry passengers for hire, or otherwise use it in a manner or for purposes contrary to those specified in this Agreement. Notwithstanding the foregoing, Borrower may, without obtaining prior written consent from the Bank, charter the vessel for up to twelve (12) weeks per twelve-month (12) period, beginning on the date of this Agreement, and every twelve (12) month period thereafter. Notwithstanding the foregoing, Borrower shall not charter the Vessel under any bareboat or demise charter agreement (all charters entered into by the Borrower to be crewed charters in full compliance with all applicable laws and regulations).

5.2.i.   Unencumbered liquidity. During the term of the Loan, Guarantor's unencumbered liquidity (in the form of cash or securities traded on public markets) shall not at any time fall below One Million Dollars and 00/100 ($1,000,000.00).

VI.   Collateral Security

6.1    <u>Creation of Security Interest.</u>  In consideration of the extension of credit as described in this Note and as security for payment of all that is owed under this Note, Borrower hereby grants to the Bank a security interest in the Collateral, including without limitation: a) the Vessel, together with all masts, cables, engines, motors, machinery, sails, rigging, auxiliary boats, anchors, chains, tackle, spare parts, apparel, furniture, fixtures, tools, pumps, equipment and supplies, radar and other electronic equipment, tenders, toys, and all fishing equipment and other attachments, accessions, appurtenances, accessories, additions, improvements, replacements, substitutions, supplies and necessaries of all kinds, affixed to or used in or on the Vessel, whether or not removed from the Vessel; b) all freights, charter hire, earnings, income, revenue, profits and proceeds of sale or lease of the Vessel, or proceeds of requisition of title to the Vessel by governmental authority, if any, insurance claim payments and returned unearned premiums, whether in the form of cash or any other property, derived from the Vessel; c) any trailer used to transport the Vessel or the equipment of the Vessel; and d) any and all of Borrower's funds or property on deposit with or held by the Bank or its affiliates, to the extent permitted by applicable law, including Borrower's deposit account with the Bank.

6.2.    <u>Security Agreement.</u>  Borrower agrees that a Mortgage, or its equivalent in applicable jurisdictions, on the Vessel in the Bank's favor will be filed and recorded with the relevant authorities.  Borrower agrees to cooperate in regard to and pay all costs of documentation and filing and recording the Mortgage on the Vessel in the Bank's favor. In addition, the Bank may require that Borrower register the Vessel with the appropriate authority in the state or territory of principal use and that the Bank's security interest be perfected under state or territory law, whether through filing of a financing statement or notation on a certificate of title, or both.  Borrower agrees to cooperate in regard to any and pay all costs of registration of the Vessel and perfection of the Bank's security interest under applicable law.  Borrower specifically authorizes the Bank to file financing statements without Borrower's signature in any locations the Bank deems necessary. Borrower also agrees to pay all applicable taxes and other fees due and owing under the laws of any state or territory with respect to the Vessel, its purchase and use, including but not limited to the state or territory of the Vessel's principal use.  The Bank may, but is not obligated to, pay these amounts for Borrower.  If the Bank does pay these amounts, Borrower agrees to repay the Bank on demand, with interest at the rate provided in this Agreement.  Borrower agrees that such amount will be secured by the security interest Borrower has granted to the Bank.

6.3.    <u>Preservation of Collateral.</u>  The Bank may, but is not required to, take such action from time to time as the Bank reasonably deems appropriate to maintain or protect the Collateral. The Bank shall have exercised reasonable care in the custody and preservation of the Collateral if it takes such action as the Borrower shall reasonably require in writing; provided, however, that such request shall not be inconsistent with the Bank's status as a secured party, and the failure of the Bank to comply with any such request shall not be deemed a failure to exercise reasonable care. In addition, any failure of the Bank to preserve or protect any rights with respect to the Collateral against prior or third parties, or to do any act with respect to preservation of the Collateral, not so requested by the Borrower, shall not be deemed a failure to exercise reasonable care in the custody or preservation of the Collateral. Borrower shall have the sole responsibility for taking such action as may be necessary, from time to time, to preserve all rights of the Borrower and the Bank in the Collateral against prior or third parties.

6.4    <u>Other Actions as to any and all Collateral.</u> Borrower further agrees to take any other action reasonably requested by the Bank to ensure the attachment, perfection and first priority of, and the ability of the Bank to enforce, the Bank's security interest in any and all of the Collateral including, without limitation, (a) executing, delivering, and where appropriate, filing financing statements and amendments, relating thereto under the Uniform Commercial Code in any state the Bank deems appropriate, to the extent, if any, that Borrower's signature thereon is required therefor, (b) causing the Bank's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Bank to enforce, the Bank's security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the United States, or with other law as applicable in any foreign jurisdiction, as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Bank to enforce, the Bank's security interest in such Collateral, (d) obtaining U.S., and foreign governmental and other third party consents and approvals required, including without limitation, any consent of any licensor, lessor or other Person obligated on Collateral, (e) obtaining waivers from mortgages in form and substance reasonably satisfactory to the Bank, and (f) taking all actions required by the Uniform Commercial Code, or by other law, as applicable, in any relevant jurisdiction, or by other law as applicable in any foreign jurisdiction.

VII.    <u>Events of Default.</u>    The following shall constitute and be deemed Events of Default hereunder:

7.1    <u>Payment of Obligations.</u> Failure by a Borrower to make any payment or pay any sum when due under the Note, this Agreement, or any of the Loan Documents.

7.2    <u>Performance Obligations.</u> Failure by Borrower or Guarantors to perform, keep or observe any covenants, warranties, promises or agreements hereunder or under the Note or any other Loan Documents, including any mortgage, and such failure shall continue for a period of fifteen (15) days after Bank's written notice to Borrower of the occurrence thereof; provided, however, that the fifteen (15) day cure period provided by this Section 7.2 shall not apply to the specific Events of Default set forth in the remainder of this Section 7.

7.3    <u>Representation and Warranties.</u> Any warranty or representation now or hereafter made by Borrower hereunder or by any other party to the Loan Documents under the Loan Documents, is untrue or incorrect in any material respect or fails to state a material fact necessary to make such warranty or representation not misleading in light of the circumstances in which it was made, or any schedule, certificate, statement, report, financial data, notice or writing furnished to the Bank at any time by the Borrower or by a party or signatory to the Loan Documents is untrue or incorrect in any material respect or fails to state a material fact needed to make the foregoing not misleading in light of the circumstances in which the foregoing were furnished, on the date as of which the facts set forth therein are stated or certified.

7.4    <u>Judgments.</u> Any judgments or orders requiring, individually or in the aggregate, payment of monies in excess of $10,000 which is not covered by insurance, shall be rendered against Borrower, and such judgments or orders shall remain unsatisfied or undischarged and in effect for thirty (30) consecutive days without a stay of enforcement or execution thereof.

7.5    <u>Government Action.</u> If any proceeding is instituted or commenced by any state or officer thereof, or relevant foreign government or officer thereof, seeking a forfeiture, suspension, termination or revocation of Borrower's certificate or articles of incorporation, and Borrower shall fail to vacate any order or action entered in such proceeding within thirty (30) day.

02/04/15 10:56:30 CP

7.6    <u>Change in Management or Control.</u>  The Guarantors shall cease to collectively own beneficially or indirectly control at least fifty-one percent (51%) of the issued and outstanding shares of the Borrower.

7.7    <u>Insolvency and Related Proceedings.</u> If Borrower: (i) authorizes or makes an assignment for the benefit of creditors; (ii) generally shall not pay its debts as they become due; (iii) shall admit in writing its inability to pay its debts generally as they come due; or (iv) shall authorize or commence (whether by the entry of an order for relief or the appointment of a receiver, trustee, examiner, custodian or other similar official therefor or for any part of its property) any proceeding or voluntary case under any bankruptcy, reorganization, insolvency, dissolution, liquidation, adjustment or arrangement of debt, receivership or similar Laws or if such proceedings are commenced or instituted, or an order for relief or approving any petition commencing such proceedings is entered against Borrower, and Borrower, by any action or failure to act, authorizes, approves, acquiesces, or consents to the commencement or institution of such proceedings, and such proceedings are not dismissed within forty five (45) days after the date of filing, commencement or institution.

7.8    <u>False Statements.</u> Borrower has made a false or misleading statement about any fact on this Agreement, application for credit, or any of the Loan Documents.

7.9    <u>Material Adverse Change.</u>  The occurrence of any event or condition which has or could reasonably be expected to have a material adverse effect on the operations or financial condition of the Borrower, or on the Bank's prospect of payment, performance or ability to realize upon the Collateral, taken as a whole, as determined by the Bank in its reasonable discretion.

7.10    <u>Tax Liens.</u> If a notice or notices of lien, levy or assessment in excess of $10,000, individually or in the aggregate, is filed or recorded with respect to all or a substantial part of the Collateral owned by Borrower by the United States, or any department, agency or instrumentality thereof, by any foreign government, or by any state, county, municipality or other governmental agency, or any taxes or debts owing at any time or times hereafter to anyone or more of the foregoing in excess of $10,000 should become a lien, upon all or a substantial part of the Collateral owned by a Borrower, unless such notice or lien is removed within thirty (30) days after filing or recording of such notice or becoming such lien.

7.11    <u>Insurance.</u> If any insurer of any policy of insurance respecting a material portion of the Collateral issues any notice of cancellation of such a policy which is not cured or such coverage replaced within ten (10) days after such notice is issued, or any such policy is allowed to lapse and is not replaced by a substitute policy having an effective date prior to or contemporaneous with such cancellation or lapse.

7.12    <u>USA Patriot Act Disclosure.</u>  Borrower fails to furnish the Bank information sufficient to verify Borrower's identity as required under the USA Patriot Act.

7.13    <u>The Vessel.</u>  There shall have occurred the execution of process, arrest, seizure, notice of claim of lien or forfeiture against the Vessel, or the Vessel shall be made the subject of legal proceedings, and its continuance for more than fourteen (14) days without bonding or other release thereof.  It shall also be an Event of Default for Borrower to allow the Vessel to lessen in value, other than through normal depreciation, such that the Bank believes in good faith that the Bank's interest is no longer adequately protected.

7.14    <u>Guarantors.</u> A Guarantor of the Obligations dies, becomes insolvent or incompetent or breaches the terms of its/his/her guaranty, unless the amount of its/his/her guaranty is

paid and the Loan principal is reduced by the amount of such payment or other Guarantors or a new guarantor, in each case acceptable to the Bank, assumes the guaranty obligations of the Guarantor that dies, becomes insolvent or incompetent or breaches the terms of its/his/her guaranty.

7.15   Cross-Default. Any default or an event of default occurs under any note, agreement, or loan document in connection with any credit or loan Borrower, or any of the Borrower's Affiliates, has or may have with the Bank, as now in effect and as hereafter amended, restated, renewed, or superseded.

VIII.   Rights and Remedies of the Bank.

8.1   Termination of Commitment and Acceleration. Upon the Maturity Date, the Loan shall be automatically due and payable without any action, presentment, demand, protest or notice of any kind. Upon the happening or occurrence of any Event of Default set forth in Article VII, or an Event of Default under any of the Loan Documents, such Event of Default not having been previously cured or waived in writing by the Bank, the Bank, may, at its sole and complete discretion and option, declare the Note due and payable without any presentment, demand, protest, notice of any of the foregoing or other notice of any kind, all of which are hereby expressly waived notwithstanding anything contained herein or in the Note to the contrary. Upon the occurrence of any Event of Default, the Bank shall have all rights and remedies now or hereafter provided by applicable laws and without limiting the generality of the foregoing, may, at its option, also appropriate and apply toward the payment of each Note, any indebtedness of the Bank to the Borrower, howsoever, created or arising, and may also exercise any and all rights and remedies hereunder, under the Loan Documents, or in and to the collateral security referred to in Article VI hereof, including, without limitation, the Collateral of Borrower.

8.2   Other Remedies Upon Default. Upon an Event of Default, the Bank may do any one or more of the following with or without prior notice to Borrower or demand for performance, except as may be required by applicable law: a) set off Borrower' liability against or foreclose any funds of Borrower held by the Bank or its affiliates in an account of general deposit (other than IRA accounts, Keogh pension plan accounts or similar accounts); b) demand that Borrower assemble and deliver the Vessel to the Bank at such location as the Bank may reasonably require (however, Borrower' delivery of the Vessel will not relieve Borrower of Borrower' obligation to satisfy any deficiency which may arise upon the subsequent sale or other disposition of the Vessel; c) lawfully enter any premises where the Vessel may be located and repossess the Vessel, with or without judicial process or judicial decree; d) sell or otherwise dispose of the Vessel; e) bring suit at law, in equity, or in admiralty to foreclose the Bank's security interest and/or recover judgment for any and all amounts due under this Agreement; f) pursue any other remedy provided to the Bank under any applicable law or other Loan Document; and g) require that Borrower pay court costs and any reasonable amount spent for repossessing, storing, preparing for sale, or selling the Vessel, and any and all other foreclosure costs to the extent permitted by applicable law.

8.3   Rights of Secured Creditor. The Bank shall have, in addition to the rights and remedies given to it under this Agreement, the Note and the Loan Documents, all of the rights and remedies of a secured party under the Uniform Commercial Code as enacted in any jurisdiction in which any of the Collateral of the Borrower may be located, all rights and remedies of a mortgagee under the Mortgage, and all rights and remedies allowed by all applicable Laws, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by said Laws. All risk of loss, damage or diminution of value with respect to each Borrower's Collateral shall be borne by the Borrower at all times and the Bank shall have no responsibility, liability or obligation to the Borrower therefor except as a result of the Bank's gross negligence or willful misconduct.

8.4   <u>Disposition of Vessel; Application of Proceeds.</u> (a) If the Bank repossesses the Vessel without judicial process, the Bank may, in Borrower's name or in the Bank's name, sell, lease, charter, operate or otherwise use the Vessel as the Bank deems advisable, without being responsible for loss or damage, and the Bank may keep the Vessel at Borrower's premises or elsewhere, at Borrower's expense. For this purposes and subject to any applicable state regulation, the Bank is irrevocably appointed Borrower's true and lawful attorney-in-fact to make all necessary transfers of the Vessel, to pay, defend or obtain the release of all maritime liens, to waive and release any warranties at disposition, and to take all related actions in Borrower's name and stead as may be necessary and appropriate to enforce the Bank's rights under this Agreement. (b) The proceeds of sale or other disposition of the Vessel shall be applied in accordance with applicable law. To the extent permitted by applicable law, any late charges, costs of retaking the Vessel, storage, costs of sale including but not limited to cleaning, repairing and/or maintenance expenses, auctioneer's fee, sales commission, if any, and advertising, insurance, allowable attorneys' fees, collection costs, court costs, and any other necessary expenses will be paid first from the proceeds of the sale or other disposition of the Vessel. Next, all accrued interest to date of payment and any and all other sums (other than Principal) due pursuant to the terms of this Agreement shall be paid. Finally, the outstanding Principal shall be paid. Any surplus of proceeds of sale or disposition of the Vessel over the amounts of such charges and expenses and amounts owed to Bank shall be paid to Borrower to the extent that such surplus is not required to be paid to other persons with liens on the Vessel. To the extent permitted by applicable law, the Borrower shall be liable for any deficiency.

8.5   <u>Entry on Premises.</u> Upon the occurrence of an Event of Default, the Bank shall have the right to enter upon the premises of the Borrower where the Collateral of Borrower is located or believed to be located, and to enter Borrower's Vessel, without any obligation to pay rent or hire to a Borrower or any responsibility or liability to a Borrower for safeguarding said Collateral from loss or damage or diminution in value, except if caused by the Bank's gross negligence or willful misconduct, and render said Collateral unusable or remove said Collateral therefrom to the premises of the Bank or any agent of the Bank, for such time as the Bank may desire in order to effectively value, collect or liquidate said Collateral.

IX.   <u>Miscellaneous</u>

9.1   <u>Waiver.</u> The Bank's failure, at any time or times hereafter, either to require strict performance by Borrower of any provisions of this Agreement, the Note or any Loan Documents, or to enforce the Bank's rights under such terms or provisions, shall not waive, effect or diminish or modify such terms or provisions, notwithstanding any conduct or custom, actual or implied, of the Bank to the contrary or in refraining from so doing at any time or times. Any suspension or waiver by the Bank of an Event of Default hereunder or under any Loan Documents or right or remedy hereunder or under any Loan Document shall not suspend, waive, release or affect any other Event of Default or right or remedy hereunder or under any Loan Documents. No Obligations of the Borrower, Events of Default or right or remedy hereunder or under any Loan Documents shall be deemed suspended or waived by the Bank unless such suspension or waiver is in writing signed by a duly authorized officer of the Bank and directed to Borrower detailing such suspension or waiver.

9.2   <u>Applicable Law; Venue; Service of Process.</u> This Agreement and any related Loan documents shall be governed, enforced and construed in accordance with the laws of the State of Florida, without regard to any laws, rules or regulations concerning conflict of laws that might result in the application of the laws of any other jurisdiction. Provided, that matters pertaining to the perfection of liens and the enforcement of remedies with

02/04/15 10:56:32 CP

respect to Collateral shall be governed by the laws of the jurisdiction where the Mortgage is filed or the Collateral is located, as applicable, to the extent such local laws are mandatorily applicable to such issues.

Notwithstanding the foregoing, Bank reserves the right to exercise any of the remedies available to a secured lender under the laws of, including the maritime laws or Uniform Commercial Code or other laws of similar effect as adopted in, or as may apply in the United States, or any place where either Borrower is registered, maintains a place of business, or any place where the Vessel or any of the Collateral may be located, including, without limitation, the remedy of non-judicial repossession and sale.

Any legal action or proceeding with respect to this Loan Agreement or any related document may be brought in the courts of Broward County in the State of Florida or the Federal Courts of the United States for the Southern District of Florida located in Broward County, and by execution and delivery of this Agreement, the Borrower and the Bank consent to the non exclusive jurisdiction of those courts. The Borrower and the Bank irrevocably waive any objection, including any objection to the laying of venue or based on the ground of forum non conveniens, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or any document related hereto. Notwithstanding the foregoing, (i) the Bank shall have the right to bring any action or proceeding against the Borrower, any Guarantor, or their property in the courts of any other jurisdiction the Bank may deem necessary and appropriate in order to enforce its rights and remedies under the Loan Documents or any related documents, and (ii) the Borrower and the Bank each acknowledge that any appeals from the aforesaid courts may have to be heard by a court located outside the jurisdiction of the jurisdiction of such courts.

BORROWER HEREBY IRREVOCABLY APPOINTS ALLEY, MAASS, ROGERS & LINDSEY, P.A. AS AGENT FOR SERVICE OF PROCESS FOR THE PURPOSES HEREOF. BORROWER HEREBY AGREES THAT THE BANK MAY EFFECT SERVICE OF PROCESS UPON THE UNDERSIGNED BY MAILING PROCESS VIA MAIL OR COURIER TO ALLEY, MAASS, ROGERS & LINDSEY, P.A., 340 Royal Poinciana Plaza, Palm Beach, FL 33480. BORROWER IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF BANK TO SERVE PROCESS IN ANY MANNER PERMITTED BY APPLICABLE LAW.

9.3    Severability; Amendment. This Agreement, the Note and the Loan Documents shall be construed and interpreted in such manner as to be effective, enforceable and valid under all applicable Laws. If any provision of this Agreement, the Note or the Loan Documents shall be held invalid, prohibited or unenforceable under any applicable Laws of any applicable jurisdiction, such invalidity, prohibition or unenforceability shall be limited to such provision and shall not affect or invalidate the other provisions hereof or thereof or affect the validity or enforceability of such provision in any other jurisdiction, to the extent the provisions hereof and thereof are severable. No amendment of this Agreement will be valid unless in writing and signed by the Borrower and by a duly authorized officer of the Bank.

9.4    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

9.5    Section Headings.   Section headings used in this Agreement are for convenience only and shall not affect the construction or interpretation of this Agreement.

9.6 **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the Bank and Borrower, and their respective heirs, executors, administrators, personal representatives, successors and assigns; provided, however, that Borrower has no right to assign any of his or her rights or Obligations hereunder without the prior written consent of the Bank.

9.7 **Notices**. Any notices or consents required or permitted by this Agreement shall be: (i) in writing, (ii) delivered in person, telecopied or sent by certified or registered mail, postage prepaid, return receipt requested, to the address set forth below, unless such address is changed by written notice hereunder, and (iii) deemed duly given upon compliance with the above when sent by the Bank to Borrower or upon actual receipt of notice when sent by the Borrower to the Bank.

    (i)    If to the Borrower:

        BG Capital Management South Florida, LLC and
        BG 1 Lazzara, LLC
        Attn: Mr. Owen Duke
        1250 South Pine Island Road, #500
        Plantation, FL 33324

    (ii)    If to the Bank:

        IBERIABANK
        200 East Las Olas Blvd., Ste 2000
        Fort Lauderdale, FL 33301
        Attention: Maria Elena Ferrer

9.8 **Waiver of Jury Trial.** THE BORROWER (AND EACH GUARANTOR) AND THE BANK BY ACCEPTANCE OF THIS AGREEMENT, KNOWINGLY, VOLUNTARILY AND WITH ADVICE OF COUNSEL, HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN OR WITH RESPECT TO ANY PROCEEDING ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE, THE LOAN AGREEMENT, OR GUARANTIES, OR WITH RESPECT TO DEALINGS BETWEEN THE BANK AND THE BORROWER OR GUARANTORS CONCERNING ANY COURSE OF CONDUCT, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANK TO PROVIDE CREDIT TO THE BORROWER.

9.9 **Disclaimer of Consequential Damages.** IN NO EVENT SHALL THE BANK OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS AND AFFILIATES, BE LIABLE FOR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF PROFITS, ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE COLLATERAL OR THE LOAN.

9.10 **Interpretation.** In the event of conflicting terms, conditions, or requirements under any of the Loan Documents, the more stringent (as applied against the Borrower or Guarantor) term, condition, or requirement shall apply.

9.11 **Further Assurances.** From time to time, Borrower shall sign and deliver to the Bank such other and further documents and assurances as the Bank may require to maintain the priority of this Agreement, the Mortgage and any other security interest the Bank has in the Vessel or other Collateral.

02/04/15  10:56:33 CT

9.12    <u>Actions Taken on Behalf of Borrower.</u> If Borrower fails to do anything Borrower is required to do under this Agreement or any other agreement with the Bank, such as to discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Vessel, place and pay for any insurance thereon, order and pay for the repair, maintenance and preservation thereof or pay any necessary recording or filing fees, the Bank may, in its sole discretion and without further obligation, take these acts on Borrower's behalf as the Bank deems appropriate. These amounts so expended will be added to the unpaid portion of the Principal Indebtedness and the rate of interest accruing on the unpaid Principal will be applied until Borrower fully repays the Bank. The Bank may, but is not obligated to, increase the amounts of Borrower's payments under this Agreement to cover the resulting total unpaid balance. Borrower agrees to make those new payments amounts if so notified by the Bank. The Bank's security interest in the Vessel shall also secure these amounts. The Bank is under no obligation to purchase insurance to protect Borrower's interest, in any, in the Vessel or to otherwise satisfy any legal requirement such as se for liability insurance covering personal injury and property damage to others.

9.13    <u>Patriot Act Notice.</u> To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

9.14    <u>Periodic Review.</u>  The Loan, as well as Borrower's and Guarantors' liquidity and contingent liabilities, shall be reviewed by the Bank on an annual basis. At such times as are requested by the Bank, Borrower shall cooperate with the Bank in reviewing this Loan and the Borrower's and Guarantors' compliance with the terms and conditions of this Agreement and the provisions of the Loan Documents.

9.15    <u>Participations.</u> Each Borrower hereby consents to the Bank's participation, sale, assignment or transfer, at any time or times hereafter, of the Loans, the Loan Documents, the Bank's interest in the Collateral or any portion hereof or thereof, without affecting the liability of Borrower hereunder; and Borrower agrees to execute new notes, acknowledgement of assignments, confirmations of loan balances and certify the nonexistence of claims and offsets against the Bank, and provide other documents as Bank may reasonably request to effect any assignment, participation, syndication or sale of any of the Loans, the Loan Documents or the Collateral.

9.16    <u>Co-Borrowers.</u> The liability of BG Capital Management South Florida, LLC and BG 1 Lazzara, LLC is joint and several and coexistent. The liability of the BG Capital Management South Florida, LLC and BG 1 Lazzara, LLC to repay the Loan together with interest, etc, and to observe the terms and conditions of this Agreement/and any other Agreement/s, document/s that may have been or may be executed in connection with this Loan, is joint and several and consequently the Lender shall have the option, in its a sole discretion, to proceed against both or either of them to recover the Loan and other charges payable to the Lender.

- SIGNATURES ON FOLLOWING PAGE -

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**Witness One:**
Signature: _____
Print Name: CLAUDIA CASALIY

**BORROWER:**

**BG 1 Lazzara, LLC, a Florida**
**Limited liability company**

By _____
Owen Duke, Manager

**Witness Two:**
Signature: _____
Print Name: Tanya Flins

**BG CAPITAL MANAGEMENT SOUTH**
**FLORIDA, LLC, a Florida limited**
**liability company**

By: _____
Owen Duke, Manager

STATE OF FLORIDA )
COUNTY OF Broward )

The foregoing instrument was acknowledged before me this 14th day of January, 2015, by Owen Duke, as Manager of **BG 1 LAZZARA, LLC,** a Florida limited liability company, on behalf of the company, and as Manager of **BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC,** a Florida limited liability company, on behalf of the company. He is personally known to me or has produced FL Drivers License as identification.

[NOTARIAL SEAL]                    NOTARY PUBLIC SIGNATURE

TANYA V. DENIS
MY COMMISSION # EE 147917
EXPIRES: November 21, 2015
Bonded Thru Notary Public Underwriters

### ADDENDUM TO LOAN AGREEMENT

THIS ADDENDUM ("Addendum") to that certain Loan Agreement dated January 14, 2015 ("Agreement") is made and entered into by and among **IBERIABANK**, a Louisiana state-chartered bank ("Bank"), on one hand, and **BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC**, a Florida limited liability company, and **BG 1 LAZZARA, LLC**, a Florida limited liability company (collectively, jointly, and severally, the "Borrower"), on the other. In consideration of the good and sufficient consideration, the receipt and adequacy of which is hereby acknowledged, the Bank and Borrower hereby agree as follows:

1.     <u>Financial Information and Report</u>. Section 5.1.b of the Agreement is hereby deleted in its entirety and is replaced with the following:

        <u>Financial Information and Reporting.</u> The Borrower and each Guarantor shall cause to be furnished to the Bank:

        (i)    Every thirteen months from the date of the last personal financial statement, the Guarantor's prepared and signed personal financial statements, all in reasonable detail and in a form acceptable to Bank, inclusive of liquidity verification, brokerage statements, bank statements, and liquidity statements;

        (iii)    On an annual basis within sixty (60) days of each Borrower's respective fiscal year end, copies of each Borrower's company-prepared financial statements, all in reasonable detail and in a form acceptable to Bank, inclusive of liquidity verification, brokerage statements, bank statements, and liquidity statements;

        (iv)    Promptly after notice of the commencement thereof, notice, in writing, of any actions, seizures, adverse claims, detentions, sequestrations, suits, arbitration or other proceedings instituted, commenced or to the Borrower's or each Guarantor's knowledge, threatened against or affecting the Borrower, the Collateral, or Guarantor;

        (v)    Promptly after the occurrence thereof, notice, in writing, of any other matter which has resulted in, or might result in, a materially adverse change in the financial or other condition of Borrower or any Guarantor or their ability to fully perform their Obligations, under the terms and conditions of this Agreement and the Loan Documents or their ability to repay the Note;

        (vi)    With reasonable promptness, such other information respecting the business, properties or the condition or operations, financial or otherwise, of the Borrower or Guarantor(s), as the Bank may from time to time reasonably request in writing; and

        (vii)    Notice of any change in location of any place of business, the state of incorporation, the form of business entity, the legal name of the Borrower or the jurisdiction of flagging of the Vessel at least thirty (30) days prior to such change (and no such change may be made without the prior written consent of the Bank).

2.     <u>Miscellaneous</u>: In the event of any conflict between the terms herein and the Agreement, this Addendum will govern and control. Except as amended hereby, the Agreement is ratified and

declared to be in full force and effect. All capitalized terms not defined herein shall have the meanings as set forth in the Agreement.

The undersigned parties have executed this Addendum to the Agreement as of the dates set forth below their names.

**Borrowers:**

**BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC,**
a Florida limited liability company

By: _____
Name:  Owen Duke, Manager
Date: _3 - 17 - 2015_

**BG 1 LAZZARA, LLC,**
a Florida limited liability company

By: _____
Name: Owen Duke, Manager
Date: _3 - 17 - 2015_

**Bank:**

**IBERIABANK,**
a Louisiana state-chartered bank

By: _____
Name: Maria Elena Ferrer, Senior Vice President
Date: _3 - 17 - 2015_

05/14/15 10:29:48 JD

EMAILED Batch #: 24988500 / Doc #: 9 / File Date: 1/19/2015 3:49:00 PM
1258306

### IBERIABANK PREFERRED SHIP MORTGAGE

This Preferred Ship Mortgage (the "Mortgage") is made and entered into effective as of the 15 day of **January, 2015**, by and between **BG 1 Lazzara, LLC**  (the "Owner"), whose primary residence (or principal place of business if not an individual) is located at **1250 S. Pine Island Road, Suite 500, Plantation, FL 33324** and **IBERIABANK**, a Louisiana state-chartered bank (together with its successors and assigns, collectively "Lender"), whose address is 200 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, FL 33301.

### RECITALS

1. Owner and BG Capital Management South Florida, LLC (collectively, "Co-Borrowers") have applied for a **$1,715,000.00** loan (the "Loan") from Lender. Lender has agreed to make the Loan to the Co-Borrowers, provided the Owner grants LENDER a preferred ship mortgage on that certain vessel owned by the Owner and identified as follows:

   a. Name: **BG**

   b. Year Make and Model: **2009 75' Lazzara motor yacht**

   c. Official Number: _____

   d. Hull Identification Number: **LYC75016J809**

   e. Hailing Port/Mooring Location: **Miami Beach, FL**

2. The Owner's name(s) and address are as stated above. The amount of the direct or contingent obligations that is or may become secured by this Mortgage (excluding interest, expenses and fees) is $1,715,000.00. The interest of the Owner in the Vessel is one hundred percent (100%) of the whole of the Vessel. The interest of the Owner being mortgaged is one hundred percent (100%) of the whole of the Vessel.

**NOW, THEREFORE,** in consideration of Lender's agreement to make the Loan and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Owner hereby grants, bargains, sells, conveys, transfers, assigns, pledges, grants a security interest in, sets over, hypothecates and mortgages unto the Lender, the whole of the Vessel to have and to hold the Vessel unto the use and benefit of Lender forever; provided, however, that if Owner shall pay or cause the Indebtedness to be paid in full to Lender, then upon payment by the Owner of any recording or other fees attendant to filing the satisfaction of this Mortgage with the United States Coast Guard and thenceforth this Mortgage and everything herein contained shall cease and be null and void; otherwise this Mortgage shall be and remain in full force and effect; and further provided that the Vessel is mortgaged to the Lender subject to the following further representations, warranties, covenants, agreements, conditions and provisions of this Mortgage.

### ARTICLE I
### DEFINITIONS

For purposes of this Mortgage, the following terms shall have the meanings set forth below.

1.1    "Act" means the Commercial Instruments and Maritime Liens Act (formerly commonly known as the Ship Mortgage Act), as codified in 46 U.S.C. §§ 31301 et seq.

1.2    "Indebtedness" means all indebtedness of Owner and/or Co-Borrowers to Lender of any kind and nature whatsoever, whether direct, indirect, contingent, primary, secondary, joint or individual and

05/14/15 10:29:49 JD

whether now existing or hereafter incurred, including without limitation all obligations under the Note and the other Loan Documents.

1.3   "**Loan Documents**" means the Note, the Loan Agreement, this Mortgage and any other loan documents now or hereafter executed by Owner or Co-Borrowers in connection with the Indebtedness.

1.4   "**Lender**" means IBERIABANK, a Louisiana state-chartered bank, and its successors and permitted assigns, as their interests may appear.

1.5   "**Note**" means that certain Term Note dated of even date herewith executed by Co-Borrowers for the benefit of Lender.

1.6   "**Permitted Encumbrances**" means: (a) the lien of this Mortgage or other liens in favor of Lender; (b) liens for damages arising out of maritime tort; (c) liens for wages of the crew of the Vessel; (d) liens for general average or salvage (including contract salvage); (e) liens for wages of stevedores when employed directly by a person listed in the Act; or (f) maritime and other liens for repair, services, and supplies to the Vessel arising in the ordinary course of business.

1.7   "**Vessel**" means the vessel identified in the recitals of this Mortgage, together with all of its engines, boilers, machinery, covers, masts, bowsprits, boats, spars, anchors, cables, chains, rigging, tackle, capstans, fittings, tools, pumps and pumping equipment, gear, apparel, furniture, equipment, spare parts, supplies, accessions and accessories and all other appurtenances thereunto appertaining and belonging, whether now owned or hereafter acquired (subject to any limitations on after-acquired property in consumer goods imposed by applicable law), whether on board or not and also any and all additions, improvements and replacements hereafter made in, for or to such vessel, or any part thereof, or in or to its equipment and appurtenances aforesaid, and all charter, earnings, hire, freight, income, revenue or other monies obtained through the use, operation, sale or lease thereof, all proceeds of requisition of title to the vessel, insurance claim payments and returned or unearned premiums, and all proceeds of the foregoing.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Owner hereby represents and warrants to Lender as follows:

2.1   **Mortgage is Legal, Valid and Binding.** This Mortgage constitutes a legal, valid and binding obligation of Owner. This Mortgage shall be recorded as a first preferred mortgage in the Vessel which is enforceable against Owner in accordance with its terms. If Owner is not a natural person, the persons executing this Mortgage represent that Owner is duly organized and validly existing and that they have the power and authority to execute and deliver this Mortgage on behalf of the Owner.

2.2   **Title to Vessel.** The Owner is the sole, true and lawful owner and is lawfully possessed of the Vessel, and the Owner owns all right, title and interest in and to the Vessel free and clear of all complaints in rem, libels, liens (maritime or otherwise), charges, claims, security interests, mortgages or other encumbrances of any kind or nature except for Permitted Encumbrances.

2.3   **Citizen of United States.** Owner is a Citizen of the United States within the meaning of the Act, for the purpose of operating the Vessel in the United States and is entitled to own and operate the Vessel in the United States under its certificate of documentation.

## ARTICLE III
## COVENANTS

Owner covenants and agrees with Lender as follows:

Page 2 of 10

3.1 **Covenants in Loan Documents.** Owner will fully perform or cause to be fully performed all covenants, agreements, obligations and conditions required of Owner in the Note and the other Loan Documents.

3.2 **Maintain Citizenship and Documentation of Vessel.** Owner will at all times maintain the Vessel, so long as it shall be subject to the lien hereof, as a vessel of the United States and shall maintain the documentation of the Vessel under the laws of the United States, and shall maintain the same hailing port for the Vessel as set forth in its current certificate of documentation unless a change of said port is authorized by the Lender in writing. Owner shall continue to be a citizen of the United States entitled to own and operate the Vessel in the U.S. under its certificate of documentation, which Owner shall maintain in full force and effect.

3.3 **Title to Vessel.** Owner shall continue to own and possess the whole of the Vessel free from all complaints in rem, libels, liens (maritime or otherwise), charges, claims, security interests, mortgages, pledges or other encumbrances of any kind or nature except for Permitted Encumbrances. The Owner hereby does and will forever warrant and defend the title and possession of the Vessel, and each part thereof, for the benefit of the Lender, against any and all claims and demands whatsoever.

3.4 **Preservation of Mortgage Lien.** Owner will comply with and not permit the Vessel to be operated contrary to applicable law, including without limitation the Act, and will take any and all such other action as may be required from time to time in order to establish and maintain this Mortgage as a valid and perfected first preferred ship mortgage under the Act on the Vessel in accordance with the terms hereof.

3.5 **Transfer and Location of Vessel.** The Owner shall not sell or transfer any interest in the Vessel, or place or permit the Vessel to be placed under any foreign registration or flag or change the hailing port of the Vessel, or do, suffer, or permit anything to be done, including placing the Vessel under charter, which would or might adversely affect the registration or documentation of the Vessel under the laws or regulations of the United States, without the prior written consent of the Lender. Owner will not, without Lender's prior written approval, remove the Vessel from its mooring location or anchorage shown above other than for voyages with the intent of returning in less than six (6) months. Owner will inform Lender of any different storage location. Owner will not abandon the Vessel. Owner shall not, without the prior written consent of Lender, transfer or change or attempt to transfer or change the Flag of the Vessel, and any such written consent to any one transfer or change of Flag shall not be construed to be a waiver of this provision with respect to any subsequent proposed transfer or change of Flag. ANY TRANSFER OR CHANGE TO WHICH LENDER CONSENTS SHALL BE SUBJECT TO ALL THE PROVISIONS OF THE LOAN DOCUMENTS AND THE LIENS THEY CREATE. ANY OTHER TRANSFER OR CHANGE OF THE FLAG OF THE VESSEL SHALL BE NULL AND VOID AS TO THE LENDER.

3.6 **Charges and Taxes.** Owner will from time to time pay or discharge or cause to be paid or discharged, as they become due and payable, all lawful repair bills, storage bills, dockage charges, taxes, assessments, fines and other charges levied, assessed or imposed upon the Vessel. Lender may, but does not commit to, pay any of these charges if Owner does not. If Lender does pay any of the aforesaid charges, Owner will repay Lender on demand, with interest at the rate in effect under the Note.

3.7 **Seizure of Vessel.** If the Vessel shall at any time, while subject to the lien hereof, be libeled, seized, detained, levied or attached under process or color of legal authority for any cause whatsoever (individually or collectively the "Seizure"), Owner will within forty-eight (48) hours of the Seizure notify the Lender in writing and, without expense to the Lender, within fourteen (14) days from the Seizure, either cause the Vessel to be released by filing an undertaking or stipulation or otherwise as may be lawfully permitted or furnish the Lender additional security of a value acceptable to the Lender. If Owner shall fail or neglect to furnish additional security to the Lender or otherwise to release the Vessel from

the Seizure, the Lender may (but need not) furnish security or take any other lawful actions to release the Vessel, and if, as a result of the Seizure, the Vessel shall be sold at a marshal's sale or otherwise under legal process, any insurance money, excess proceeds and other sums recoverable with respect to the Vessel shall be paid to the Lender and shall be applied against the Indebtedness. In the event of a Seizure, Owner authorizes Lender to disclose any information which Lender deems necessary to protect Lender's interest in the Vessel and Owner further authorizes Lender or Lender's agents in Owner's name and as Owner's attorney in fact to: (i) receive or take possession of the Vessel; (ii) defend any action and/or discharge any lien; and (iii) refer the protection of the Lender's interest to an attorney who is not Lender's salaried employee and receive from Owner reasonable attorneys' fees. This power of attorney shall not be affected by Owner's disability.

3.8     **Insurance.** Owner will maintain in full force and effect fire, theft, and "all risk" marine hull and machinery and protection and indemnity insurance on the Vessel, and such other insurance covering such risks and perils, upon such terms and in such amount and with such endorsements as Lender may reasonably require, including without limit, environmental coverage. In addition to protecting Owner, the insurance must protect Lender as a loss payee and as an additional insured (without liability for payment of premium) and must be written for at least one year at a time. The amount of Owner's marine hull and machinery insurance shall not be less than the market value of the Vessel or the unpaid amount of the Loan, whichever is greater (except as otherwise restricted by law). The underwriter and maximum deductible on Owner's insurance must be reasonably satisfactory to Lender. Lender may sign any proof of loss and endorse any check, draft, or other form of payment issued by the insurance company or its agent as a loss payment and Owner hereby appoints Lender as Owner's attorney-in-fact for this purpose. This power of attorney shall not be affected by Owner's disability. Proceeds of the insurance may be used either to repair the Vessel or to reduce the Indebtedness, in Lender's discretion. If Owner's insurance lapses or is canceled at any time before this Mortgage is fully paid and performed, Lender must be given prompt notice of said lapse or cancellation. In the event of lapse or cancellation, or in the event of Owner's failure to pay any premiums when due or otherwise to provide or maintain insurance coverage, Lender may, but is not obligated to, buy replacement coverage protecting Owner and Lender or Lender alone. In such event, Owner will repay the premiums at Lender's request with interest at the rate in effect under the Note.

Owner shall procure breach of warranty endorsements or a separate Mortgagee's single interest coverage in an amount at all times equal to or greater than the Owner's Indebtedness to Mortgagee secured hereby, such that no act or omission of Owner, or any charterer, or breach of any warranty, including breach of any warranty of seaworthiness, whether express or implied, shall operate to forfeit Mortgagee's coverage under the above policies or result in a cancellation of insurance as to Mortgagee.

**INSURANCE IS REQUIRED IN CONNECTION WITH THIS LOAN. BORROWER HAS THE OPTION TO FURNISH THE REQUIRED INSURANCE COVERAGE THROUGH AN INSURER OR AGENT OF BORROWER'S CHOICE OR THROUGH AN INSURANCE POLICY THAT IS IN EXISTENCE AND THAT IS OWNED OR CONTROLLED BY BORROWER OR AN INSURANCE POLICY OBTAINED FROM AN INSURANCE COMPANY AUTHORIZED TO DO BUSINESS IN THE STATE IN WHICH THIS AGREEMENT IS EXECUTED. LENDER MAY REJECT BORROWER'S CHOICE OF INSURER OR AGENT ONLY IF BASED ON REASONABLE STANDARDS AS PROVIDED BY APPLICABLE LAW.**

3.9     **Operation and Maintenance of Vessel.** Owner will operate or take all actions necessary to cause the Vessel to be operated in full compliance with the Act and every other applicable law, treaty, convention, order, rule or regulation of the United States, any state or any other jurisdiction (foreign or otherwise) wherein operated or any department or agency thereof, including without limitation the Federal Maritime Commission, the U.S. Maritime Administration, the United States Department of Transportation, the United States Coast Guard, the Bureau of Customs, the United States Department

of the Treasury and the Federal Communications Commission. Owner will at all times and at its own cost and expense maintain and preserve the Vessel in good condition, working order and repair, ordinary wear and tear excepted, and will cause the Vessel to be kept fully equipped and such equipment to be kept in good condition, working order and repair, ordinary wear and tear excepted. Owner shall not, without Lender's prior written consent, make any substantial change or alteration in the Vessel, its structure, rigging, or engines. Owner promises that at no time will Owner use the Vessel for any commercial purpose, as Owner's principal dwelling or for bareboat charter, without Lender's express prior written consent. Unless Owner is in default under this Agreement and Lender exercises any of Lender's remedies upon default, Owner will be permitted to retain actual possession and use of the Vessel. The Vessel may be operated only for pleasure unless Lender otherwise agrees in writing. The Vessel may be operated only within the geographical limits and other requirements of the marine insurance covering the Vessel.

3.10    **Creation of Liens.** Neither the Owner nor any other person (including without limitation any master or charterer of the Vessel) has or shall have any right, power or authority to create, incur or permit to be placed or imposed upon the Vessel, or any part thereof, or any of its freights, profits or hire, any lien whatsoever other than the Permitted Encumbrances; provided, however, that (i) any permitted lien for repairs, services or supplies under subsection (f) of the definition of Permitted Encumbrances in Section 1.6 shall be subject and subordinate to the lien of this Mortgage; and (ii) notwithstanding anything in the foregoing to the contrary, Owner shall, no later than 30 days after they become liens on the Vessel, pay, satisfy or discharge any and all liens of the types described in clauses (b), (c), (d) and (e) of such definition. Owner shall notify Lender in the event that any wages and all other claims which might create a lien on the Vessel have not been paid in full when due.

3.11    **Requisition of Title to Vessel.** In the event that title or ownership of the Vessel shall be requisitioned, purchased or taken by any government of any country or any agent thereof, the lien of this Mortgage shall be deemed to attach to the claim for compensation, and the compensation, purchase price, reimbursement or award shall be payable to the Lender. Owner shall promptly execute and deliver such documents, if any, and shall promptly do and perform such acts, if any, as in the opinion of the Lender may be necessary or useful to facilitate or expedite the collection by the Lender of such compensation, purchase price, reimbursement or award.

3.12    **Notice of Loss or Adverse Claim.** Within forty-eight (48) hours of (a) any requisition of the use of or title to, or seizure or forfeiture of, the Vessel by any governmental authority or any other party, or the attachment, levying upon, filing of an action in rem against, detention, sequestration or taking into custody of the Vessel in connection with any proceeding, (b) any marshal's or other sale of the Vessel, or (c) any casualty, accident, theft, destruction, loss or damage to the Vessel, Owner shall provide notice of same to Lender.

3.13    **Copies of Mortgage and Notice.** Owner shall carry, or cause to be carried, a certified copy of this Mortgage and of any amendments and supplements hereto, or assignments hereof, with the Vessel's documents and on board the Vessel with the ship's papers and will exhibit the same or cause the same to be exhibited, on demand, to any person having business with the Vessel and to any representative of the Lender. Unless otherwise approved by the Lender, a notice reading as follows, printed in plain type of such size that it shall cover a space not less than six inches wide by nine inches high, protected from exposure to the elements, shall be kept prominently displayed in the wheelhouse and in the captain's cabin on the Vessel:

**Notice of Mortgage:**
**This Vessel is covered by a Preferred Ship Mortgage**
**from BG 1 Lazzara, LLC, the Owner**
**to IBERIABANK, the Lender**

Page 5 of 10

3.14    **Inspection of Vessel and Books.** Owner will at all times let Lender inspect the Vessel and its cargoes and papers (including, but not limited to, any relevant certificate of title, license, certificate of documentation or other vessel document, ship mortgage and policy of insurance) and examine Owner's related accounts and records.

3.15    **Further Action.** From time to time, Owner shall, and the Lender may on behalf of Owner, execute and deliver such other and further instruments and assurances and take such other actions as in the opinion of Lender's counsel may reasonably be required to subject the Vessel more effectually to the lien hereof and to the payment of the Indebtedness and for operation of the Vessel as herein provided, and (in case of an Event of Default) to effectuate sales as provided in Article IV hereof.

ARTICLE IV
DEFAULT

4.1    **Events of Default.** The occurrence of any of the following events shall constitute an event of default under this Mortgage (an "Event of Default"): (a) an event of default as defined therein shall occur and be continuing under this Mortgage or the other Loan Documents; (b) Owner shall fail to perform any covenant herein contained beyond any applicable notice and/or cure periods; (c) Owner has made a false or misleading statement about any important fact in this Mortgage or in the related Note or application for credit approval; (d) Owner does not make any payment or pay any other sum when due under the Note, the Loan Agreement or this Mortgage; (e) Owner (if an individual) dies or becomes incompetent or otherwise unable to make timely payments of any sum due under the Note or this Mortgage; (f) Owner becomes insolvent, files for bankruptcy, receivership, insolvency or similar proceedings, or any assignment for the benefit of creditors, or similar relief, or creditors institute any such proceedings against Owner; (g) any other event occurs that Lender in good faith believes endangers Owner's ability to repay the Note or this Mortgage; or (h) any other event occurs that Lender in good faith believes jeopardizes or impairs the value of Lender's collateral for Owner's obligations under this Mortgage or Lender's ability to realize that value in a foreclosure.

4.2    **Remedies.** If an Event of Default shall have occurred and be continuing, then the Lender may, in every case and concurrently or separately:

(a)    Exercise any or all remedies available to Lender under the Loan Documents, including without limitation acceleration of payment of all Indebtedness;

(b)    Exercise all the rights and remedies provided (i) under this Mortgage; (ii) in foreclosure and otherwise given to Lenders by the provisions of the Act; and (iii) to the extent not preempted by federal law, to a secured party when a debtor is in default under a security agreement under the Florida Uniform Commercial Code;

(c)    Exercise any other right or remedy provided by law or agreement, including without limitation the right of setoff and the right to recover deficiency or other judgment for any amount due under the Loan Documents or hereunder;

(d)    Take and enter into possession of the Vessel, at any time, wherever the same may be, without legal process and without being responsible for loss or damage, and Owner or other person in possession shall forthwith, upon demand of the Lender, surrender to the Lender possession of the Vessel and the Lender may, without being responsible for loss or damage except in case of the Lender's own gross negligence, willful misconduct or bad faith, hold, lay up, lease, charter, operate or otherwise use the Vessel for such time and upon such terms as it may deem to be for its best advantage, accounting only for the net profits, if any, arising from such use of the Vessel and charging upon all receipts from the use of the Vessel or from any sale thereof or from the exercise of any of the powers conferred by subparagraph (e) next

Page 6 of 10

following, all costs, expenses, charges, damages or losses by reason of such use and with the right to dock the Vessel free of charge at the Owner's dock or elsewhere at Owner's expense;

(e)     Demand, collect, receive, compromise and sue for, so far as may be permitted by law, in the name of the Owner, all earnings, revenues, income and profits of the Vessel, all amounts due from insurers under any insurance thereon as payments of losses or as return premiums or otherwise, all salvage awards and recoveries, all recoveries in general average or otherwise, and all other sums due or to become due in respect of the Vessel, or in respect of any insurance thereon, from any person whomsoever, and to make, give and execute in the name of the Owner acquittances, receipts, releases or other discharges for the same, and to endorse and accept in the name of Owner all instruments in writing with respect to the foregoing, and Owner does hereby irrevocably appoint the Lender the true and lawful attorney-in-fact of Owner, upon the happening of an Event of Default, to do all said acts; and

(f)     Take and enter into possession of the Vessel at any time, wherever the same may be, without legal process and, if it seems desirable to the Lender and without being responsible for loss or damage, sell the Vessel upon such terms and conditions as the Lender may determine, free from any claim of or by Owner, at a public sale or sales after advertisement or at a private sale or sales after any required notice to Owner, at any place as the Lender may specify and in such commercially reasonable manner as the Lender may deem advisable.

In any suit to enforce its rights, powers or remedies, the Lender shall be entitled as a matter of right: (i) to the appointment of a receiver or receivers of the Vessel and the earnings thereof with full rights and powers to use and operate the Vessel; and (ii) to a decree ordering and directing the sale and disposition of the Vessel. The Lender may become the purchaser at the said sale, and the Lender shall have the right to credit on the purchase price any and all sums of money due to the Lender hereunder.

Each and every right and remedy provided in this Section 4.2 shall be cumulative and in addition to every other remedy given hereunder or otherwise existing. The exercise of any right or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right or remedy. No waiver, delay or omission by the Lender in the exercise of any right or remedy accruing upon any Event of Default shall impair the Lender's right to exercise such right or remedy or be construed to be a waiver of any such Event of Default or to be any acquiescence therein. Nothing contained herein shall limit any rights or remedies available to the Lender under the Loan Documents, regardless of the existence of an Event of Default, and nothing in this Section 4.2 shall be interpreted in such manner as to permit Lender to exercise any remedies contrary to applicable law.

4.3     **Application of Moneys.** The proceeds of any judicial or other sale of the Vessel and the net earnings from any management, charter, lease, operation or other use of the Vessel, under any of the powers specified in Section 4.2, together with the proceeds of any insurance, claim for damages, or judgment and any other moneys received from or for the account of Owner pursuant hereto or otherwise shall be applied in accordance with the provisions of the Loan Documents.

4.4     **Advances and Entry by Lender.** If Owner shall default in the performance or observance of any of the covenants in this Mortgage, the Lender may, in its discretion, do any act or make any expenditures Lender deems necessary or appropriate to remedy such default or protect Lender's rights, including, without limitation of the foregoing, the obtaining of insurance, the payment and discharge of taxes and liens, entry upon the Vessel to make repairs (and for that purpose docking and maintaining the Vessel) and defending suits. Owner shall reimburse the Lender on demand, with interest rate as set forth in the Note for any and all reasonable expenditures so made or incurred. Until Owner has so reimbursed the Lender for such expenditures, advances and expenses, the amount thereof shall be a debt due from Owner to the Lender, and payment thereof shall be secured by the lien of this Mortgage.

05/14/15  10:29:58  JD

4.5    **Sales, etc. of Certain Assets.** Unless and until one or more Events of Default shall occur and be continuing, the Owner (a) shall be permitted to retain actual possession and use of the Vessel and (b) shall have the right, from time to time, in its discretion and without application to the Lender, and without obtaining a release therefrom by the Lender, to dispose of, free from the lien hereof, any engines, boilers, machinery, covers, masts, bowspirits, boats, spars, anchors, cables, chains, rigging, tackle, capstans, fittings, tools, pumps and pumping equipment, gear, apparel, furniture, equipment, spare parts, supplies, accessions, accessories or any other appurtenances of the Vessel that are no longer useful, necessary, profitable or advantageous in the operation of the Vessel, by first or simultaneously replacing the same with new engines, boilers, machinery, covers, masts, bowspirits, boats, spars, anchors, cables, chains, rigging, tackle, capstans, fittings, tools, pumps and pumping equipment, gear, apparel, furniture, equipment, spare parts, supplies, accessions, accessories or other appurtenances of not less than equal value at the time of replacement, which shall forthwith become subject to the lien of this Mortgage as a preferred ship mortgage thereon.

### ARTICLE V
### MISCELLANEOUS

5.1    **Notices.** All notices provided for herein shall be in writing and addressed to the party entitled to such notice at the address set forth above or such other address as shall be provided by such party to the other party. Notices shall be hand delivered, sent by reliable overnight courier, telegram, confirmed facsimile or by certified mail return receipt requested.

5.2    **Invalidity of Any Provision.** If any provisions hereof shall be held invalid or unenforceable according to law, the remaining provisions hereof shall not be affected thereby and shall continue in full force and effect.

5.3    **Successors and Assigns: Joint and Several Liability.** All the covenants, stipulations, promises and agreements contained in this Mortgage shall bind and inure to the benefit of Owner and the Lender and their respective successors and permitted assigns; provided, however, that nothing in this Section shall be deemed to permit any sale or transfer of the Vessel otherwise prohibited hereunder. If more than one person and/or entity executes this Mortgage as Owner, each such person or entity shall be jointly and severally liable for all of the obligations of Owner hereunder, and such obligations shall be absolute and unconditional.

5.4    **No Waiver.** No provision of this Mortgage or any other document and none of the actions or omissions to act by the Lender contemplated thereby shall be deemed to or shall constitute a waiver by the Lender of the preferred status of this Mortgage or of any of the benefits, privileges or provisions given by the Act.

5.5    **Governing Law.** This Mortgage shall be governed by and construed in accordance with the general maritime law of the United States and, to the extent not permitted by such general maritime law, the laws of the State of Florida.

5.6    **Venue.** Owner expressly submits and consents to the non-exclusive jurisdiction of any state or federal court located within Broward County, Florida, in any action, suit or proceeding commenced therein in connection with or with respect to this First Preferred Ship Mortgage, the Loan Agreement, Note or any Loan Document and WAIVES ANY RIGHT TO JURY TRIAL AND OBJECTION TO VENUE IN CONNECTION THEREWITH.

5.7    **Waiver of Jury Trial.** OWNER AND LENDER BY ACCEPTANCE OF THIS AGREEMENT, KNOWINGLY, VOLUNTARILY AND WITH ADVICE OF COUNSEL, HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN OR WITH RESPECT TO ANY PROCEEDING ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS FIRST PREFERRED SHIP MORTGAG, THE LOAN AGREEMENT, THE NOTE, GUARANTIES OR OTHER LOAN AGREEMENT, OR WITH RESPECT TO DEALINGS

BETWEEN LENDER AND OWNER CONCERNING ANY COURSE OF CONDUCT, STATEMENTS (WHETHER VERAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO PROVIDE CREDIT TO BORROWERS.

5.8     **Attorneys' Fees and Costs**. To the extent permitted by law, Owner shall pay all of Lender's reasonable attorneys' fees and costs, at all pretrial, trial and appellate levels, relating to the enforcement of this Mortgage, any claim made by Owner or any third party arising out of or otherwise relating to this Mortgage, the ownership of the Vessel, any maritime or other lien upon the Vessel, or the Seizure of the Vessel.

5.9     **Future Advances.**     This Mortgage is executed for the purpose of securing not only the payment of the *above* described Note but also to secure all renewals, extensions or rate modifications of the *above* described Note, and said Mortgage shall remain in full force and effect to secure all renewals, extensions or rate modifications of the *above* described Note.

[Signature(s) on the following page]

IN WITNESS WHEREOF, the undersigned has executed this instrument on this the 15 day of January, 2015.

Witness One:

Signature: _Barbara Foli_    Owner:
Print Name: _Barbara Folcini_

Witness Two:    BG 1 LAZZARA, LLC, a Florida limited
    liability company
Signature: _____
Print Name: _Michael J. Cardenas_    By: _Owen Duke_
    Owen Duke, Manager

State of Florida

County of _BROWARD_

Executed before me, this 15 day of January, 2015, by **Owen Duke**, as Manager of BG 1 Lazzara, LLC, a Florida limited liability company, who is [✓] personally known to me or [ ] has produced _____ as identification.

[SEAL]

KIRSTIE WARD
Notary Public - State of Florida
My Comm. Expires Jan 26, 2018
Commission # FF 059778
Bonded Through National Notary Assn.

_Kirstie Ward_
Notary Public, State of Florida
Print Name: _KIRSTIE WARD_

_Jan 15, 15_

*Loan# 53 004 02540*

## SATISFACTION AND RELEASE OF PREFERRED SHIP MORTGAGE

The undersigned, **Comerica Bank ("Mortgagee")** the holder of a certain First Preferred

Mortgage on the Marshall Islands flag vessel **BG** with official number **70683** dated **September**

**11, 2009**, granted by **BG Capital LSX Corp.** to Mortgagee, to secure payment of the total

amount of **$3,000,000.00 USD**, with interest, costs, expenses and performance of mortgage

covenants, and recorded on **September 11, 2009**, in the office of the Deputy Commissioner of

Maritime Affairs of the Republic of The Marshall Islands in **Fort Lauderdale, Florida USA** in

**Book PM 20 at Page 633, at 2:55 P.M.**, does hereby consent that the said First Preferred

Mortgage is released and discharged of record.

In Witness whereof, the undersigned causes this Satisfaction and Release of the Preferred Ship

Mortgage to be duly executed by its authorized Vice President this _13th_ day of January, 2015.


**Comerica Bank**


By: _____

Name/Capacity: Sarah R. Miller, Vice President

## ACKNOWLEDGEMENT

State of: Michigan
County of: Wayne

The foregoing instrument was acknowledged before me this ___13___ day of January, 2015, by
Sarah R. Miller, a Vice President, of COMERICA BANK, on behalf of said bank, and who is
personally known to me or produced _____NA_____ as identification.

_Lorre J. Sweetman_
NOTARY PUBLIC, STATE OF MICHIGAN
Printed Name:   LORRE J. SWEETMAN
My Commission Expires:   AUGUST 18, 2017
Commission No.:

LORRE J SWEETMAN
Notary Public, State of Michigan
County of Oakland
My Commission Expires Aug. 18, 2017
Acting in the County of _Wayne_

*Loan # 5300 402540*

# Republic of the Marshall Islands

**RECORDING INDEX PAGE**                          **Book PM 26**          **Page 185**

| Name of Vessel or Vessels | Official Number | Gross Tonnage | Net Tonnage |
|---|---|---|---|
| BG | 70683 | 91 | 27 |

| | | |
|---|---|---|
| Type of Instrument | : | RELEASE THE FIRST PREFERRED MORTGAGE |
| Date of Instrument | : | January 13, 2015 |
| Mortgagor | : | BG Capital LSX Corp. |
| Mortgagee | : | Comerica Bank |
| Total Amount of Mortgage | : | USD3,000,000.00 with interest and costs, expenses and performance of mortgage covenants. |
| Date(s) of Maturity | | |
| Evidence of Mortgage Debt | | |
| Interest in Vessel | | The whole of the vessel |
| Separate Discharge Amount | : | |
| Intended Effect of Instrument | : | To be released of record |
| Instrument recorded on/at | : | date: January 19, 2015    time: 09:04 A.M., E.S.T. |
| Previous Recordings Affected | : | Book PM 20 at Page 633 (Mortgage) |

The above instrument details have been verified as correct and are approved for recordation by the interested parties.
For and on behalf of the Mortgagee:                    For and on behalf of the Mortgagor:

Sarah R. Miller                                        n/a
Vice President                                         n/a

Executed on  January 19, 2015

MI–224 (Rev. 02/96)

*Loan # 3300 702540*



# Republic of the Marshall Islands

### Office of the Maritime Administrator

## CERTIFICATE OF OWNERSHIP AND ENCUMBRANCE

#### of a vessel registered under Marshall Islands Flag

IT IS HEREBY CERTIFIED that as of January 19, 2015 at 09:04 A.M., E.S.T.,   according to the records of the Office of the Maritime Administrator of the Republic of the Marshall Islands, the vessel described hereunder:

IMO NO.: _____  OFFICIAL NO.: 70683   CALL LETTERS: V7SU3   TYPE: PRIVATE YACHT MOTOR

VESSEL NAME:  BG

DATE OF REGISTRATION:  September 11, 2009     GROSS TONS: 91     NET TONS: 27

BUILT AT:  TAMPA, FLORIDA                                        IN: 2009

PRESENT CERTIFICATE OF REGISTRY NUMBER: 549-14-PY          ISSUED: September 11, 2014

AT:  Ft. Lauderdale, Florida, U.S.A.

is owned by:

| NAME | RESIDENCE | CITIZENSHIP | PROPORTION |
|------|-----------|-------------|------------|
| BG CAPITAL LSX CORP. | Majuro, Marshall Islands | Marshall Islands | 100% |

AND THAT there are on record in this Office the following mortgages, liens or other encumbrances, and no others:

* * * NONE * * *

Issued by the Authority of the Government of the Republic of the Marshall Islands under my hand and seal at Fort Lauderdale, Florida USA on this 19th day of January, 2015 at 9:05 A.M., E.S.T.

Guy E. C. Maitland
Senior Deputy Commissioner of Maritime Affairs

Gloria E. Roque
Deputy Commissioner of Maritime Affairs

MI-223 (Rev. 9/24/13)

Loan # 3300 402540



# Republic of the Marshall Islands

### Office of the Maritime Administrator

## CERTIFICATE OF OWNERSHIP AND ENCUMBRANCE

#### of a vessel registered under Marshall Islands Flag

IT IS HEREBY CERTIFIED that as of January 19, 2015 at 09:04 A.M., E.S.T.,   according to the records of the Office of the Maritime Administrator of the Republic of the Marshall Islands, the vessel described hereunder:

IMO NO.: _____   OFFICIAL NO.: 70683   CALL LETTERS: V7SU3   TYPE: PRIVATE YACHT MOTOR

VESSEL NAME: BG

DATE OF REGISTRATION: September 11, 2009   GROSS TONS: 91   NET TONS: 27

BUILT AT: TAMPA, FLORIDA   IN: 2009

PRESENT CERTIFICATE OF REGISTRY NUMBER: 949-14-PY   ISSUED: September 11, 2014

AT: Ft. Lauderdale, Florida, U.S.A.

is owned by:

| NAME | RESIDENCE | CITIZENSHIP | PROPORTION |
|------|-----------|-------------|------------|
| BG CAPITAL LSX CORP. | Majuro, Marshall Islands | Marshall Islands | 100% |

AND THAT there are on record in this Office the following mortgages, liens or other encumbrances, and no others:

* * * NONE * * *

Issued by the Authority of the Government of the Republic of the Marshall Islands under my hand and seal at Fort Lauderdale, Florida USA on this 19th day of January, 2015 at 9:05 A.M., E.S.T.

Guy E. C. Maitland
Senior Deputy Commissioner of Maritime Affairs

Gloria E. Roque
Deputy Commissioner of Maritime Affairs

MI-223 (Rev. 9/24/13)

02/04/15 11:11:36 CP

## GUARANTY

THIS GUARANTY (the "Agreement") is made and entered into on this 14th day of January 2015, by **ROBERT GENOVESE**, an individual (hereinafter, referred to as "Guarantor"), in favor of **IBERIABANK**, a Louisiana state-chartered bank, with offices located at 200 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, FL 33301, or any future holder or holders of this Agreement (hereinafter referred to as "Lender"), guaranteeing the Obligations (as hereinafter defined) of **BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC**, a Florida limited liability company, and **BG 1 LAZZARA, LLC**, a Florida limited liability company (collectively, jointly and severally, hereinafter referred to as "Borrower"). · Any capitalized terms used herein and not otherwise defined herein shall have the same meanings given to such terms in the Loan Agreement (as hereinafter defined).

FOR VALUE RECEIVED, and in consideration of and for credit and financial accommodations extended to or for the account of the above-named Borrower, the undersigned Guarantor agrees as follows:

**SECTION 1.  Guaranty of the Obligations.**  Guarantor hereby absolutely and unconditionally agrees to, and by these presents does hereby, guarantee the prompt and punctual payment, performance and satisfaction of all of the obligations of the Borrower to Lender under that certain Loan Agreement (as amended from time to time, "Loan Agreement"), the Term Note, the Preferred Mortgage, all dated of even date herewith, and any other documents relating thereto and/or executed in connection therewith (collectively, the "Loan Documents"), executed by Borrower in favor of Lender in the principal amount of **ONE MILLION SEVEN HUNDRED FIFTEEN THOUSAND AND 00/100 U.S. DOLLARS ($1,715,000.00),** and any and all amendments thereto and/or substitutions therefor and/or renewals, extensions and/or refinancings thereof, in principal, interest, costs and attorneys' fees (with all of such  indebtedness and/or obligations being hereinafter individually and collectively referred to under this Agreement as  "the Obligations").

**SECTION 2.  Joint, Several and Solidary Liability.**  Guarantor further agrees that its obligations and liabilities for the prompt and punctual payment, performance and satisfaction· of the Obligations shall be on a "joint and several" and "solidary" basis along with Borrower to the same degree and extent as if Guarantor had been and/or will be a co-borrower, co-principal obligor and/or co-maker of the Obligations.  In the event that there is more than one guarantor under this Agreement, or in the event that there are other guarantors, endorsers or sureties of all or any portion of the Obligations, Guarantor's obligations and liabilities hereunder shall be on a "joint and several" and "solidary" basis along with such other guarantor or guarantors, endorsers and/or sureties.

**SECTION 3.  Duration; Cancellation of Agreement.**  This Agreement and Guarantor's obligations and liabilities hereunder shall remain in full force and effect until such time as the Obligations shall be paid, performed and/or satisfied in full, in principal, interest, costs and attorneys' fees, and all outstanding commitments of Lender to Borrower (conditional or otherwise) have terminated; or until such time as this Agreement may be cancelled or otherwise terminated by Lender under a written cancellation instrument in favor of Guarantor (subject to the automatic reinstatement provisions set forth herein below).

Nothing under this Agreement or under any other agreement or understanding by and between

1 of 11

## COMPOSITE EXHIBIT B

Guarantor and Lender, shall in any way obligate, or be construed to obligate, Lender to agree to the subsequent termination or cancellation of Guarantor's obligations and liabilities hereunder as long as Borrower's Obligations remain unpaid and outstanding; it being fully understood and agreed by Guarantor that Lender may, within its sole and uncontrolled discretion and judgment, refuse to release Guarantor from any of its obligations and liabilities under this Agreement for any reason whatsoever as long as the Obligations remain unpaid and outstanding, or Lender is subject to any outstanding commitment (conditional or otherwise) to Borrower.

**SECTION 4. Default by Borrower; Certain Waivers of Guarantor.** Should Borrower default under any provision of the Obligations (whether at stated maturity, by required prepayment, declaration, acceleration or otherwise) in favor of Lender, and/or fail to perform any covenant or agreement hereunder guaranteed, Guarantor unconditionally and absolutely agrees to pay the full then unpaid amount of the Obligations. Such payment or payments shall be made immediately following demand by Lender at Lender's offices indicated above.

Guarantor hereby waives notice of acceptance of this Agreement and of any Obligations to which he applies or may apply. Guarantor further waives presentment and demand for payment of the Obligations, notice of dishonor and of nonpayment, notice of intention to accelerate, notice of acceleration, protest and notice of protest, collection or institution of any suit or other action by Lender in collection thereof, including any notice of default in payment thereof or other notice to, or demand for payment thereof on any party.

Guarantor additionally waives any and all rights and pleas of division and discussion, or any similar rights provided under the laws of the State of Florida, United States of America, or any or state or applicable jurisdiction.

**SECTION 5. Guarantor's Subordination of Rights to Lender.** In the event that Guarantor should for any reason (i) advance or lend monies to Borrower (or Borrower's Affiliate) for any reason whatsoever, whether or not such funds are used by Borrower to make payment or payments under the Obligations, and/or (ii) make any payment for and on behalf of Borrower under the Obligations, and/or (iii) make any payment to Lender in total or partial satisfaction of Guarantor's obligations and liabilities hereunder, Guarantor hereby agrees that any and all rights that Guarantor may have or acquire to collect or to be reimbursed by Borrower (or by Borrower's Affiliate, any guarantor, endorser or surety of the Obligations), whether Guarantor's rights of collection or reimbursement arise by way of subrogation to the rights of Lender or otherwise, shall in all respects be subordinate, inferior and junior to Lender's rights to collect and enforce payment, performance and satisfaction of the Obligations then remaining , until such time as the Obligations are fully paid and satisfied. ,

Guarantor further agrees to refrain from attempting to collect and/or enforce any of Guarantor's aforesaid rights against Borrower (or Borrower's Affiliate, or any other obligor, or any guarantor, surety or endorser of the Obligations), arising by way of subrogation or otherwise, until such time as the Obligations then remaining in favor of Lender are fully paid and satisfied, in principal, costs and attorneys' fees.

From the occurrence of and during the continuation of an Event of Default, in the event that Guarantor should for any reason whatsoever receive any payment or payments from Borrower (or Borrower's Affiliate, or any other obligor or any guarantor, surety or endorser of the Obligations) on any such amount or amounts that Borrower (or such a third party) may owe to Guarantor for

any of the reasons stated above, Guarantor agrees to accept such payment or payments for and on behalf of Lender, advising Borrower (or the third party payee) of such a fact, and Guarantor unconditionally agrees to immediately deliver such funds to Lender, with such funds being held by Guarantor during any interim period, in trust for Lender. In the event that Guarantor should for any reason receive any such funds from Borrower (or any third party payee), and Guarantor should deposit such funds in one or more of Guarantor's deposit accounts, no matter where located, Lender shall have the right to attach any and all of Guarantor's deposit accounts in which such funds were deposited, whether or not such funds were commingled with other monies of Guarantor, and whether or not such funds then remain on deposit in such an account or accounts. To this end, Guarantor collaterally assigns and pledges to Lender any and all of Guarantor's present and future rights, title and interest in and to all monies that Guarantor may now and/or in the future maintain in deposit with banks, savings and loan associations and other entities, in which Guarantor may at any time deposit any such funds that may be received from Borrower (or any other guarantor, endorser or surety of the Obligations) in favor of Lender.

**SECTION 6.  Additional Covenants.**  Guarantor further agrees that Lender may, at its sole option, at any time, and from time to time, without the consent of or notice to Guarantor, or any one of them, or to any other party, and without incurring any responsibility to Guarantor or to any other party, and without impairing or releasing the obligations of Guarantor under this Agreement, and without affecting the liability of the Guarantor hereunder:

(A)  Discharge or release any party (including, but not limited to, Borrower or any co-guarantor under this Agreement) who is or may be liable to Lender for the Obligations, and Lender is under no obligation to pursue any party not discharged before making a claim under this Agreement;

(B)  Sell, exchange, release, surrender, realize upon or otherwise deal with, in any manner and in any order, any collateral directly or indirectly securing repayment of the Obligations;

(C)  With the mutual consent of Borrower or pursuant to the default terms of any agreement with Borrower, change the manner, place or terms of payment, or change or extend the time of payment of or renew, as often and for such periods as Lender may determine, or alter the Obligations;

(D)  Settle or compromise the Obligations;

(E)  Subordinate and/or agree to subordinate the payment of all or any part of the Obligations or Lender's security rights in and/or to any collateral directly or indirectly securing the Obligations, to the payment and/or security rights of any other present and/or future creditors of Borrower;

(F)  Apply any payments made by Borrower or others and/or proceeds derived from cross-secured collateral to other loans that Borrower may then owe to Lender, whether the Obligations subject to this Agreement remain unpaid;

(G)  Take or accept any other security or guaranty for any or all of the Obligations; and/or

(H)  Enter into, deliver, modify, amend or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Obligations.

02/04/15 11:11:37 CP

In addition, no course of dealing between Lender and Borrower (or any other obligor or any guarantor, surety or endorser of the Obligations), nor any failure or delay on the part of Lender to exercise any of Lender's rights and remedies, or any other agreement or agreements by and between Lender and Borrower (or any other obligor or any guarantor, surety or endorser) shall have the effect of impairing or releasing Guarantor's obligations and liabilities to Lender or of waiving any of Lender's rights and remedies. Any partial exercise of any rights and remedies granted to Lender shall furthermore not constitute a waiver of any of Lender's other rights and remedies, it being Guarantor's intent and agreement that Lender's rights and remedies shall be cumulative in nature. Guarantor further agrees that, should Borrower default under its Obligations, any waiver or forbearance on the part of Lender to pursue the rights and remedies available to Lender shall be binding upon Lender only to the extent that Lender specifically agrees to such waiver or forbearance in writing. A waiver or forbearance on the part of Lender as to one event of default shall not constitute a waiver or forbearance as to any other default.

**SECTION 7. No Release of Guarantor.** Guarantor's obligations and liabilities under this Agreement shall not be released, impaired, reduced or otherwise affected by, and shall continue in full force and effect, notwithstanding the occurrence of any event, including without limitation any one or more of the following events:

(A) (i) Death, insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, lack of authority (whether corporate, partnership or trust) of Borrower (or any person acting on Borrower's behalf), or any other obligor or any guarantor, surety or endorser of the Obligations, (ii) any change in Borrower's management, ownership, identity, business, or organizational structure, (iii) any merger, consolidation, incorporation, and/or (iv) Borrower's participation in any joint venture, or other corporate or business alliance;

(B) Partial payment or payments of any amount due and/or outstanding under the Obligations;

(C) Any payment by Borrower or any other party to Lender that is held to constitute a preferential transfer or a fraudulent conveyance under any applicable law, or for any reason, Lender is required to fund such payment or pay such amount to Borrower or to any other person;

(D) Any dissolution of Borrower or any sale, lease or transfer of all or any part of Borrower's assets;

(E) Any failure of Lender to notify Guarantor of the acceptance of this Agreement or of the failure of Borrower to make any payment due by Borrower to Lender.

(F) The unenforceability against Borrower of the Loan Documents, or the invalidity of any of the obligations owing by Borrower to Lender under the Loan Documents, or any provision thereof, or any document related thereto; and/or

(G) Any sale or assignment of the Loan Documents.

This Agreement and Guarantor's obligations and liabilities hereunder shall continue to be effective, and/or shall automatically and retroactively be reinstated if a release or discharge has occurred, as the case may be, if at any time any payment or part thereof to Lender with respect to

the Obligations is rescinded or must otherwise be restored by Lender pursuant to any insolvency, bankruptcy, reorganization, receivership, or any other debt relief granted to Borrower or to any other party. In the event that Lender must rescind or restore any payment received by Lender in satisfaction of the Obligations, any prior release or discharge from the terms of this Agreement given to Guarantor shall be without effect, and this Agreement and Guarantor's obligations and liabilities hereunder shall automatically be renewed or reinstated and shall remain in full force and effect to the same degree and extent as if such a release or discharge was never granted. It is the intention of Lender and Guarantor that Guarantor's obligations and liabilities hereunder shall not be discharged except by Guarantor's full and complete performance of such obligations and liabilities and then only to the extent of such performance, and only in accordance with Section 3 hereof.

**SECTION 8.   Enforcement of Guarantor's Obligations and Liabilities.**   Guarantor understands, agrees and confirms that this is a guaranty of payment when due and not of collection.   Guarantor agrees that, should Lender deem it necessary to file an appropriate collection action to enforce Guarantor's obligations and liabilities under this Agreement, Lender may commence such a civil action against Guarantor without the necessity of first (i) attempting to collect the Obligations from Borrower or from any other obligor or any guarantor, surety or endorser, whether through filing of suit or otherwise, (ii) attempting to exercise against any collateral directly or indirectly securing repayment of the Obligations, whether through the filing of an appropriate foreclosure action or otherwise, or (iii) including Borrower or any other obligor or any guarantor, surety or endorser of the Obligations as an additional party defendant in such a collection action against Guarantor. If there is more than one guarantor under this Agreement, each Guarantor additionally agrees that Lender may file an appropriate collection and/or enforcement action against any one or more of them, without impairing the rights of Lender against any other guarantor under this Agreement.

In the event that Lender should ever deem it necessary to refer this Agreement to an attorney-at-law for the purpose of enforcing Guarantor's obligations and liabilities hereunder, or of protecting or preserving Lender's rights hereunder, Guarantor (and each of them, on a joint, several and solidary basis) agrees to reimburse Lender for the reasonable fees of such an attorney (including pretrial, trial and appellate levels, if necessary).

Guarantor additionally agrees that Lender shall not be liable for failure to use diligence in the collection of any of the Obligations or any collateral security therefor, or in creating or preserving the liability of any person liable on any such Obligations, or in creating, perfecting or preserving any security for any such Obligations.

**SECTION 9.   Representations and Warranties by Guarantor.**   Guarantor represents and warrants to Lender that:

(A)   Guarantor has the lawful power to own her properties and to engage in her business as presently conducted.

(B)   Guarantor's guaranty of the Obligations and Guarantor's execution, delivery and performance of this Agreement is not in violation of any laws and will not result in a default under any contract, agreement or instrument to which Guarantor is a party or by which Guarantor or his property may be bound.

02/04/15 11:11:38 CP

(C)   Guarantor will receive a direct or indirect material benefit from the transaction(s) contemplated herein and/or arising out of the Obligations.

(D)   This Agreement, when executed and delivered by Guarantor, will constitute a valid, legal and binding obligation of Guarantor enforceable in accordance with its terms.

(E)   All actions and consents required to be performed, obtained and/or satisfied prior to the execution and delivery of this Agreement, and to constitute this Agreement as the valid and binding obligation of Guarantor in accordance with its terms, have been performed, obtained and satisfied in due and strict compliance with all applicable laws.

(F)   There are no actions, suits or proceedings pending or threatened against or affecting Guarantor or the property of Guarantor before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to Guarantor would have a material adverse effect on the financial condition, property, or operations of Guarantor or Guarantor's ability to perform under this Agreement.

(G)   Any payments required to be made by Guarantor hereunder shall be made in full, "net taxes" in the currency in which the monies, obligations or liabilities of Borrower were due, arising, or incurred.  Guarantor agrees to pay Lender such additional amounts as will be necessary to cover any and all (i) taxes or assessments, governmental charges or levies, duties, fees, deductions or withholding, restrictions or conditions of any nature or other amounts imposed by, or on behalf of, any government or any taxing authority thereof or therein, or any subdivision thereof, or (ii) any stamp duty or documentary taxes or charges imposed by any government or any taxing authority thereof or therein, resulting from, related to or in connection with this Agreement or the other Loan Documents (or any advances made thereunder) or any other related documents or instruments delivered in connection herewith or the transactions contemplated thereby or hereby.

(H)   There are no exchange approvals required for the execution of this Agreement, and Guarantor is and will be permitted to purchase sufficient freely transferable United States Dollars for the payment of any monies which may become due and payable by Guarantor hereunder.

(I)    The Guarantor is subject to civil and commercial laws with respect to its obligation under this Agreement.  The execution, delivery and performance of this Agreement by the Guarantor constitutes a commercial act as opposed to a governmental act.  The Guarantor (and all of Guarantor's property) does not enjoy, in the courts or under the laws of the United States of America, or any other nation, any right of immunity from suit, setoff or attachment or execution on a judgment in respect of the obligations of the Borrower under the Loan Documents or in respect of the obligations of the Guarantor hereunder.

(J)   Copies of the Loan Documents and all related documents have been made available to the Guarantor and it is familiar with the contents thereof.

(K)   Guarantor shall provide to Lender with copies of her compiled personal financial statement, in scope and form reasonably satisfactory to Lender, at least thirteen months from the date of Guarantor's previous financial statement.  Guarantor agrees to provide copies of all filings with the relevant tax administration agency (i.e. IRS or applicable equivalent) within thirty (30) days of filing, including without limitation, trust tax returns, K-1s, and copies of all extensions. Guarantor shall provide Lender with other financial information as Lender may reasonably request

from time to time and during the term of the Loan. Guarantor shall participate in, and provide all documentation reasonably required for, the Lender's annual liquidity verifications and annual review of the Guarantor's contingent liabilities.

**SECTION 10. Additional Documents.** Upon the reasonable request of Lender, Guarantor will, at any time, and from time to time, duly execute and deliver to Lender any and all such further instruments and documents, and supply such additional information, as may be necessary or advisable in the opinion of Lender, to obtain the full benefits of this Agreement.

**SECTION 11. Transfer of Obligations.** This Agreement is for the benefit of Lender and for such other person or persons as may from time to time become or be the holders of the Obligations hereby guaranteed and this Agreement shall be transferable and negotiable, with the same force and effect and to the same extent as the Obligations may be transferable, it being understood that, upon the transfer or assignment by Lender of the Obligations hereby guaranteed, the legal holder of such Obligations shall have all of the rights granted to Lender under this Agreement.

Guarantor hereby recognizes and agrees that Lender may, from time to time, one or more times, transfer all or any portion of the Obligations to one or more third parties. Such transfers may include, but are not limited to, sales of a participation interest in such Obligations in favor of one or more third party lenders. Guarantor specifically agrees and consents to all such transfers and assignments and Guarantor further waives any subsequent notice of and right to consent to any such transfers and assignments as may be provided under applicable law. Guarantor additionally agrees that the purchaser of a participation interest in the Obligations will be considered as the absolute owner of a percentage interest of such Obligations and that such a purchaser will have all of the rights granted to the purchaser under any participation agreement governing the sale of such a participation interest. Guarantor further waives any right of offset that Guarantor may have against Lender and/or any purchaser of such a participation interest in the Obligations and Guarantor unconditionally agrees that either Lender or such a purchaser may enforce Guarantor's obligations and liabilities under this Agreement, irrespective of the failure or insolvency of Lender or any such purchaser.

Guarantor further agrees that, upon any transfer of all or any portion of the Obligations, Lender may transfer and deliver any and all collateral securing repayment of such Obligations (including, but not limited to, any collateral provided by Guarantor) to the transferee of such Obligations and such collateral (again, including but not limited to Guarantor's collateral) shall secure any and all of the Obligations in favor of such a transferee. Guarantor additionally agrees that, after any such transfer or assignment has taken place, Lender shall be fully discharged from any and all liability and responsibility to Borrower (and Guarantor) with respect to such collateral arising after the transfer or assignment, and the transferee thereafter shall be vested with all the powers and rights with respect to such collateral.

**SECTION 12. Right of Offset.** As collateral security for the repayment of Guarantor's obligations and liabilities under this Agreement, Guarantor hereby grants Lender, as well as its successors and assigns, the right to apply, at any time and from time to time, whether or not Borrower is then in default under its Obligations guaranteed hereunder, any and all funds that Guarantor may then have on deposit with or in the possession or control of Lender and its successors or assigns (with the exception of funds deposited in IRA, pension or other tax-deferred deposit accounts), towards repayment of any of the Obligations subject to this Agreement.

**SECTION 13. Notices.**

(A) To give Guarantor any notice required under this Agreement, Lender may hand deliver the notice to Guarantor, or mail the notice to Guarantor by first class mail, or by registered or certified mail. Lender will deliver or mail the notice to Guarantor at Guarantor's address contained in Lender's records, or at any other address which Guarantor may have given Lender by written notice provided in this Section.

(B) To give Lender any notice required under this Agreement, Guarantor shall mail the notice to Lender by first class mail, by registered or certified mail, or by sending the notice by private courier service (such as Federal Express, United Parcel Service, DHL, and Emery) at Lender's main offices, or at such other address as Lender may have given to Guarantor by written notice as provided in this Section.

(C) Any notice provided in this Agreement must be in writing and will be considered as given and effective (unless a different effective date is set forth in the notice) on the day it is delivered by hand or ten (10) days after being deposited in the U.S. mail, or five (5) days after being delivered to a private courier service, as provided above.

**SECTION 14. Construction.** The provisions of this Agreement shall be in addition to and cumulative of, and not in substitution, novation or discharge of, any and all prior or contemporaneous guaranty or other agreements by Guarantor (or any one or more of them), in favor of Lender or assigned to Lender by others, all of which shall be construed as complementing each other. Nothing herein contained shall prevent Lender from enforcing any and all such other guaranties or agreements in accordance with their respective terms.

**SECTION 15. Amendment.** No amendment, modification, consent or waiver of any provision of this Agreement, and no consent to any departure by Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Lender, and then shall be effective only to the specific instance and for the specific purpose for which given.

**SECTION 16. Successors and Assigns Bound.** Guarantor's obligations and liabilities under this Agreement shall be binding upon Guarantor's successors, heirs, legatees, devisees, administrators, executors and assigns. The rights and remedies granted to Lender under this Agreement shall also inure to the benefit of Lender's successors and assigns, as well as to any and all subsequent holder or holders of any of the Obligations subject to this Agreement.

**SECTION 17. Caption Headings.** Caption headings of the sections of this Agreement are for convenience purposes only and are not to be used to interpret or to define their provisions. In this Agreement, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

**SECTION 18.    Governing Law.** This Agreement shall be governed and construed in accordance with the substantive laws of the State of Florida, without regard to the conflict of laws provisions thereof.

**SECTION 19. Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable, this Agreement shall be construed and enforceable as if the illegal, invalid or

unenforceable provision had never comprised a part of it, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

**SECTION 20. Jury Trial Waiver. GUARANTOR AND LENDER EACH WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR ANY OF THE LOAN DOCUMENTS, OR THE COLLATERAL. GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO LENDER ENTERING INTO THIS AGREEMENT AND THAT LENDER IS RELYING UPON THE FOREGOING WAIVER IN ITS FUTURE DEALINGS WITH BORROWER. GUARANTOR WARRANTS AND REPRESENTS THAT HE HAS REVIEWED THE FOREGOING WAIVER WITH HIS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED HER JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**SECTION 21. Judicial Proceedings.** Any judicial proceeding brought against Guarantor with respect to this Agreement may be brought, at the election of Lender, in any state or federal court of competent jurisdiction located in (i) in any courts of the jurisdiction in which the Vessel or any Collateral is located or registered; (ii) the State of Florida, Miami-Dade County, United States of America, or (iii) any other Competent Court that the Lender will choose, and, by execution and delivery of this Agreement, Guarantor accepts, generally and unconditionally, the nonexclusive jurisdiction of such courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement or any document hereby contemplated. Guarantor hereby waives personal service of process and consents that service of process upon it may be made by courier service (e.g. DHL) at its address specified above and service so made shall be deemed completed upon delivery by the courier to the address specified above.

GUARANTOR HEREBY IRREVOCABLY APPOINTS ALLEY, MAASS, ROGERS & LINDSEY, P.A. AS AGENT FOR SERVICE OF PROCESS FOR THE PURPOSES HEREOF. GUARANTOR HEREBY AGREES THAT LENDER MAY EFFECT SERVICE OF PROCESS UPON THE UNDERSIGNED BY MAILING PROCESS VIA MAIL OR COURIER TO ALLEY, MAASS, ROGERS & LINDSEY, P.A., 340 Royal Poinciana Plaza, Palm Beach, FL 33480. GUARANTOR IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY MANNER PERMITED BY APPLICABLE LAW.

Any judicial proceeding by Guarantor against Lender involving, directly or indirectly, any matter in any way arising out of, related to, or connected with this Agreement or the Loan Documents or any document hereby or thereby contemplated shall be brought only in a state or federal court located in Miami-Dade County, State of Florida, United States of America, or any other Court that Lender will choose. All proceedings in any such tribunal, whether the action is brought by Lender or Guarantor or any third party, shall be conducted in the English language if permitted by the applicable tribunal.

02/04/15 11:11:40 CP

**SECTION 22. <u>Waiver of Immunity.</u>** To the extent that the Guarantor may in any jurisdiction claim for himself, the Borrower or the real or personal property of either, immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to the Guarantor, the Borrower or the property of either, such immunity (whether or not claimed), the Guarantor hereby waives (and will not raise on behalf of the Borrower) such immunity to the full extent permitted by the laws of such jurisdiction.

**SECTION 23. <u>Consequential Damages.</u>** Guarantor hereby fully waives any claim or right now or hereafter existing against Lender for any incidental, special, or consequential damages whether based on contract, warranty, tort (including negligence and strict liability), or otherwise.

- SIGNATURES ON FOLLOWING PAGE -

IN WITNESS WHEREOF, Guarantor has executed this Agreement in favor of Lender on the day, month and year first written above.

GUARANTOR:

**ROBERT GENOVESE**

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument was acknowledged before me this 14th day of January, 2015, by **ROBERT GENOVESE**. He is personally known to me or has produced *Bahamian drivers licence* as identification.

TANYA V. DENS
MY COMMISSION # EE 147917
EXPIRES: November 21, 2015
Bonded Thru Notary Public Underwriters

NOTARY PUBLIC
Printed Name: _Tanya Denis_

My Commission Expires:

Notary Stamp:

11 of 11

## GUARANTY

THIS GUARANTY (the "Agreement") is made and entered into on this 20ᵗʰ day of July, 2017, by **BG BIG BOAT, LTD.**, a company incorporated under the laws of the Cayman Islands (hereinafter, referred to as "Guarantor"), in favor of **IBERIABANK**, a Louisiana state-chartered bank, with offices located at 200 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, FL 33301, or any future holder or holders of this Agreement (hereinafter referred to as "Lender"), guaranteeing the Obligations (as hereinafter defined) of **BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC**, a Florida limited liability company ("BG CAPITAL") and **BG 1 LAZZARA, LLC,** a Florida limited liability company ("BG 1," and with BG CAPITAL collectively, jointly and severally, hereinafter referred to as "Borrowers" and each individually as "Borrower").   Any capitalized terms used herein and not otherwise defined herein shall have the same meanings given to such terms in the Loan Agreement (as hereinafter defined).

WHEREAS, Borrowers applied to Lender for a secured loan in the amount of $1,715,000.00 in the form of a term loan (the "Loan");

WHEREAS, the Loan was approved by Lender subject to the Term Note, the Loan Agreement, the Guaranty and other Loan documents dated January 14, 2015 (the "Loan Documents");

WHEREAS, Events of Default have occurred in connection with the Loan;

WHEREAS, as an Affiliate of Borrowers, it is in Guarantor's best interest to agree to guarantee the Loan;

WHEREAS, in exchange for $10.00 and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties desire to add Guarantor as a guarantor of the Loan;

NOW THEREFORE, FOR VALUE RECEIVED, and in consideration of and for credit and financial accommodations extended to or for the account of the above-named Borrowers, the undersigned Guarantor agrees as follows:

**SECTION 1.   Guaranty of the Obligations.**   Guarantor hereby absolutely and unconditionally agrees to, and by these presents does hereby, guarantee the prompt and punctual payment, performance and satisfaction of all of the obligations of the Borrowers to Lender under that certain Loan Agreement (as amended from time to time, "Loan Agreement"), the Term Note, and the mortgage on the Lazzara vessel as described in the Loan Agreement (the "Lazzara Mortgage"), all dated January 14, 2015, and any other documents relating thereto and/or executed in connection therewith (collectively, the "Loan Documents"), executed by either Borrower in favor of Lender in the original principal amount of **ONE MILLION SEVEN HUNDRED FIFTEEN THOUSAND AND 00/100 U.S. DOLLARS ($1,715,000.00)**, and any and all amendments thereto and/or substitutions therefor and/or renewals, extensions and/or refinancings thereof, in principal, interest, costs and attorneys' fees (with all of such indebtedness and/or obligations being hereinafter individually and collectively referred to under this Agreement as the "Obligations").

**SECTION 2.  Joint, Several and Solidary Liability.**  Guarantor further agrees that its obligations and liabilities for the prompt and punctual payment, performance and satisfaction of the Obligations

shall be on a "joint and several" and "solidary" basis along with Borrowers to the same degree and extent as if Guarantor had been and/or will be a co-borrower, co-principal obligor and/or co-maker of the Obligations. In the event that there is more than one guarantor under this Agreement, or in the event that there are other guarantors, endorsers or sureties of all or any portion of the Obligations, Guarantor's obligations and liabilities hereunder shall be on a "joint and several" and "solidary" basis along with such other guarantor or guarantors, endorsers and/or sureties.

**SECTION 3.   Duration; Cancellation of Agreement.**   This Agreement and Guarantor's obligations and liabilities hereunder shall remain in full force and effect until such time as the Obligations shall be paid, performed and/or satisfied in full, in principal, interest, costs and attorneys' fees, and all outstanding commitments of Borrowers (conditional or otherwise) have terminated; or until such time as this Agreement may be cancelled or otherwise terminated by Lender under a written cancellation instrument in favor of Guarantor (subject to the automatic reinstatement provisions set forth herein below).

Nothing under this Agreement or under any other agreement or understanding by and between Guarantor and Lender, shall in any way obligate, or be construed to obligate, Lender to agree to the subsequent termination or cancellation of Guarantor's obligations and liabilities hereunder as long as Borrowers' Obligations remain unpaid and outstanding; it being fully understood and agreed by Guarantor that Lender may, within its sole and uncontrolled discretion and judgment, refuse to release Guarantor from any of its obligations and liabilities under this Agreement for any reason whatsoever as long as  the Obligations remain unpaid and outstanding, or Lender is subject to any outstanding commitment (conditional or otherwise) to Borrowers.

**SECTION 4.  Default by Borrowers; Certain Waivers of Guarantor.**  Should Borrowers default under any provision of the Obligations (whether at stated maturity, by required prepayment, declaration, acceleration or otherwise) in favor of Lender, and/or fail to perform any covenant or agreement hereunder guaranteed, Guarantor unconditionally and absolutely agrees to pay the full then unpaid amount of the Obligations. Such payment or payments shall be made immediately following demand by Lender at Lender's offices indicated above.

Guarantor hereby waives notice of acceptance of this Agreement and of any Obligations to which it applies or may apply. Guarantor further waives presentment and demand for payment of the Obligations, notice of dishonor and of nonpayment, notice of intention to accelerate, notice of acceleration, protest and notice of protest, collection or institution of any suit or other action by Lender in collection thereof, including any notice of default in payment thereof or other notice to, or demand for payment thereof on any party.

Guarantor additionally waives any and all rights and pleas of division and discussion, or any similar rights provided under the laws of the State of Florida, United States of America, or any or state or applicable jurisdiction.

**SECTION 5.  Guarantor's Subordination of Rights to Lender.**  In the event that Guarantor should for any reason (i) advance or lend monies to Borrowers (or Borrowers' Affiliate(s)) for any reason whatsoever, whether or not such funds are used by either Borrower to make payment or payments under the Obligations, and/or (ii) make any payment for and on behalf of Borrowers under the Obligations, and/or (iii) make any payment to Lender in total or partial satisfaction of Guarantor's obligations and liabilities hereunder, Guarantor hereby agrees that any and all rights

that Guarantor may have or acquire to collect or to be reimbursed by Borrowers (or by any Borrower's Affiliate(s), any guarantor, endorser or surety of the Obligations), whether Guarantor's rights of collection or reimbursement arise by way of subrogation to the rights of Lender or otherwise, shall in all respects be subordinate, inferior and junior to Lender's rights to collect and enforce payment, performance and satisfaction of the Obligations then remaining, until such time as the Obligations are fully paid and satisfied.

Guarantor further agrees to refrain from attempting to collect and/or enforce any of Guarantor's aforesaid rights against Borrowers (or any Borrower's Affiliate(s), or any other obligor, or any guarantor, surety or endorser of the Obligations), arising by way of subrogation or otherwise, until such time as the Obligations then remaining in favor of Lender are fully paid and satisfied, in principal, costs and attorneys' fees.

From the occurrence of and during the continuation of an Event of Default, in the event that Guarantor should for any reason whatsoever receive any payment or payments from Borrowers (or any Borrower's Affiliate's, or any other obligor or any guarantor, surety or endorser of the Obligations) on any such amount or amounts that Borrowers (or such a third party) may owe to Guarantor for any of the reasons stated above, Guarantor agrees to accept such payment or payments for and on behalf of Lender, advising Borrowers (or the third party payee) of such a fact, and Guarantor unconditionally agrees to immediately deliver such funds to Lender, with such funds being held by Guarantor during any interim period, in trust for Lender. In the event that Guarantor should for any reason receive any such funds from Borrowers (or any third party payee), and Guarantor should deposit such funds in one or more of Guarantor's deposit accounts, no matter where located, Lender shall have the right to attach any and all of Guarantor's deposit accounts in which such funds were deposited, whether or not such funds were commingled with other monies of Guarantor, and whether or not such funds then remain on deposit in such an account or accounts. To this end, Guarantor collaterally assigns and pledges to Lender any and all of Guarantor's present and future rights, title and interest in and to all monies that Guarantor may now and/or in the future maintain in deposit with banks, savings and loan associations and other entities, in which Guarantor may at any time deposit any such funds that may be received from Borrowers (or any other guarantor, endorser or surety of the Obligations) in favor of Lender.

**SECTION 6. Additional Covenants.** Guarantor further agrees that Lender may, at its sole option, at any time, and from time to time, without the consent of or notice to Guarantor, or any one of them, or to any other party, and without incurring any responsibility to Guarantor or to any other party, and without impairing or releasing the obligations of Guarantor under this Agreement, and without affecting the liability of the Guarantor hereunder:

(A) Discharge or release any party (including, but not limited to, Borrowers or any co-guarantor under this Agreement) who is or may be liable to Lender for the Obligations, and Lender is under no obligation to pursue any party not discharged before making a claim under this Agreement;

(B) Sell, exchange, release, surrender, realize upon or otherwise deal with, in any manner and in any order, any collateral directly or indirectly securing repayment of the Obligations;

(C) With the mutual consent of Borrowers or pursuant to the default terms of any agreement with any Borrower, change the manner, place or terms of payment, or change or extend

the time of payment of or renew, as often and for such periods as Lender may determine, or alter the Obligations;

    (D)  Settle or compromise the Obligations;

    (E)  Subordinate and/or agree to subordinate the payment of all or any part of the Obligations or Lender's security rights in and/or to any collateral directly or indirectly securing the Obligations, to the payment and/or security rights of any other present and/or future creditors of Borrowers;

    (F)  Apply any payments made by Borrowers or others and/or proceeds derived from cross-secured collateral to other loans that Borrowers may then owe to Lender, whether the Obligations subject to this Agreement remain unpaid;

    (G)  Take or accept any other security or guaranty for any or all of the Obligations; and/or

    (H)  Enter into, deliver, modify, amend or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of the Obligations.

In addition, no course of dealing between Lender and Borrowers (or any other obligor or any guarantor, surety or endorser of the Obligations), nor any failure or delay on the part of Lender to exercise any of Lender's rights and remedies, or any other agreement or agreements by and between Lender and Borrowers (or any other obligor or any guarantor, surety or endorser) shall have the effect of impairing or releasing Guarantor's obligations and liabilities to Lender or of waiving any of Lender's rights and remedies.  Any partial exercise of any rights and remedies granted to Lender shall furthermore not constitute a waiver of any of Lender's other rights and remedies, it being Guarantor's intent and agreement that Lender's rights and remedies shall be cumulative in nature.  Guarantor further agrees that, should Borrowers default under its Obligations, any waiver or forbearance on the part of Lender to pursue the rights and remedies available to Lender shall be binding upon Lender only to the extent that Lender specifically agrees to such waiver or forbearance in writing.  A waiver or forbearance on the part of Lender as to one event of default shall not constitute a waiver or forbearance as to any other default.

**SECTION 7.  No Release of Guarantor.**  Guarantor's obligations and liabilities under this Agreement shall not be released, impaired, reduced or otherwise affected by, and shall continue in full force and effect, notwithstanding the occurrence of any event, including without limitation any one or more of the following events:

    (A)  (i) Death, insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, lack of authority (whether corporate, partnership or trust) of Borrowers (or any person acting on any Borrower's behalf), or any other obligor or any guarantor, surety or endorser of the Obligations, (ii) any change in Borrowers' management, ownership, identity, business, or organizational structure, (iii) any merger, consolidation, incorporation, and/or (iv) Borrowers' participation in any joint venture, or other corporate or business alliance;

    (B)  Partial payment or payments of any amount due and/or outstanding under the Obligations;

(C)  Any payment by any Borrower or any other party to Lender that is held to constitute a preferential transfer or a fraudulent conveyance under any applicable law, or for any reason, Lender is required to fund such payment or pay such amount to Borrowers or to any other person;

(D)  Any dissolution of any Borrower or any sale, lease or transfer of all or any part of any Borrower's assets;

(E)  Any failure of Lender to notify Guarantor of the acceptance of this Agreement or of the failure of Borrowers to make any payment due by Borrowers to Lender.

(F)  The unenforceability against Borrowers of the Loan Documents, or the invalidity of any of the obligations owing by Borrowers to Lender under the Loan Documents, or any provision thereof, or any document related thereto; and/or

(G)  Any sale or assignment of the Loan Documents.

This Agreement and Guarantor's obligations and liabilities hereunder shall continue to be effective, and/or shall automatically and retroactively be reinstated if a release or discharge has occurred, as the case may be, if at any time any payment or part thereof to Lender with respect to the Obligations is rescinded or must otherwise be restored by Lender pursuant to any insolvency, bankruptcy, reorganization, receivership, or any other debt relief granted to Borrowers or to any other party.  In the event that Lender must rescind or restore any payment received by Lender in satisfaction of the Obligations, any prior release or discharge from the terms of this Agreement given to Guarantor shall be without effect, and this Agreement and Guarantor's obligations and liabilities hereunder shall automatically be renewed or reinstated and shall remain in full force and effect to the same degree and extent as if such a release or discharge was never granted.  It is the intention of Lender and Guarantor that Guarantor's obligations and liabilities hereunder shall not be discharged except by Guarantor's full and complete performance of such obligations and liabilities and then only to the extent of such performance, and only in accordance with Section 3 hereof.

**SECTION 8.  Enforcement of Guarantor's Obligations and Liabilities.**  Guarantor understands, agrees and confirms that this is a guaranty of payment when due and not of collection.  Guarantor agrees that, should Lender deem it necessary to file an appropriate collection action to enforce Guarantor's obligations and liabilities under this Agreement, Lender may commence such a civil action against Guarantor without the necessity of first (i) attempting to collect the Obligations from Borrowers or from any other obligor or any guarantor, surety or endorser, whether through filing of suit or otherwise, (ii) attempting to exercise against any collateral directly or indirectly securing repayment of  the Obligations, whether through the filing of an appropriate foreclosure action or otherwise, or (iii) including Borrowers or any other obligor or any guarantor, surety or endorser of the Obligations as an additional party defendant in such a collection action against Guarantor.  If there is more than one guarantor under this Agreement, each Guarantor additionally agrees that Lender may file an appropriate collection and/or enforcement action against any one or more of them, without impairing the rights of Lender against any other guarantor under this Agreement.

In the event that Lender should ever deem it necessary to refer this Agreement to an attorney-at-law for the purpose of enforcing Guarantor's obligations and liabilities hereunder, or of protecting or preserving Lender's rights hereunder, Guarantor (and each of them, on a joint, several and solidary basis) agrees to reimburse Lender for the reasonable fees of such an attorney

(including pretrial, trial and appellate levels, if necessary).

Guarantor additionally agrees that Lender shall not be liable for failure to use diligence in the collection of any of the Obligations or any collateral security therefor, or in creating or preserving the liability of any person liable on any such Obligations, or in creating, perfecting or preserving any security for any such Obligations.

**SECTION 9.    Representations and Warranties by Guarantor.**    Guarantor represents and warrants to Lender that:

(A)  Guarantor has the lawful power to own its properties and to engage in its business as presently conducted.

(B)  Guarantor's guaranty of the Obligations and Guarantor's execution, delivery and performance of this Agreement is not in violation of any laws and will not result in a default under any contract, agreement or instrument to which Guarantor is a party or by which Guarantor or its property may be bound.

(C)  Guarantor will receive a direct or indirect material benefit from the transaction(s) contemplated herein and/or arising out of the Obligations.

(D)  This Agreement, when executed and delivered by Guarantor, will constitute a valid, legal and binding obligation of Guarantor enforceable in accordance with its terms.

(E)  All actions and consents required to be performed, obtained and/or satisfied prior to the execution and delivery of this Agreement, and to constitute this Agreement as the valid and binding obligation of Guarantor in accordance with its terms, have been performed, obtained and satisfied in due and strict compliance with all applicable laws.

(F)  There are no actions, suits or proceedings pending or threatened against or affecting Guarantor or the property of Guarantor before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to Guarantor would have a material adverse effect on the financial condition, property, or operations of Guarantor or Guarantor's ability to perform under this Agreement.

(G)  Any payments required to be made by Guarantor hereunder shall be made in full, "net taxes" in the currency in which the monies, obligations or liabilities of Borrowers were due, arising, or incurred.  Guarantor agrees to pay Lender such additional amounts as will be necessary to cover any and all (i) taxes or assessments, governmental charges or levies, duties, fees, deductions or withholding, restrictions or conditions of any nature or other amounts imposed by, or on behalf of, any government or any taxing authority thereof or therein, or any subdivision thereof, or (ii) any stamp duty or documentary taxes or charges imposed by any government or any taxing authority thereof or therein, resulting from, related to or in connection with this Agreement or the other Loan Documents (or any advances made thereunder) or any other related documents or instruments delivered in connection herewith or the transactions contemplated thereby or hereby.

(H)  There are no exchange approvals required for the execution of this Agreement, and Guarantor is and will be permitted to purchase sufficient freely transferable United States Dollars

for the payment of any monies which may become due and payable by Guarantor hereunder.

(I)   The Guarantor is subject to civil and commercial laws with respect to its obligation under this Agreement.  The execution, delivery and performance of this Agreement by the Guarantor constitutes a commercial act as opposed to a governmental act.  The Guarantor (and all of Guarantor's property) does not enjoy, in the courts or under the laws of the United States of America, or any other nation, any right of immunity from suit, setoff or attachment or execution on a judgment in respect of the obligations of the Borrowers under the Loan Documents or in respect of the obligations of the Guarantor hereunder.

(J)  Copies of the Loan Documents and all related documents have been made available to the Guarantor and Guarantor is familiar with the contents thereof.

**SECTION 10.  Additional Documents.**  Upon the reasonable request of Lender, Guarantor will, at any time, and from time to time, duly execute and deliver to Lender any and all such further instruments and documents, and supply such additional information, as may be necessary or advisable in the opinion of Lender, to obtain the full benefits of this Agreement.

**SECTION 11.  Transfer of Obligations.**  This Agreement is for the benefit of Lender and for such other person or persons as may from time to time become or be the holders of the Obligations hereby guaranteed and this Agreement shall be transferable and negotiable, with the same force and effect and to the same extent as the Obligations may be transferable, it being understood that, upon the transfer or assignment by Lender of the Obligations hereby guaranteed, the legal holder of such Obligations shall have all of the rights granted to Lender under this Agreement.

Guarantor hereby recognizes and agrees that Lender may, from time to time, one or more times, transfer all or any portion of the Obligations to one or more third parties.  Such transfers may include, but are not limited to, sales of a participation interest in such Obligations in favor of one or more third party lenders.  Guarantor specifically agrees and consents to all such transfers and assignments and Guarantor further waives any subsequent notice of and right to consent to any such transfers and assignments as may be provided under applicable law.  Guarantor additionally agrees that the purchaser of a participation interest in the Obligations will be considered as the absolute owner of a percentage interest of such Obligations and that such a purchaser will have all of the rights granted to the purchaser under any participation agreement governing the sale of such a participation interest.  Guarantor further waives any right of offset that Guarantor may have against Lender and/or any purchaser of such a participation interest in the Obligations and Guarantor unconditionally agrees that either Lender or such a purchaser may enforce Guarantor's obligations and liabilities under this Agreement, irrespective of the failure or insolvency of Lender or any such purchaser.

Guarantor further agrees that, upon any transfer of all or any portion of the Obligations, Lender may transfer and deliver any and all collateral securing repayment of such Obligations (including, but not limited to, any collateral provided by Guarantor) to the transferee of such Obligations and such collateral (again, including but not limited to Guarantor's collateral) shall secure any and all of the Obligations in favor of such a transferee.  Guarantor additionally agrees that, after any such transfer or assignment has taken place, Lender shall be fully discharged from any and all liability and responsibility to Borrowers (and Guarantor) with respect to such collateral arising after the transfer or assignment, and the transferee thereafter shall be vested with all the powers and rights

with respect to such collateral.

**SECTION 12. Right of Offset.** As collateral security for the repayment of Guarantor's obligations and liabilities under this Agreement, Guarantor hereby grants Lender, as well as its successors and assigns, the right to apply, at any time and from time to time, whether or not Borrowers are then in default under their Obligations guaranteed hereunder, any and all funds that Guarantor may then have on deposit with or in the possession or control of Lender and its successors or assigns (with the exception of funds deposited in IRA, pension or other tax-deferred deposit accounts), towards repayment of any of the Obligations subject to this Agreement.

**SECTION 13. Notices.**

(A) To give Guarantor any notice required under this Agreement, Lender may hand deliver the notice to Guarantor, or mail the notice to Guarantor by first class mail, or by registered or certified mail. Lender will deliver or mail the notice to Guarantor at Guarantor's address contained in Lender's records, or at any other address which Guarantor may have given Lender by written notice provided in this Section.

(B) To give Lender any notice required under this Agreement, Guarantor shall mail the notice to Lender by first class mail, by registered or certified mail, or by sending the notice by private courier service (such as Federal Express, United Parcel Service, DHL, and Emery) at Lender's main offices, or at such other address as Lender may have given to Guarantor by written notice as provided in this Section.

(C) Any notice provided in this Agreement must be in writing and will be considered as given and effective (unless a different effective date is set forth in the notice) on the day it is delivered by hand or ten (10) days after being deposited in the U.S. mail, or five (5) days after being delivered to a private courier service, as provided above.

**SECTION 14. Construction.** The provisions of this Agreement shall be in addition to and cumulative of, and not in substitution, novation or discharge of, any and all prior or contemporaneous guaranty or other agreements by Guarantor (or any one or more of them), in favor of Lender or assigned to Lender by others, all of which shall be construed as complementing each other. Nothing herein contained shall prevent Lender from enforcing any and all such other guaranties or agreements in accordance with their respective terms.

**SECTION 15. Amendment.** No amendment, modification, consent or waiver of any provision of this Agreement, and no consent to any departure by Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Lender, and then shall be effective only to the specific instance and for the specific purpose for which given.

**SECTION 16. Successors and Assigns Bound.** Guarantor's obligations and liabilities under this Agreement shall be binding upon Guarantor's successors, heirs, legatees, devisees, administrators, executors and assigns. The rights and remedies granted to Lender under this Agreement shall also inure to the benefit of Lender's successors and assigns, as well as to any and all subsequent holder or holders of any of the Obligations subject to this Agreement.

**SECTION 17. Caption Headings.** Caption headings of the sections of this Agreement are for

convenience purposes only and are not to be used to interpret or to define their provisions. In this Agreement, whenever the context so requires, the singular includes the plural and the plural also includes the singular.

**SECTION 18.   Governing Law.** This Agreement shall be governed and construed in accordance with the substantive laws of the State of Florida, without regard to the conflict of laws provisions thereof.

**SECTION 19.  Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable, this Agreement shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

**SECTION 20.  Jury Trial Waiver. GUARANTOR AND LENDER EACH WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS AGREEMENT, OR ANY OF THE LOAN DOCUMENTS, OR THE COLLATERAL.   GUARANTOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO LENDER ENTERING INTO THIS AGREEMENT AND THAT LENDER IS RELYING UPON THE FOREGOING WAIVER IN ITS FUTURE DEALINGS WITH BORROWERS.  GUARANTOR WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE FOREGOING WAIVER WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**SECTION 21.  Judicial Proceedings.** Any judicial proceeding brought against Guarantor with respect to this Agreement may be brought, at the election of Lender, in any state or federal court of competent jurisdiction located in (i) in any courts of the jurisdiction in which the Vessel or any Collateral is located or registered; (ii) the State of Florida, Miami-Dade County, United States of America, or (iii) any other Competent Court that the Lender will choose, and, by execution and delivery of this Agreement, Guarantor accepts, generally and unconditionally, the nonexclusive jurisdiction of such courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement or any document hereby contemplated. Guarantor hereby waives personal service of process and consents that service of process upon it may be made by courier service (e.g. DHL) at its address specified above and service so made shall be deemed completed upon delivery by the courier to the address specified above.

GUARANTOR HEREBY IRREVOCABLY APPOINTS ALLEY, MAASS, ROGERS & LINDSEY, P.A. AS AGENT FOR SERVICE OF PROCESS FOR THE PURPOSES HEREOF. GUARANTOR HEREBY AGREES THAT LENDER MAY EFFECT SERVICE OF PROCESS UPON THE UNDERSIGNED BY MAILING PROCESS VIA MAIL OR COURIER TO ALLEY, MAASS, ROGERS & LINDSEY, P.A., 340 Royal Poinciana Plaza, Palm Beach, FL 33480. GUARANTOR IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY SUMMONS,

COMPLAINT OR OTHER PROCESS. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY MANNER PERMITED BY APPLICABLE LAW.

Any judicial proceeding by Guarantor against Lender involving, directly or indirectly, any matter in any way arising out of, related to, or connected with this Agreement or the Loan Documents or any document hereby or thereby contemplated shall be brought only in a state or federal court located in Miami-Dade County, State of Florida, United States of America, or any other Court that Lender will choose.   All proceedings in any such tribunal, whether the action is brought by Lender or Guarantor or any third party, shall be conducted in the English language if permitted by the applicable tribunal.

**SECTION 22.  Waiver of Immunity.**  To the extent that the Guarantor may in any jurisdiction claim for himself, the Borrowers or the real or personal property of either, immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to the Guarantor, the Borrowers or the property of either, such immunity (whether or not claimed), the Guarantor hereby waives (and will not raise on behalf of the Borrowers) such immunity to the full extent permitted by the laws of such jurisdiction.

**SECTION 23.  Consequential Damages.**  Guarantor hereby fully waives any claim or right now or hereafter existing against Lender for any incidental, special, or consequential damages whether based on contract, warranty, tort (including negligence and strict liability), or otherwise.

**SECTION 24.  Waiver.** Nothing herein shall be construed to waive or discharge any of Lender's claims or rights for any Event of Default that has occurred or is occurring under the Loan Documents.

**SECTION 25. Mortgage and Security Agreement**. This Guaranty is given in accordance with that certain Security Agreement and Second Preferred Ships Mortgage of even date herewith and is secured by the security interests and liens granted thereunder and pursuant to other documents, agreements, and instruments executed in connection therewith.

- SIGNATURES ON FOLLOWING PAGE

IN WITNESS WHEREOF, Guarantor has executed this Agreement in favor of Lender on the day, month and year first written above.

GUARANTOR:

**BG BIG BOAT, LTD.**

By: _____
Stacey Vogel, Director

STATE OF FLORIDA
COUNTY OF Braward

The foregoing instrument was acknowledged before me this 20 day of July, 2017, by **STACEY VOGEL**, as director of Guarantor.   He is <u>personally known</u> to me or has produced _____ as identification.

_____
NOTARY PUBLIC
Printed Name: KIRSTIE WARD

Jan 26, 18
My Commission Expires:

Notary Stamp:

KIRSTIE WARD
Notary Public - State of Florida
My Comm. Expires Jan 26, 2018
Commission # FF 059778
Bonded Through National Notary Assn.

5300402540

## FIRST ADDENDUM TO TERM NOTE

THIS FIRST ADDENDUM ("Addendum") to that certain Term Note dated January 14, 2015 (the "Note"), is made and entered into by and between·IBERIABANK, a Louisiana state-chartered bank, and its successors and assigns as their interest may appear, with its office at 200 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, FL 33301 ("Lender"), and BG·CAPITAL MANAGEMENT SOUTH FLORIDA, LLC, a Florida limited liability company ("BG CAPITAL"), and BG 1 LAZZARA, LLC, a Florida limited liability company ("BG 1," and together with BG CAPITAL, collectively, jointly, and severally, the "Borrower"), on the other.

WHEREAS, the Borrower applied to Lender for a secured loan in the amount of $1,715,000.00 in the form of a term loan (the "Loan");

WHEREAS, the Loan was approved by Lender subject to the Term Note, the Loan Agreement, the Guaranty and other Loan Documents dated January 14, 2015 (the "Loan Documents");

WHEREAS, Events of Default have occurred in connection with the Loan;

WHEREAS, it is in Borrower's best interest to agree to the amended terms required by Lender;

WHEREAS, in exchange for $10.00 and other good and valuable consideration, the receipt of which are hereby acknowledged, the parties hereby agree as follows:

1. **Guarantors.** All references in the Note to "Guarantor" or "Guarantors" will be deemed to include the Corporate Guarantor, BG BIG BOAT LTD.

2. **Vessels.** All references in the Note to the "Vessel" will be replaced with the Vessels.

3. **Miscellaneous.** In the event of any conflict between the terms herein and the Note, as amended, this First Addendum will govern·and control. Except as amended hereby, the Note is ratified and declared to be in full force and effect. All capitalized terms not defined herein shall have the meanings as set forth in the Loan Agreement.  Nothing herein shall be construed to waive or discharge any of Lender's claims or rights for any Event of Default that has occurred or is occurring under the Loan Documents.

[SIGNATURE PAGE FOLLOWS]

# COMPOSITE EXHIBIT C

The undersigned parties have executed this First Addendum to the Note as of the dates set forth below their names.

**Borrower:**

BG 1 LAZZARA, LLC,

a Florida Limited liability company

By: _____

Name: Robert Genovese

Title: Manager

Date: July 20, 2017

BG CAPITAL MANAGEMENT SOUTH

FLORIDA, LLC, a Florida limited liability company

By: _____

Name: Robert Genovese

Title: Manager

Date: July 20, 2017

## FIRST ADDENDUM TO LOAN AGREMENT

THIS FIRST ADDENDUM ("Addendum") to that certain Loan Agreement dated January 14, 2015 (the "Loan Agreement"), is made and entered into by and between IBERIABANK, a Louisiana state-chartered bank, and its successors and assigns as their interest may appear, with its office at 200 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, FL 33301 ("Bank"), and BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC, a Florida limited liability company ("BG CAPITAL"), and BG 1 LAZZARA, LLC, a Florida limited liability company ("BG 1," and together with BG CAPITAL, collectively, jointly, and severally, the "Borrower"), on the other.

WHEREAS, the Borrower applied to Bank for a secured loan in the amount of $1,715,000.00 in the form of a term loan (the "Loan");

WHEREAS, the Loan was approved by Bank subject to the Term Note, the Loan Agreement, the Guaranty and other Loan Documents dated January 14, 2015 (the "Loan Documents");

WHEREAS, Events of Default have occurred in connection with the Loan;

WHEREAS, it is in Borrower's best interest to agree to the amended terms required by Bank;

WHEREAS, the Original Loan was approved by Lender subject to the Term Note, the Loan Agreement and other Loan documents dated January 14, 2015 (the "Original Loan Documents");

WHEREAS, in exchange for $10.00 and other good and valuable consideration, the receipt of which are hereby acknowledged, the parties hereby agree as follows:

1. Section 1.1 – Certain Definitions.

   a. The definitions of "Collateral," "Guarantor," "Loan Documents," "Mortgages" and "Vessel" are deleted in their entirety and replaced with the following, respectively:

   "Collateral" means the Lazzara Vessel and the Feadship Vessel, and each of their engines, equipment and appurtenances, the proceeds from the sale thereof, and all other property encumbered by any security documents form the Borrower or Guarantors to Bank which secure the Note, together with all property of each Borrower or Guarantor that for any purpose, whether in trust for any Borrower or Guarantor for custody, pledge, collection or otherwise, is now or hereafter in the actual or constructive possession of, or in transit to, the Bank in any capacity, its correspondents or agents, and the right of set-off against all deposits and credits of the Borrower and each Guarantor with, and all claims of the Borrower or each Guarantor against, the Bank at any time existing, including, without limitation, any deposit account maintained by Borrower at the Bank.

   "Guarantor" includes the Corporate Guarantor and the Individual Guarantor.

   "Loan Documents" means those documents set forth in Section 3.1 hereof, and any other agreements, instruments, documents or certificates heretofore, now or from time to time hereafter executed by or on behalf of Borrower, or at the request of the Bank and delivered to Bank in connection therewith or pursuant thereto, including, without limitation, the Mortgages on the Lazzara Vessel and the Feadship Vessel, the Note, the Security Agreement, the UCC financing statement, and guaranties, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time and all extensions, renewals or substitutions thereof or therefore.

   "Mortgages" means the Preferred Ship mortgage covering the Lazzara Vessel and the Second Preferred Marshall Islands Vessel Mortgage covering the Feadship Vessel, in form and substance satisfactory to the Bank to grant Bank a lien and ship mortgage on the Vessels, and any amendments and modifications thereof, which, in the case of the Lazzara Vessel, shall attain

first priority and shall be established, maintained and perfected as a first preferred ship mortgage upon filing, and in the case of the Feadship Vessel shall attain second priority and shall be established, maintained and perfected as a second preferred ship mortgage upon filing.

"Vessels" means (a) the Lazzara Vessel (as defined herein); and (b) the Feadship Vessel (as defined herein).

b.   The following definitions are added to Section 1.1.

"Corporate Guarantor" means BG BIG BOAT, LTD., a Cayman Islands company.

"Feadship Vessel" means the *BG*, a 1990 154' Feadship Motor Yacht, its engines, equipment and appurtenances, Official Number **71061**, currently documented with the Republic of the Marshall Islands.

"Individual Guarantor" includes Robert Genovese, individually.

"Lazzara Vessel" means the *BG*, a 2009 75' Lazzara Motor Yacht, its engines, equipment and appurtenances, Official Number **1258306**, currently documented with the United States Coast Guard, under the name *BG* with a Hailing Port of Miami Beach, FL.

2.   Guarantors.  All references in the Loan Agreement to the "Guarantor" or "Guarantors" will be deemed to include the Corporate Guarantor and Individual Guarantor, as applicable, unless otherwise provided herein.

3.   Vessels.  All references in the Loan Agreement to the "Vessel" will be deemed to refer to the "Vessels," the Feadship Vessel and the Lazzara Vessel.

4.   Sections 3.1.c. and 3.1.d.  Sections 3.1.c and 3.1.d of the Loan Agreement are hereby deleted in their entirety and replaced with the following:

"3.1.c   Mortgages on the Vessels. Bank acknowledges having received a duly executed original copy of the preferred ship mortgage covering the Lazzara Vessel;

3.1.d   (i) Proof that the Mortgages on the Vessels are in a form so that they may be duly filed and recorded and accepted for filing and recording; (ii) abstracts or title searches showing the Mortgages constitute (1) the first lien on the Lazzara Vessel; and (2) the second lien on the Feadship Vessel; (iii) estoppel statements, releases of or satisfactions to release and file UCC termination statements of any liens or encumbrances on or affecting title to the Vessels, and other Collateral, including estoppel statements, releases or satisfactions of any existing mortgage and UCC filings, or equivalent in the applicable jurisdiction, on the Vessels and other Collateral; and (iv) such other documents, certificates, affidavits, indemnities and opinions as the Bank may require of the Borrower or Guarantors."

5.   Sections 3.1.i and 3.1.j.  Sections 3.1.i and 3.1.j of the Loan Agreement are hereby deleted in their entirety and replaced with the following:

"3.1.i   The duly executed Guaranty of each of the Guarantors.  Bank acknowledges having received a duly executed original copy of the Guaranty of Robert Genovese;

3.1.j   Assignments of Insurance, one covering the Lazzara Vessel and another one covering the Feadship Vessel.  Bank acknowledges having received a duly executed original copy of the Assignment of Insurance for the Lazzara Vessel."

6.   Section 3.1.q.  The following is added as Section 3.1.q.:

"3.1.q.  Security Agreement executed by the Corporate Guarantor;

7. <u>Section 4.14</u>. Section 4.14 of the Loan Agreement is hereby deleted in its entirety and replaced with the following:

"<u>Ship Mortgages</u>. The representations, warranties, covenants and conditions set forth in the Bank's Mortgages for the Vessels are incorporated herein by reference."

8. <u>Section 5.1.b.</u> The parties understand and acknowledge that the financial information and reporting requirements of Sections 5.1.b(i) only apply to the Individual Guarantor.

9. <u>Section 5.2.i.</u>   Section 5.2.i. is hereby deleted in its entirety and replaced with the following:

5.2.i.   <u>Unencumbered liquidity.</u>   During the term of the Loan, Individual Guarantor's unencumbered liquidity (in the form of cash or securities traded on public markets) shall not at any time fall below One Million Dollars and 00/100 ($1,000,000.00)."

10. <u>Section 7.14</u>.   Section 7.14 is hereby deleted in its entirety and replaced with the following:

"7.14   <u>Guarantors.</u> A Guarantor of the Obligations dies, becomes insolvent or incompetent or breaches the terms of its/his/her guaranty, unless the amount of its/his/her guaranty is paid and the Loan principal is reduced by the amount of such payment or other Guarantors or a new guarantor, in each case acceptable to the Bank, assumes the guaranty obligations of the Guarantor that dies, becomes insolvent or incompetent or breaches the terms of its/his/her guaranty."

11. <u>No Waiver</u>. By entering into this Addendum or by failing to require strict performance by Borrower of any of the terms or provisions of the Loan Agreement, the Note or any Loan Document, Bank does not waive, affect, diminish or modify such terms or provisions. Any suspension or waiver by the Bank of an Event of Default hereunder or under any Loan Documents or right or remedy hereunder or under any Loan Document shall not suspend, waive, release or affect any other Event of Default or right or remedy hereunder or under any Loan Documents. No Obligations of the Borrower, Events of Default or right or remedy hereunder or under any Loan Documents shall be deemed suspended or waived by the Bank unless such suspension or waiver is in writing signed by a duly authorized officer of the Bank and directed to Borrower detailing such suspension or waiver.

12.   <u>Miscellaneous</u>. In the event of any conflict between the terms herein and the Loan Agreement, this First Addendum will govern and control. Except as amended hereby, the Loan Agreement is ratified and declared to be in full force and effect. All capitalized terms not defined herein shall have the meanings as set forth in the Loan Agreement.

The undersigned parties have executed this First Addendum to the Loan Agreement as of the dates set forth below their names.

Witness One:
Signature: _____
Print Name: Maria Elena Ferrer

BORROWER:

BG 1 LAZZARA, LLC, a Florida Limited liability company

By: _____
Print Name: Robert Genovese
Title: Manager
Date: July 20, 2017

Witness Two:
Signature:)
Print Name: _Maria Elena Ferrer_

BG CAPITAL MANAGEMENT SOUTH
FLORIDA, LLC, a Florida limited
liability company

By: _____
Print Name: Robert Genovese
Title: Manager
Date: July _20_, 2017

STATE OF FLORIDA            )
COUNTY OF _Broward_         )

The foregoing instrument was acknowledged before me this _20_ day of July, 2017, by Robert
Genovese, as Manager of **BG 1 LAZZARA, LLC**, a Florida limited liability company, on behalf of
the company, and as Manager of **BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC**, a
Florida limited liability company, on behalf of the company.  He or she is personally known to me
or has produced _____ as identification.

_Kirstie Ward_

[NOTARIAL SEAL]                          NOTARY PUBLIC SIGNATURE

KIRSTIE WARD
Notary Public - State of Florida
My Comm. Expires Jan 26, 2018
Commission # FF 059778
Bonded Through National Notary Assn.

**AGREED AND ACCEPTED:**

**IBERIABANK**, a Louisiana state-chartered bank

By: _____
Name: _Maria Elena Ferrer_
Title: _Senior Vice President_

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Security Agreement") made as of the 20~~th~~ day of July, 2017, by and between **BG BIG BOAT, LTD.** with its principal place of business at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, PO Box 268, Grand Cayman KY1-1104 ("Owner") and IBERIABANK, a Louisiana state-chartered bank with offices at 200 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, FL 3301 ("Secured party").

WHEREAS, Owner's Affiliates, BG CAPITAL MANAGEMENT SOUTH FLORIDA, LLC, a Florida limited liability company ("BG CAPITAL") and BG 1 LAZZARA, LLC, a Florida limited liability company ("BG 1," and with BG CAPITAL, collectively, jointly and severally, hereinafter referred to as "Borrowers" and each individually as "Borrower"), applied to Secured Party for a secured loan in the amount of $1,715,000.00 in the form of a term loan (the "Loan");

WHEREAS, the Loan was approved by Secured Party subject to the Term Note, the Loan Agreement, the Guaranty and other Loan Documents dated January 14, 2015 (the "Loan Documents");

WHEREAS, Events of Default (as defined in the Loan Agreement) have occurred in connection with the Loan;

WHEREAS, as an Affiliate of Borrowers, Secured Party has required that Owner provide a guaranty of the Loan, a preferred second mortgage on the Vessel in favor of Mortgagee, and grant Secured party a security interest in the assets of Owner; and

WHEREAS, in connection with and in consideration of Secured Party's extension of the Loan, Owner has agreed to grant Secured party a security interest in the assets of Owner as set forth below.

NOW, THEREFORE, subject to the terms and conditions set forth in this Security Agreement, the parties hereto agree as follows:

1. <u>Grant of Security Interest</u>. In consideration of (i) the extension of the Loan as set forth in the Loan Agreement dated January 14, 2015, as amended by the First Addendum to Loan Agreement dated July __, 2017, from Secured party to Borrowers, Owner's Affiliates and (ii) any other loans, advances, or other financial accommodations at any time at or after the date hereof effectively made or extended by the Secured party to or for the account of Borrowers, directly or indirectly, as principal, guarantor or otherwise, including any obligations which Borrowers or Owner may have to the Secured Party (the "Indebtedness"), Owner hereby grants to Secured party a continuing priority security interest in, assignment of and right of setoff against, the Collateral described in Paragraph 2 hereof to secure the payment, performance and observance of (a) all obligations, liabilities and agreements of any kind of Borrowers to the Secured Party, now existing or hereafter arising, direct or indirect, absolute or contingent, secured or unsecured, due or not, arising out of or relating to the Indebtedness (all of the foregoing being herein referred to as the

12/19/17  10:19:02  JPD

"Obligations") and (b) all agreements, documents and instruments evidencing any of the foregoing or under which any of the foregoing may have been issued, created, assumed or guaranteed (collectively "Loan Documents").

2.  Collateral.  The "Collateral" in which a continuing priority security interest in favor of the Secured Party is hereby granted is described in Schedule "A" annexed hereto and made a part hereof and also includes all attachments and accessions now or hereafter affixed to the Collateral or used in connection therewith and all substitutions and replacements therefore, and all proceeds thereof (including, without limitation, claims of the Owner against third parties for loss, damage to or destruction of any Collateral) together with all money (as that term is defined in the Uniform Commercial Code of the State of Florida (the "UCC")), securities, drafts, notes, items and other property of Owner, and the proceeds thereof, now or hereafter held or received by or in transit to the Secured party from or for Owner, whether for safekeeping, custody, pledge, transmission, collection or otherwise, and any and all deposits (general or special), balances, sums, proceeds and credits of Owner with, and any and all claims of Owner against the Secured party at any time existing.

3.  Owner's Representations and Warranties.  Owner warrants, represents and covenants to the Secured Party that:

(a)       Owner is a duly organized and existing and in good standing under the laws of the Cayman Islands. Owner has full power and authority to carry out and perform its undertakings and obligations as provided herein.  The execution and delivery by Owner of this Security Agreement and the consummation of the transactions contemplated in this Security Agreement have been duly authorized by all proper or requisite corporate proceedings and will not conflict with or breach any provision of any agreement to which Owner is a part or by which it may be bound, the Certificate of Incorporation or Bylaws of Owner, or equivalent.  No consent, approval or authorization of, or filing, registration or qualification with, any Person, governmental, regulatory or otherwise, is required to be obtained or effected by Owner in connection with the execution, issuance, delivery and performance of this Security Agreement or, if so required, it has been duly obtained or effected before the date hereof. The execution, issuance, delivery and performance of this Security Agreement and the incurrence or performance of the Obligations and indebtedness of Owner hereunder, (i) has been duly and properly authorized by all necessary corporate, manager, member and other action of Owner, and (ii) has not resulted and will not result in: (1) the creation or imposition of any Lien, security interest, mortgage, charge or any encumbrance of any nature whatsoever (except in favor of Secured Party) upon any property or assets of Owner, including the Collateral; or (2) the violation or contravention of, the occurrence of a default, event of default or event, which with the passage of time or giving of notice or both, would constitute a default or event of default under, any term or provision, any order of any court, or any contract, agreement, mortgage indenture, instrument, judgment or Laws to which Owner is a party or signatory or by which Owner is bound.

(b)     The execution, delivery and performance by Owner of this Agreement does not and will not contravene any contractual restriction or, any law binding on or effecting Owner or any of its properties.

(c)     No consent or approval, notice to or waiver or other action is required for the due execution, delivery and performance by Owner of this Agreement.

(d)     This Agreement is a legal, valid and binding obligation of Owner, enforceable against Owner in accordance with its terms, except as maybe limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditor's rights generally and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or in law).

(e)     Owner is the owner of and has good and marketable title to all of the Collateral, free and clear of all liens and encumbrances of any kind and nature whatsoever except for liens already granted to the Secured party, if any, or are discharged at the time of execution of this Security Agreement and the funding of the Loan held by Secured Party.

(f)     The chief executive office and other places of business of Owner, the books and records relating to the Collateral and the Collateral are, and have been during the four (4) month period prior to the date hereof (or in the case of a new business, from the date of commencement of said business), located at the address set forth in the recitals hereinabove, and Owner will not change the same, or merge or consolidate with any person or change its name, without prior written notice to and consent of the Secured Party.

(g)     The Secured Party shall at all reasonable times have ready and free access to and the right to inspect the Collateral and any records pertaining thereto (and the right to make extracts from and to receive from Owner originals or true copies of such records and any papers and instruments relating to any Collateral upon request therefore) and Owner hereby grants to the Secured Party a security interest in all such records, papers and instruments to secure the payment, performance and observance of the Obligations.

(h)     Owner will, at its sole cost and expense, perform all acts and execute all documents requested by the Secured Party from time to time to evidence, perfect, maintain or enforce the Secured Party's first priority security interest granted herein or otherwise in furtherance of the provisions of this Security Agreement.

(i)     At any time and from time to time, Owner shall, at its sole cost and expense, execute and deliver to the Secured Party such financing statements pursuant to the UCC, applications for certificates of title, and other papers, documents or instruments as may be requested by the Secured Party in connection with this Security Agreement, and Owner hereby authorizes the Secured Party, at the Owner's expense, to execute and file at any time and from time to time one or more financing statements or copies thereof or of this Security Agreement with respect to the Collateral, signed only by the Secured Party.

(j)     In its discretion, the Secured Party may, at any time and from time to time, after a Default, as hereinafter defined, has occurred, in its name, the Owner's name or otherwise, notify any account Owner or obligor of any account, contract, document, instrument, chattel paper or general intangible included in the Collateral to make payment to or otherwise act at the direction of the Secured Party.

(k)     In its discretion, Secured Party may, at any time and from time to time, after a Default has occurred, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable by the Secured Party with respect to any Collateral, and/or extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release any Collateral or Obligations, all without notice. to or consent by Owner and without otherwise discharging or affecting the Obligations, the Collateral or the security interest therein created.

(l)     In its discretion, Secured Party may, at any time and from time to time, for the account of Owner, pay any amount or do any act required of Owner hereunder, which Owner fails to do or pay, and any such payment shall be deemed an advance by Secured Party to Owner payable on demand together with interest at the highest rate then payable on the Obligations.

(m)     Owner will pay the Secured Party for all sums, costs, and expenses which Secured Party may pay or incur pursuant to the provisions of this Security Agreement or in negotiating, executing, perfecting defending, or protecting the security interest granted herein or in enforcing payment of the Obligations or otherwise in connection with the provisions hereof, including but not limited to court costs, collection charges, travel expenses, and reasonable attorneys' fees, whether or not an action or proceeding is commenced, all of which, together with interest at the highest rate then payable on the Obligations, shall be part of the Obligations, be payable on demand and be secured hereby.

(n)     All proceeds and collections arising from or received with respect to accounts receivable or contract rights, if included in the Collateral, shall, but only in the event that a Default has occurred, be segregated, not be commingled with any other property of the Owner, be held in trust for the Secured Party by Owner and be delivered in kind by Owner to Secured Party or its designee, with any necessary endorsement or assignment thereon.

(o)     All proceeds of any Collateral received by Owner after the occurrence of a Default or the occurrence of an event which, with the passage of time, the giving of notice or otherwise would constitute a Default, shall not be commingled with other property of Owner, but shall be segregated, held by Owner in trust for the Secured Party, and immediately delivered to the Secured Party in the form received, duly endorsed in blank where appropriate to effectuate the provisions hereof, the same to be held by the Secured Party as additional Collateral hereunder or, at Secured Party's option, to be applied to payment of the Obligations, whether or not due and in any order the Secured Party may elect.

(p)     In its sole discretion, the Secured Party may, at any time and from time to time, assign, transfer or deliver to any transferee of any Obligations, any Collateral, whereupon the Secured Party shall be fully discharged from all responsibility and the transferee shall be vested with all powers and rights of Secured Party hereunder with respect thereto, but the Secured Party shall retain all rights and powers with respect to any Collateral not assigned, transferred or delivered.

(q)     The representations, warranties, covenants and conditions set forth in the Secured Party's Mortgage for the Vessel (as such term is defined in Schedule A) are incorporated herein by reference.

(r)     As of the date hereof, there are no claims, filed or threatened against Owner, the value of which exceeds Ten Thousand Dollars ($10,000.00).

(s)     Owner is the sole owner of all shares in the Vessel and has and shall have possession of the whole (100%) Vessel free from all liens, security interests or encumbrances whatsoever except for the security interests in favor of Secured Party, including under this Security Agreement and the Loan Documents. If Secured Party has to establish or contest title in the Vessel, or defend its security interest or mortgage lien, Owner shall be responsible for all of the Secured Party's expenses and losses including, without limitation, legal fees and expenses, and Owner shall indemnify Secured Party if anyone other than Owner or Secured Party claims an interest in the Vessel or any part of it.  Owner will keep the Vessel free of any mortgages, security interests, liens or encumbrances except in favor of Secured Party.

(t)     No notice from any governmental body or other party has been served upon Owner, claiming any violation of any applicable laws or requiring, or calling attention to, any material work, repairs, construction, alterations or installation on or in connection with the Vessel.  Owner has not received notice of any special tax assessment affecting the Vessel, or any of the Collateral.

(u)     All information provided by Owner, including, but not limited to, any information pertaining to a guarantor, to Secured Party is true, correct and complete on the date hereof and, unless amended by Owner with the consent of the Secured Party, at all times hereafter.

(v)     Owner has no other names nor is it doing business under any name other than its corporate name.

(w)     No Person has any option to acquire ownership of the Collateral or any portion thereof.

4.   Covenants. The Owner hereby covenants and agrees that, until the Obligations and indebtedness of the Owner to the Secured Party have been satisfied and discharged in full, the Owner will comply with the following covenants, unless the Secured Party shall give its prior written consent to the contrary:

(a)     The Owner shall pay, or cause to be paid, when due all principal and interest under the Note and all other Obligations in respect with this Security Agreement, the Note and the other Loan Documents.

(b)     Owner agrees to promptly, and in no event more than three (3) days after it becomes aware of the occurrence thereof, inform the Bank in writing, of any Default or events which with the giving of notice or lapse of time or both, would constitute a Default together with a description of the particulars thereof, how Owner intends to cure or avoid the Default and any writings or notices Owner has received or generated in connection with the Default or potential Default.

(b)     Owner will maintain the Collateral, in good condition and repair and in proper working order, normal wear and tear excepted, and will pay and discharge, or cause to be paid and discharged, when due, the cost of repairs, replacement or maintenance to the foregoing and all rentals or mortgage payments on the foregoing (including, without limitation, the completion of customary annual inspection, periodic dry dock work and other routine maintenance, in accordance with generally accepted industry practices and procedures in the ship ownership and management industry and as required by the classification and regulatory authorities). In the event Owner fails in the foregoing, Owner hereby authorizes, without requiring the Secured Party, to perform the same and to incur such reasonable costs, fees and expenses in connection therewith which shall be payable on demand by the Owner as provided herein. Owner will cause the Vessel to be kept in such condition as will entitle her to the highest classification and rating of the applicable classification society for vessels of the same age and type without outstanding recommendations or notations; and annually on the anniversary hereof Owner will furnish to the Secured Party a certificate by the applicable classification society with respect to such Vessel that such classification is maintained. Owner will not make or permit to be made, any change in the classification of the Vessel by the applicable classification society or any substantial change in the structure, type or speed of the Vessel without first receiving the written approval thereof by the Secured Party.

(c)     Owner shall maintain and preserve, and shall cause its captain to maintain and preserve, all licenses, permits and authorizations necessary to own and operate the Vessel.

(d)     Owner shall pay, or cause to be paid, when due, all material indebtedness, lawful claims or demands with respect to the Collateral which, if unpaid, might result in, or permit the creation of, any lien or encumbrance on the Collateral, including, without limitation, all lawful claims for labor, materials and supplies, and, in general, do and cause to be done, everything reasonably necessary to fully preserve the rights and interests of Secured Party under this Agreement and the other Loan Documents. In addition, Owner shall at all times defend Secured Party's rights and interests in and to the Collateral, and the first priority position of said rights and interests against any and all claims of any person adverse to Secured Party and take all necessary or appropriate actions to *give* effect to Secured Party's first priority of rights and interests contemplated by this Agreement and the other Loan Documents.

(e)     Owner hereby absolutely and irrevocably assigns and transfers to the Secured Party all of Owner's right, title and interest in and to a maintenance, service, charter, demise, or other third-party contracts affecting the Collateral. Owner irrevocably appoints the Secured Party its true and lawful attorney-in-fact, at the option of the Secured Party at any time and from time to time, to demand, receive and enforce Owner's rights thereunder.

(f)     Owner will maintain at all times in full force and effect fire, theft, and "all risk" marine hull and machinery and protection and indemnity insurance on the Vessel, and such other insurance covering such risks and perils, upon such terms and in such amount and with such endorsements as the Secured Party may reasonably require, including without limit, pollution, environmental coverage and seizure coverage. In addition to protecting Owner, the insurance must protect the Secured Party as a loss payee and as an additional insured (without liability for payment of premium), but only to the extent that the insurance company agrees to list the Secured Party as an additional insured, and must be written for at least one year at a time. The amount of Owner's marine hull and machinery insurance shall not be less than the market value of the Vessel or 120% of the unpaid amount of the Loan, whichever is greater (except as otherwise restricted by law). The underwriter and maximum deductible on Owner's insurance must be reasonably satisfactory to the Secured Party. The Secured Party may sign any proof of loss and endorse any check, draft, or other form of payment issued by the insurance company or its agent as a loss payment, and Owner hereby appoints the Secured Party as Owner's attorney-in-fact for this purpose. This power of attorney shall not be affected by Owner's disability. Proceeds of the insurance may be used either to repair the Vessel or to reduce the Indebtedness, in the Secured Party's discretion. If Owner's insurance lapses or is canceled at any time before this Mortgage is fully paid and performed, the Secured Party must be given prompt notice of said lapse or cancellation. In the event of lapse or cancellation, or in the event of Owner's failure to pay any premiums when due or otherwise to provide or maintain insurance coverage, the Secured Party may, but is not obligated to, buy replacement coverage protecting Owner and the Secured Party or the Secured Party alone. In such event, Owner will repay the premiums at the Secured Party's request with interest at the rate in effect under the Note. Owner shall procure breach of warranty endorsements or separate the Secured Party's single interest coverage in an amount at all times equal to or greater than the Owner's indebtedness to the Secured Party as set forth in the Note, such that no act or omission of Owner, or any charterer, or breach of any warranty, including breach of any warranty of seaworthiness, whether express or implied, shall operate to forfeit the Secured Party's coverage under the above policies or result in a cancellation of insurance as to the Secured Party. Owner shall maintain insurance coverage in accordance with this section during any freight or similar shipment of the Vessel, and the Secured Party shall be listed as an additional insured and loss payee on such policy.

(g)     If the Vessel shall at any time, while subject to the lien hereof, be libeled, seized, detained, levied or attached under process or color of legal authority for any cause whatsoever (individually or collectively the "Seizure"), Owner will within forty-eight (48) hours of the Seizure notify the Secured Party in writing and, without expense to the Secured Party, within fourteen (14) days from the Seizure, either cause the Vessel to be released by filing an undertaking or stipulation or otherwise as may be lawfully permitted or furnish the Secured Party additional security of a value

acceptable to the Secured Party. If Owner shall fail or neglect to furnish additional security to the Secured Party or otherwise to release the Vessel from the Seizure, the Secured Party may (but need not) furnish security to release the Vessel, and if, as a result of the Seizure, the Vessel shall be sold at a marshal's sale or otherwise under legal process, any insurance money, excess proceeds and other sums recoverable with respect to the Vessel shall be paid to the Secured Party and shall be applied against the Indebtedness. In the event of a Seizure, Owner authorizes the Secured Party to disclose any information which the Secured Party deems necessary to protect the Secured Party's interest in the Vessel and Owner further authorizes the Secured Party or the Secured Party's agents in Owner's name and as Owner's attorney in fact to: (i) receive or take possession of the Vessel; (ii) defend any action and/or discharge any lien; and (iii) refer the protection of the Secured Party's interest to an attorney who is not the Secured Party's salaried employee and receive from Owner reasonable attorneys' fees. This power of attorney shall not be affected by Owner's disability.

(h) Owner shall not operate the Vessel except in accordance with its Certificate of Registry. The Vessel shall always be under the command of a Master licensed by or having a certificate of competence issued by a country acceptable to the **Republic of the Marshall Islands** maritime authorities, and who meets the requirements of the Vessel's insurance policy.

(i)      Owner hereby agrees, represents and warrants that the Vessel is not and shall not be used as Owner's principal dwelling place. The Vessel may be operated only for pleasure and may not be used for any commercial purposes, unless the Secured Party otherwise agrees in writing. The Vessel may be operated only within the geographical limits and other requirements of the marine insurance covering the Vessel. If the Vessel is chartered, Owner agrees to and Owners hereby assigns to the Secured Party all charter hire and all other payments received in consideration for said charter as additional security for this Agreement. Owner shall keep all dockage charges current. Owner shall not use, nor allow the use of, the Vessel for any illegal purpose or contrary to any provision of the laws, treaties, regulations or orders of the Republic of the Marshall Islands or other jurisdiction in which the Vessel is operated. If Owner takes the Vessel to another country, Owner will comply with all pertinent treaties between the Republic of the Marshall Islands and such country, and all laws and applicable regulations of such country. The illegal commerce in, or possession, carriage, or use of any firearms or controlled substance whatsoever on or about the Vessel is absolutely prohibited.

(j) Owner will not, without the Secured Party's prior written consent, move the Vessel from the place(s) as stated in the Loan Documents where it is customarily moored in the summer or stored in the winter, as the case may be, or from the State of the Vessel's principal use, other than for voyages with the intent of returning.

(k) Owner will not, without the Secured Party's prior written consent, sell or mortgage the Vessel, pledge it as security for another loan, give it away, lease, or otherwise use it in a manner or for purposes contrary to those specified in this Agreement. Owner shall not, without receiving written permission from Secured Party, charter the Vessel under any bareboat or demise charter

agreement (all charters entered into by the Owner to be crewed charters in full compliance with all applicable laws and regulations).

(l)    Owner agrees that it shall bear the risks of loss with respect to the Collateral and will indemnify Secured Party, and cause to have indemnified, and hold the Secured Party harmless from any and all claims, demands, liabilities, losses, damages, diminutions of value, costs and expenses relating to or in any way arising out of or from any possession, use, operation, control, sale, disposition or collection of any of the Collateral, except to the extent the foregoing are caused directly by the Owner's gross negligence or willful misconduct. Owner hereby releases the Secured Party from any and all claims or causes of action, which Owner may have, now or hereafter, relating to the foregoing, except those arising from the Secured Party's gross negligence or willful misconduct.

(m)   Without the prior written consent of the Secured Party, Owner shall make any material change in its capital structure or in the ownership structure of Owner.

(n)   Owner shall not, directly or indirectly, create, assume, incur, become or be liable for or with respect to any manner of obligations, subordinate loans, liabilities or indebtedness whatsoever to any Person, or by way of any guaranty that may give rise to a lien, security interest, or other encumbrance against the Collateral.

(o)   Owner shall not, without the Secured Party's prior written consent: (i) change its corporate name or adopt an assumed corporate name, change its jurisdiction of incorporation or corporate or organization structure, or change its organizational identification number; (ii) sell all or any substantial portion of its assets; or (iii) register the Vessel in a jurisdiction other than the Marshall Islands.

5.  Default.  Any of the following events or occurrences shall constitute a "Default" under this Agreement and the Obligations:

(a)      The failure of the Owner, or any other person or entity responsible, to make punctual payment of any sum payable hereunder, upon the Obligations or under any Loan Document;

(b)      The failure of the Owner, or any other person or entity responsible, to timely perform any Obligations to be performed by them hereunder, with respect to the Obligations or under any Loan Document; and

(c)      With respect to the Owner, any maker, endorser or guarantor of, or any other party to the Obligations, each of whom is included in the term "them" as used in this paragraph; any failure to perform with respect to any liabilities or obligations to, or agreements with, Secured Party; death or dissolution; death of any shareholder/member of a corporation, partnership, limited liability company or other form of entity included in the term "them"; insolvency; calling of a meeting of creditors; making or sending a notice of an intended bulk transfer, suspension or liquidation of usual business; failure when required to furnish Secured Party with any financial

information or to permit Secured Patty to inspect books and records; making any misrepresentation to Secured Party in obtaining credit; failing to pay or remit any tax when assessed or due; commencement of a voluntary or involuntary proceeding under any Federal or State bankruptcy law now or hereinafter in existence; application for the appointment of a receiver or liquidating agent or similar person; entry of a judgment against any of them (but excepting any judgment of any amount which is covered by liability insurance); issuance of an order of attachment against any of their property; failure of any of them to comply at any time with Regulation U of the Federal Reserve Board; or if at any time in the reasonable opinion of the Secured Party, the financial responsibility of any of them should become impaired.

(d)     There shall have occurred the execution of process, arrest, seizure, notice of claim of lien or forfeiture against the Vessel, or the Vessel shall be made the subject of legal proceedings, and its continuance for more than fourteen (14) days without bonding or other release thereof. It shall also be an Event of Default for Owner to allow the Vessel to lessen in value, other than through normal depreciation, such that the Secured Party believes in good faith that the Secured Party's interest is no longer adequately protected.

(e)     If any insurer of any policy of insurance respecting a material portion of the Collateral issues any notice of cancellation of such a policy which is not cured or such coverage replaced within ten (10) days after such notice is issued, or any such policy is allowed to lapse and is not replaced by a substitute policy having an effective date prior to or contemporaneous with such cancellation or lapse.

(f)     Owner has made a false or misleading statement about any fact on this Security Agreement or any of the Loan Documents.

6.  Rights Upon Default.  Upon the occurrence of any Default and at any time thereafter, the Secured Party shall have the right to declare the Obligations, or any of them, immediately due and payable without notice, demand or protest, all of which are hereby waived, and shall have the following rights and remedies of a secured party under the UCC or available to the Secured Party under the Obligations or Loan Documents; all such rights and remedies being cumulative, not exclusive and enforceable alternatively, successively or concurrently:

(a)     The right to enter at any time and from time to time, with or without judicial process or the aid and assistance of others, any premises where any Collateral may be located;

(b)     set off Owner's liability against or foreclose any funds of Owner held by the Secured Party or its affiliates in an account of general deposit (other than IRA accounts, Keogh pension plan accounts or similar accounts);

(c)     demand that Owner assemble and deliver the Vessel to the Secured Party at such location as the Secured Party may reasonably require (however, Owner' delivery of the Vessel will not relieve Owner of Owner's obligation to satisfy any deficiency which may arise upon the subsequent sale or other disposition of the Vessel;

(d)    lawfully enter any premises where the Vessel may be located and repossess the Vessel, with or without judicial process or judicial decree;

(e)    sell or otherwise dispose of the Vessel;

(f)    bring suit at law, in equity, or in admiralty to foreclose the Secured Party's security interest and/or recover judgment for any and all amounts due under this Agreement;

(g)    pursue any other remedy provided to the Secured Party under any applicable law or other Loan Document; and

(h)    require that Owner pay court costs and any reasonable amount spent for repossessing, storing, preparing for sale, or selling the Vessel, and any and all other foreclosure costs to the extent permitted by applicable law.

If the Secured Party repossesses the Vessel without judicial process, the Secured Party may, in Owner's name or in the Secured Party's name, sell, lease, charter, operate or otherwise use the Vessel as the Secured Party deems advisable, without being responsible for loss or damage, and the Secured Party may keep the Vessel at Owner's premises or elsewhere, at Owner's expense. For this purposes and subject to any applicable state regulation, the Secured Party is irrevocably appointed Owner's true and lawful attorney-in-fact to make all necessary transfers of the Vessel, to pay, defend or obtain the release of all maritime liens, to waive and release any warranties at disposition, and to take all related actions in Owner's name and stead as may be necessary and appropriate to enforce the Secured Party's rights under this Agreement. The proceeds of sale or other disposition of the Vessel shall be applied in accordance with applicable law.  To the extent permitted by applicable law, any late charges, costs of retaking the Vessel, storage, costs of sale including but not limited to cleaning, repairing and/or maintenance expenses, auctioneer's fee, sales commission, if any, and advertising, insurance, allowable attorneys' fees, collection costs, court costs, and any other necessary expenses will be paid first from the proceeds of the sale or other disposition of the Vessel.  Next, all accrued interest to date of payment and any and all other sums (other than Principal) due pursuant to the terms of this Agreement shall be paid. Finally, the outstanding Principal shall be paid. Any surplus of proceeds of sale or disposition of the Vessel over the amounts of such charges and expenses and amounts owed to Secured Party shall be paid to Owner to the extent that such surplus is not required to be paid to other persons with liens on the Vessel. To the extent permitted by applicable law, the Owner shall be liable for any deficiency.

7. Preservation of Collateral. The Secured Party may, but is not required to, take such action from time to time as the Secured Party reasonably deems appropriate to maintain or protect the Collateral. The Secured Party shall have exercised reasonable care in the custody and preservation of the Collateral if it takes such action as the Owner shall reasonably require in writing; provided, however, that such request shall not be inconsistent with the Secured Party's status as a secured party, and the failure of the Secured Party to comply with any such request

shall not be deemed a failure to exercise reasonable care. In addition, any failure of the Secured Party to preserve or protect any rights with respect to the Collateral against prior or third parties, or to do any act with respect to preservation of the Collateral, not so requested by the Owner, shall not be deemed a failure to exercise reasonable care in the custody or preservation of the Collateral. Owner shall have the sole responsibility for taking such action as may be necessary, from time to time, to preserve all rights of the Owner and the Secured Party in the Collateral against prior or third parties.

8. <u>Other Actions as to any and all Collateral</u>.  Owner further agrees to take any other action reasonably requested by the Secured Party to ensure the attachment, perfection and first priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral including, without limitation, (a) executing, delivering, and where appropriate, filing financing statements and amendments, relating thereto under the Uniform Commercial Code in any state the Secured Party deems appropriate, to the extent, if any, that Owner's signature thereon is required therefor, (b) causing the Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (c) complying with any provision of any statute, regulation or treaty of the Republic of the Marshall Islands, Cayman Islands, the State of Florida, the United States, or with other law as applicable in any foreign jurisdiction, as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (d) obtaining Marshall Islands, Cayman Islands, U.S., and foreign governmental and other third party consents and approvals required, including without limitation, any consent of any licensor, lessor or other Person obligated on Collateral, (e) obtaining waivers from mortgages in form and substance reasonably satisfactory to the Secured Party, and (f) taking all actions required by the Uniform Commercial Code, or by other law, as applicable, in any relevant jurisdiction, or by other law as applicable in any foreign jurisdiction.

9. <u>Application of Proceeds Received</u>. The Secured Party may apply the sale proceeds actually received from any sale or other disposition to the reasonable expenses of retaking, holding, preparing for sale, selling, leasing and the like, to reasonable attorneys' fees and all travel and other expenses which may be incurred by Secured Party in attempting to collect the Obligations or enforce this Security Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Security Agreement; and then to the Obligations in such order and as to principal, or interest or other charges as the Secured Party may desire; and Owner shall remain liable and will pay the Secured Party, on demand, any deficiency remaining, together with interest thereon at the highest rate then payable on the Obligations and the balance of any expenses unpaid, with any surplus to be paid to Owner, subject to any duty of the Secured Party, imposed by law, to the holder of any subordinate interest in the Collateral actually known to the Secured Party. The Secured Party may appropriate, set off and apply to the payment of the Obligations, any Collateral in or coming into the possession of the Secured Party or its agents, without notice to Owner and in such manner as Secured Party may in its discretion determine.

10. Attorney-In-Fact. To effectuate the terms and provisions hereof, Owner hereby designates and appoints the Secured Party and its designees or agents as attorney-in-fact of Owner, irrevocably and with full power of substitution, with authority, after the occurrence of a Default, to: receive, open and dispose of all mail addressed to Owner and notify the Post Office authorities to change the address for delivery of mail addressed to Owner to such address as Secured Party may designate; endorse the name of Owner on any notes, acceptances, checks, drafts, money orders, instruments or other evidences of Collateral or the proceeds thereof that may come into the Secured Party's possession; sign the name of Owner on any invoices, documents, drafts against and notices to account Owners or obligors of Owner, assignments and requests for verification of accounts; execute proofs of claim and loss; execute endorsements, assignments of other instruments of conveyance or transfer; adjust and compromise any claims under insurance policies or otherwise; execute releases; and do all other acts and things necessary or advisable in the sole discretion of the Secured Party to carry out and enforce this, Security Agreement and/or the Obligations. All acts done under the foregoing authorization are hereby ratified and approved and neither Secured Party nor any designee or agent thereof shall be liable for any acts of commission or omission, for any error of judgment or for any mistake of fact or law. This power or attorney being coupled with an interest is irrevocable while any Obligation shall remain unpaid.

11. Miscellaneous. The Secured Party shall not be deemed, by its acceptance of this Security Agreement, to have assumed any responsibility, or obligation or duty with respect to, any of the Collateral or its use, or any matter or proceeding arising out of or relating thereto, including without limitation, any obligation or duty to take action to collect, preserve or protect its or Owner's rights in the Collateral. Owner hereby releases the Secured Party from any claims, causes of action and demands at any time arising out of or with respect to this Security Agreement, the Obligations, the Collateral or its use or disposition, and Owner hereby agrees to hold the Secured Party harmless from and with respect to any and such claims, causes of action and demands relating thereto. The Secured Party's prior recourse to any Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of the Obligations. No act, omission or delay by the Secured Party shall constitute a waiver of its rights and remedies hereunder or otherwise. No single or partial waiver by the Secured Party of any Default or right or remedy which it may have shall operate as a waiver of any other Default, right or remedy or of the same Default, right or remedy on a future occasion. Owner hereby waives presentment, notice of dishonor and protest of all instruments included in or evidencing the Obligations of the Collateral, and all other notices and demands whatsoever (except as expressly otherwise provided herein). In the event of any litigation with respect to any matter connected with this Security Agreement, the Obligations or the Collateral, Owner hereby waives the right to a trial by jury. Owner hereby irrevocably consents to the jurisdiction of the Courts of the State of Florida and of any Federal Court located in such State in connection with any action or proceeding arising out of or relating to the Obligations, this Security Agreement or the Collateral, or any document or instrument delivered with respect to any of the Obligations. Notwithstanding the foregoing, (i) the Secured Party shall have the right to bring any action or proceeding against the Owner or any obligor, or their property in the courts of any other jurisdiction the Secured Party may deem necessary and appropriate in order to enforce its rights and remedies under the Loan Documents

or any related documents, and (ii) the Owner and the Secured Party each acknowledge that any appeals from the aforesaid courts may have to be heard by a court located outside the jurisdiction of the jurisdiction of such courts. Owner hereby waives personal service of any process in connection with any such action or proceeding and agrees that the service thereof may be made by certified or registered mail directed to Owner at any address of Owner set forth in this Security Agreement. Owner so served shall appear or answer to such process within thirty (30) days after the mailing thereof. Should Owner so served fail to appear or answer within said thirty (30) day period, Owner shall be deemed in default and judgment may be entered by Secured Party against Owner for the amount requested and such other relief as may be demanded in any process so served. ill the alternative, in its discretion, Secured Party may effect service upon Owner in any other form or manner permitted by law. All terms herein shall have the meanings as defined in the UCC, unless the context otherwise requires. No provision hereof shall be modified, altered or limited except by a written instrument expressly referring to this Security Agreement and to such provision, and executed by the party to be charged. This Security Agreement and all Obligations shall be binding upon the successors, or assigns of Owner and shall, together with the rights and remedies of the Secured Party hereunder, inure to the benefit of the Secured Party and its successors, endorsees and assigns, This Security Agreement and the Obligations shall be governed, enforced and controlled by and in accordance with the laws of the State of Florida, without regard to any laws, rules or regulations concerning conflict of laws that might result in the application of the laws of any other jurisdiction. Provided, that matters pertaining to the perfection of liens and the enforcement of remedies with respect to Collateral shall be governed by the laws of the jurisdiction where the Mortgage is filed or the Collateral is located, as applicable, to the extent such local laws are mandatorily applicable to such issues. Notwithstanding the foregoing, Secured Party reserves the right to exercise any of the remedies available to a secured lender under the laws of, including the maritime laws or Uniform Commercial terms hereof shall in no way be affected thereby. The Secured Party is authorized to annex hereto the schedules and exhibits, if any, referred to herein; Owner acknowledges receipt of a copy of this Security Agreement. If the provisions of this Security Agreement should conflict with the terms and provisions of any loan or line of credit agreement entered into by the Owner with the Secured Party in connection with the Obligations, the terms and provisions of the loan or line of credit agreement shall control any conflicting terms and provisions herein contained. The Secured Party's failure, at any time or times hereafter, either to require strict performance by Owner of any provisions of this Security Agreement, the Note or any other Loan Document, or to enforce the Secured Party's rights under such terms or provisions, shall not waive, effect or diminish or modify such terms or provisions, notwithstanding any conduct or custom, actual or implied, of the Secured Party to the contrary or in refraining from so doing at any time or times. Any suspension or waiver by the Secured Party of a Default hereunder or under any Loan Documents or right or remedy hereunder or under any Loan Document shall not suspend, waive, release or affect any other Default or right or remedy hereunder or under any Loan Documents. No Obligations of the Owner, Default or right or remedy hereunder or under any Loan Documents shall be deemed suspended or waived by the Secured Party unless such suspension or waiver is in writing signed by a duly authorized officer of the Secured Party and directed to Owner detailing such suspension or waiver. From time to time, Owner shall sign and deliver to Secured Party such other and further documents and assurances as the Secured Party

may require to maintain the priority of this Security Agreement, the Note and other Loan Documents, and any other security interest the Secured Party has in the Vessel or other Collateral.

THE OWNER AND THE SECURED PARTY BY ACCEPTANCE OF THIS AGREEMENT, KNOWINGLY, VOLUNTARILY AND WITH ADVICE OF COUNSEL, HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN OR WITH RESPECT TO ANY PROCEEDING ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE LOAN DOCUMENTS, OR WITH RESPECT TO DEALINGS BETWEEN THE SECURED PARTY AND THE Owner CONCERNING ANY COURSE OF CONDUCT, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE SECURED PARTY TO PROVIDE CREDIT TO THE OWNER.

IN WITNESS WHEREOF, the undersigned have executed this Security Agreement to be effective as of the _____ day of July, 2017.

OWNER:

**BG BIG BOAT LTD,**
a Cayman Islands company

By: _____
Print Name: Stacey Vogel
Title: Director

SECURED PARTY:

**Iberiabank,**
a Louisiana state-chartered bank

By: _____
Print Name: Maria Elena Ferrer
Title: Senior Vice President

STATE OF FLORIDA            )
COUNTY OF BROWARD           )

The foregoing instrument was acknowledged before me this 20 day of July, 2017, by Stacey Vogel, as Director of **BG BIG BOAT LTD.**, a Cayman Islands company, on behalf of the company. He is personally known to me or has produced _____ as identification.

[NOTARIAL SEAL]                      NOTARY PUBLIC SIGNATURE

KIRSTIE WARD
Notary Public • State of Florida
My Comm. Expires Jan 26, 2018
Commission # FF 059778
Bonded Through National Notary Assn.

## SCHEDULE "A"

"Collateral" means the Vessel (as described below), its engines, equipment and appurtenances, the proceeds from the sale thereof, all present and future: (a) charter or management agreements covering the charter (whether on a bareboat, demise, voyage or time charter basis), lease, use or operation of the Vessel, together with the benefits, rights and remedies thereunder, including without limitation all charter hire payments, rents and other monies now or hereafter due or to become due pursuant to said agreements, whether now owned or hereafter acquired; and (b) all accounts, general intangibles (including payment intangibles and software), and any supporting obligations, including guaranties, whether now owned or hereafter acquired, arising out of the use or operation of, or otherwise related to, the Vessel or any charter concerning the Vessel; (c) all amounts due from underwriters under any insurance on the Vessel as payment of losses, or as return premiums, or otherwise; as well as (d) all cash and non-cash proceeds of any of the foregoing; together with and including all other property encumbered by any security documents from the Owner or Guarantors to Secured Party which secure the Note, together with all property of Owner or each Guarantor that for any purpose, whether in trust for Owner or any Guarantor for custody, pledge, collection or otherwise, is now or hereafter in the actual or constructive possession of, or in transit to, the Secured Party in any capacity, its correspondents or agents, and the right of set-off against all deposits and credits of the Owner and each Guarantor with, and all claims of the Owner or each Guarantor against, the Secured Party at any time existing, including, without limitation, any deposit account maintained by Owner at the Secured Party.

"Vessel" means the *"BG,"* a 1990 154' Feadship Motor Yacht, its engines, equipment and appurtenances, Official Number 71061, documented with the Republic of the Marshall Islands.

# Republic of the Marshall Islands

### Office of the Maritime Administrator

## CERTIFICATE OF OWNERSHIP AND ENCUMBRANCE
### of a vessel registered under Marshall Islands Flag

IT IS HEREBY CERTIFIED that as of August 28, 2017 at 12:58 P.M., E.D.S.T.,   according to the records of the Office of the Maritime Administrator of the Republic of the Marshall Islands, the vessel described hereunder:

IMO NO.: 1007952   OFFICIAL NO.: 71061   CALL LETTERS: V7LO5   TYPE: COMMERCIAL YACHT MOTOR

VESSEL NAME:  BG

DATE OF REGISTRATION:   March 26, 2015        GROSS TONS: 515        NET TONS: 154

BUILT AT:   AALSMEER, THE NETHERLANDS                    IN:  1990

PRESENT CERTIFICATE OF REGISTRY NUMBER: 11-17-CY            ISSUED: June 16, 2017

AT:  Geneva, Switzerland

is owned by:

| NAME | RESIDENCE | CITIZENSHIP | PROPORTION |
|------|-----------|-------------|------------|
| BG BIG BOAT, LTD. | CAYMAN ISLANDS | CAYMAN ISLANDS | 100% |

(Foreign Maritime Entity)

AND THAT there are on record in this Office the following mortgages, liens or other encumbrances, and no others:

FIRST PREFERRED MORTGAGE dated March 20, 2015, granted by BG Big Boat Ltd to IberiaBank in the total amount of US$3,500,000.00 and interest, expenses, fees, costs and performance of mortgage covenants; recorded on March 26, 2015 at 10:20 A.M., E.D.S.T. at Fort Lauderdale, Florida USA in Book PM 26 at Page 543.

SECOND PREFERRED MORTGAGE dated July 20, 2017, granted by BG Big Boat, Ltd. to Iberiabank in the total amount of US$1,715,000.00 and interest, expenses, fees, costs and performance of mortgage covenants; recorded on August 28, 2017 at 12:58 P.M., E.D.S.T. at Fort Lauderdale, Florida USA in Book PM 28 at Page 1662.

Issued by the Authority of the Government of the Republic of the Marshall Islands under my hand and seal at Fort Lauderdale, Florida USA on this 30th day of August, 2017 at 1:38 P.M., E.D.S.T.



Guy E. C. Maitland
Senior Deputy Commissioner of Maritime Affairs

Gloria E. Santos
Deputy Commissioner of Maritime Affairs

MI-223 (Rev. 9/24/13)

# REPUBLIC OF THE MARSHALL ISLANDS

## MARITIME OFFICE

### Ft. Lauderdale



**I HEREBY CERTIFY THAT** the within is a true copy of the instrument Received for record and

Recorded in BOOK ___ **PM28** ___ at PAGE ___ **1662** ___

on ___ **28-AUG-2017** ___

at ___ **12** ___ H ___ **58** ___ M ___ **PM** ___ T ___ **E.D.S.T.** ___ TZ

Name of Vessel: ___ **BG** ___

Official Number: ___ **71061** ___

GIVEN under my hand and seal this 28th day of August, 2017

_____
(Signature)

Gloria E. Santos
(Print Name)

Deputy Commissioner
for the Republic of the Marshall Islands

Rev. 5/26/11                                   MI-249